## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KIALEGEE TRIBAL TOWN** )<br>100 Kialegee Drive )<br>Wetumka, Oklahoma 74883, )<br> )<br>       Plaintiff, )<br>v. )<br> )<br>**DAVID L. BERNHARDT**, )<br>Secretary )<br>United States Department of the Interior )<br>1849 C Street, N.W. )<br>Washington, DC 20240 )<br> )<br>**KATUK MAC LEAN SWEENEY,** )<br>Acting Assistant Secretary for Indian Affairs )<br>United States Department of the Interior )<br>1849 C Street, N.W. )<br>Washington, DC 20240 )<br> )<br>**UNITED STATES DEPARTMENT OF** )<br>**THE INTERIOR** )<br>1849 C Street, N.W. )<br>Washington, DC 20240 )<br> )<br>       Defendants. ) | Civil Action: 1:21-cv-00590 |

---

### Plaintiff's Complaint for Declaratory and Injunctive Relief
[Previously Filed under No. 1:17-cv-01670 (CKK)]

### Introduction

1.      Pursuant to Federal Rule of Civil Procedure 15, Plaintiff Kialegee Tribal Town (hereinafter referred to as "Kialegee") hereby files its Amended Complaint for Declaratory and Injunctive Relief.

2.      The controversy at hand concerns only treaty rights.  Defendants claim that: Kialegee is not a part of the "Whole Creek Nation of Indians," as defined in Article 4 of the Creek Treaty of February 14, 1833, (7 Stat. 417), that Kialegee is not a beneficiary of Article 4 of said

treaty when it refers to "the property of the whole Muskogee or Creek Nation as well as those residing upon the land" and that does not exercise jurisdiction over its lands. Defendants' position is based entirely on the argument that treaties entered into between the United States of America and the "Whole Creek Nation of Indians" gave jurisdiction over lands only to Muskogee Creeks and not the "Whole Creek Nation of Indians." Defendants even consider the lands allotted to Kialegee members also to be solely under the jurisdiction of the Muskogee Creeks. As a result, the only and simple question to be determined is whether Kialegee, who are part of the historic Creek Nation, are included under the treaties signed by the historic Creek Nation. Plaintiff respectfully submits that history, law and logic overwhelmingly answer in the affirmative.

3.      Kialegee previously filed Case No. 1:17-cv-01670 (CKK), which was dismissed as not being ripe for lack of conduct by the Defendants. See "Memorandum Opinion" attached hereto as Exhibit "F" and made a part hereof. This Court ruled that Kialegee "needs to allege with some specificity the actions allegedly taken by "Federal Defendants", which give rise to Plaintiff's cause of action." (Case 1:17-cv-01670-CKK Document 34 Filed 09/07/18 Page 20 of 20). In addition, Footnote 11 of this Court's "Memorandum Opinion" states that "Federal Defendants indicate that "[i]t may be that in the future, after the IBIA issues its final decision on Plaintiff's challenge to the Regional Director's April 26, 2017 decision, Plaintiff will have an action for which it may want to seek judicial review[.]" Fed. Defs' Reply at 8." The United States Department of Interior has now recently erroneously ruled that the Kialegee "does not exercise jurisdiction over any area of Indian Country" and rejected a Liquor Control Ordinance to the Bureau of Indian Affairs. See Decision Attached hereto as Exhibit G and made a part hereof.

2

**Parties**

4.      Kialegee is an Indian Tribe that is federally-recognized pursuant to the provisions of the Oklahoma Indian Welfare Act of June 26, 1936, 49 Stat. 1967 ("OIWA").  Plaintiff Kialegee submits that it, as a federally-recognized Indian Tribe and member of the historic Creek nation, has jurisdiction over all lands within the Creek Reservation as land owned in common with two other federally-recognized Creek Tribal Towns and the federally-recognized Muskogee Creek Nation ("MCN"), in accordance with treaties entered between Kialegee and the United States and as read in context with the Indian Canon of Construction.

5.      Sued in his official capacity, David L. Bernhardt is Secretary of the United States Department of the Interior.

6.      Sued in his official capacity, Tara Katuk Mac Lean Sweeney is Acting Assistant Secretary for Indian Affairs, United States Department of the Interior.  The United States Department of the Interior is an executive department of the government of the United States of America.

**Jurisdiction**

7.      This Court has jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. §1362 (actions brought by tribes) because this action is brought by a federally-recognized Indian Tribe with a governing body recognized by the Secretary of the Interior and presents a question arising under federal law (whether Kialegee is included in the treaties). Jurisdiction is also established based on 25 U.S.C. § 5123, which provides a cause of action against the government of the United States for promulgating any regulation or making any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, **or any other Act of Congress**, with respect to a federally recognized Indian tribe that

classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

## Venue

8.      Venue is proper in this district under 28 U.S.C. §1391(e)(1) because the Defendants reside and may be found here.

## Statement of Facts

### The Story of The Creek Nation and Kialegee Tribal Town.

9.      The story of the Creeks and that of the Kialegee are one in the same.  Originally, Muskogee (sometimes spelled Mvskoke) cultural groups (understood as organized groups of matrilineal clans) occupied a significant portion of southeastern North America.  This area superimposed over today's drawn political boundaries includes areas of Alabama, Georgia, Florida, and South Carolina.[1]  About half the confederacy spoke the Muskogee language, which thus constituted the ruling language and gave name to the confederacy.

10.      At the end of the seventeenth century, the Creek speaking people existed as a confederacy of more than seventy tribal towns.  These towns were known as tálwas.[2]  Kialegee Tribal Town began as one of the Creek tálwas.

11.      Tradition holds that tálwas gathered in a town square, around a sacred fire from which villagers would take coals back to their homes to rekindle their own hearth fires.  This ritual occurred at the end of the Green Corn Ceremony or "Busk" from the word "poskitá" or "to fast." This occurred upon the ripening of corn, and was considered a purification ritual.

---

[1] *See* Barbara Alice Mann, "A Man of Misery": Chitto Harjo and the Senate Select Committee on Oklahoma Statehood, in NATIVE AMERICAN SPEAKERS OF THE EASTERN WOODLANDS: SELECTED SPEECHES AND CRITICAL ANALYSES 197, 197 (Barbara Alice Mann ed., 2001).
[2] Spelled sometimes as tvlwv, tálwas, etulwa, or etawla.

12.     According to oral tradition, the Kialegee are a daughter town of Tuckabatche (located along rivers in what is now Alabama).  The towns of Abika, Coosa, Coweta, and Tuckabutche are considered the four "mother" towns of the Creek Confederacy as passed down in Creek oral histories.[3]

13.     Oral histories also hold that Kialegee established two additional towns within the Muscogee-speaking "core" of the Creek Confederacy, Auchenauhatche and Hutchachuppe.[4] Other accounts place Kialegee as descendants of the Tuckabatchee on the Tallapoosa River in Alabama.  Historian Stephen Dow Beckham has noted that Tuckabatchee "spun off Kialegee, which in turn, was the progenitor of Auchenauhatche and Hitchachuppe."  In light of either view, it is well-established that Kialegee is an identifiable Creek tribe.

14.     As a result, Kialegee Tribal Town is long-recognized as being historically Creek and as a successor to the Creek Nation.  *See*, *e.g.*, Department of the Interior, Bureau of Indian Affairs, Notice "Indian Tribal Entities that Have a Government-to-Government Relationship with the United States," specifically listing "**Kialegee Tribal Town of Creek Indians, Oklahoma**." 44 Fed. Reg. 7235 (Jan. 31, 1979); *see also* Department of the Interior, Bureau of Indian Affairs, Notice, "Indian Entities Recognized and Eligible To Receive Services From The United States Bureau of Indian Affairs," providing a "current list of tribal entities recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes" and including "**Kialegee Tribal Town of the Creek Indian Nation of Oklahoma**" 60 Fed. Reg.

---

[3] Theodore and Blue Clark. "Creek (Mvskoke)." Oklahoma Historical Society's Encyclopedia of Oklahoma History and Culture, *available at* http://www.okhistory.org/publications/enc/entry.php?entry=cr006 (accessed October 17, 2017).

[4] Moore, John H., "Kialegee Tribal Town."  OKLAHOMA HISTORICAL SOCIETY'S ENCYCLOPEDIA OF OKLAHOMA HISTORY AND CULTURE, *available at* http://www.okhistory.org/publications/enc/entry.php?entry=KI001 (accessed Oct. 17, 2017).

9250, 9252 (Feb. 16, 1995), *see also* Department of The Interior, National Park Service, C.F.R.

Vol. 82 No. 105, dated April 3, 2017 (Listing the **"[t]en present-day Indian tribes [that] include**

**Creek descendants" including "Kialegee Tribal Town"**).

15.     Other federally-recognized Muskogee groups include the Alabama-Quassarte

Tribal Town, Kialegee Tribal Town, and Thlopthlocco Tribal Town of Oklahoma, the Coushatta

Tribe of Louisiana, the Alabama-Coushatta Tribe of Texas, and the Poarch Band of Creeks in

Alabama.

16.     Cultural anthropologist Morris E. Opler, at the request of the United States

Department of the Interior, explained that:[5]

> It is essential to realize that the Creeks were not and, strictly speaking, are not now,
> a tribe.  The Creek Nation is a confederacy of tribes, and as a political phenomenon
> this confederacy stands the most important and advanced of its kind in aboriginal
> America with the possible exception of the Iroquois Confederacy.  .

17.     The Bureau of Indian Affairs has endorsed the same:

> The Creek Nation was a confederacy - an alliance of separate and independent
> tribes that gradually became, over a long period, a single political organization.
> Through most of its history, however, the Confederacy was a dynamic institution,
> constantly changing in size as tribes, for whatever reason, entered the alliance or
> left it. The evidence suggests that many more groups joined than withdrew. . . .

BIA Office of Federal Acknowledgement memorandum recommending federal recognition

of Poarch Band of Creek Indians, at p. 67 (Dec. 29, 1983).

18.     Indeed, the focal point of all Creek cultural and sociopolitical existence was the

town:

> The leading men of the town assembled everyday in council … Here they made
> decisions involving war and peace, planting and hunting, disputes between citizens,
> the maintenance of order, the punishment of offenders, the care of the public
> building grounds, the ceremonials and amusements. . . .

---

[5] Morris E. Opler, REPORT ON THE HISTORY AND CONTEMPORARY STATE OF ASPECTS OF CREEK
SOCIAL ORGANIZATION AND GOVERNMENT (1937).

Angie Debo, The Road to Disappearance; A History of the Creek Indins, 12 (1941).

19.     As the society and political structure of the Creek Confederacy matured, so too did that of the newly-formed United States of America.  Soon after the ratification of the United States Constitution in 1788, the United States entered into a treaty with the Creeks on June 29, 1796 (the "1796 Treaty") a copy of which is attached hereto as Exhibit "A."  This Treaty was entered into by "the United States and the said Creek Nation"  The signatories to the 1796 Treaty **specifically include the Kialegee,** which clearly defines the Kialegee as part of the Creek Nation under said Treaty:

### TREATY WITH THE CREEKS.  1796.

*Hitchetaws.*
Talmasee Matla.

*Tuckabatchees.*
Tustincke Hajo,
Okolissa,
Coweta Matla,
Coosa Mico,
Fusatchee Mico,
Pio Hatkee,
Foosatchee Mico,
Neathlaco,
Tuchabatchee Howla,
Spoko Hajo.

*Kialeegees.*
Chuckchack Nincha,
Opoyo Matla,
Lachlee Matla.

*Big Tallasees.*
Chowostia Hajo,
Neathloco Opyo,
Neathloco,
Chowlactley Mico,
Tocoso Hajo,
Hoochee Matla,
Howlacta,
Tustinica Mico,
Opoy Fraico.

*Big Talassee.*
Houlacta,
Eleatee Hajo,
Chosolop Hajo,
Coosa Hajo.

*Tuchabatchees.*
Chohajo.

*Coosi's.*
Tushegee Tustinagee,
Talmasa Watalica.

*Euphalees.*
Tothes Hago.

*Otasees.*
Opio Tustinagee,
Yafkee Matle Hajo,
Oboyethlee Tustinagee,
Tustinagee Hajo,
Hillibee Tustinagee Hajo,
Effa Tuskeena,
Emathlee Loco,
Tustenagee Mico,
Yaha Tustinagee,
Cunctastee Justinagee.

*Ottasees.*
Coosa Tustanagee,
Neamatle Matla.

*Wecokee's.*
Tusticnika Hajo.

*Tuchabatchee's.*
Neamatoochee.

*Cussita's.*
Talewa Othleopoya,
Talmasse Matla,
Niah Weathla,
Emathlee-laco,
Ottessee Matla,
Muclassee Matla,
Eufaltee Matla.

*Tuckabatchees.*
Cunipee Howla.

*Cowetas.*
Hospotak Tustinagee.

*Natchees.*
Spoko Hodjo.

*Uchee's.*
Tustinagee Chatee.

*Usuchees.*
Spokoca Tustinagee,
Othley poey Tustinagee,
Tuskeeneah.

20.     The foregoing reference alone puts to rest any and all arguments made or that could be made against Kialegee's existence as part of the Creek Nation.  The Kialegee are undisputedly Creek.  Yet, for the sake of absolute certainty on this point, history counsels that the rest of the story be told.

21.     Unfortunately, the Treaty of 1796 was overridden by United States' desire to acquire new lands.  Only a few years later, the institutionalized process of relocating or destroying all Native Americans in order to acquire and profit from their land was instituted.  The Kialegee were no exception to this program.

22.     In March 1814 at Horseshoe Bend in Alabama, then-General Andrew Jackson led a force that killed more than 1,000 Creeks.  The Red Stick War, as it is called, officially ended in August 1814 with the Treaty of Fort Jackson.  In this agreement, all Creeks were forced to cede more than 22 million acres of land in the Southeast United States.

23.     A full copy of the Treaty of Fort Jackson, whose terms were published as "Treaty With The Creeks, 1814" and compiled by Charles J. Kappler, LLM, Clerk to the Senate Committee on in Indian Affairs, in "Indian Affairs. Laws and Treaties, Vol. II," is attached hereto and labelled as Exhibit "B."  The Treaty of Fort Jackson, by and between the United States and the Creek Indians, includes the following two signatories:

> Yoholo Micco, of Kialijee, his x
>     mark,                              [L. S.]
> Socoskee Emautla, of Kialijee, his
>     x mark,                            [L. S.]

24.     Scholars have documented in clear terms that Kialegee people have historically been referred to as those of Kialijee, or the Kialijee Creek, which was part of Creek Confederacy as it existed in Alabama prior to removal.  *See* Hurt, Douglas, "The Shaping of a Creek (Muskogee) Homeland in Indian Territory, 1828-1907," Ph.D Dissertation submitted to the graduate faculty of

8

the University of Oklahoma Graduate College, 2000, at p. 204 (Referring to the Kialegee as "a part of the historical Creek Confederacy and the contemporary Nation"); *see also id*. at 352 (collecting authority showing that Kialegee was part of the Creek Confederacy):

> **Town: Kialegee**
> **County:** McIntosh
> **Variant:** Kialegee, Kialiche, Kialege, Kayaleychi, Kailaidshi
> **History:** Upper, red town…Alabama: Upper town of Kialijee, Kealedji, or Kiolege on Kialijee Creek…daughter town of Tuckabatche
> **Sources:** Cate, box 6, folder 9; Foreman, box 48, binder R6; Gatschet, "Towns and Villages of the Creek Confederacy," 387; Opler, "The Creek Tribal Towns of Oklahoma in 1937," 107; Swanton, "The Social Significance of the Creek Confederacy," 6; Waselkov and Braund, *William Bartram*, 108; Yahola, "Untitled," 7.

25.    This is another reference to the Kialegee on the relevant treaties that clearly supports that the Kialegee are undisputedly Creek and a part of the "whole Creek Nation."

26.    After the signing of the Treaty of Fort Jackson in 1814, the Creek people were then further subjected to a series of land trades, most of which were the product of deceit or outright fraud. All of these were part and parcel of the United States' policy to remove Native Americans from their traditional homelands.

27.    The policy of forcibly relocating Native peoples became formal law on May 28, 1830, when then-President Jackson signed into law a bill from the Twenty-First Congress titled the "Indian Removal Act."

28.    The United States now-codified push for removal produced the Treaty of 1832, in which the Creeks ceded their eastern homelands to the United States in exchange for lands in Indian Territory. 7 Stat. 366 (1832). Among the rights granted to the Creeks by the Removal Treaty of March 24, 1832 was the right to perpetual self-government of their new lands.

29.    The Treaty of 1832 required a census of all Creek tálwas. Treaty of 1836, Art. II. (A census of these persons shall be taken under the direction of the President and the selections shall be made so as to include the improvements of each person within his selection, if the same

can be so made, and if not, then all the persons belonging to the same town … ."). The census was carried out by Thomas J. Abbott and Benjamin S. Parsons during 1832 through 1833. The census, now known as the "Parsons and Abbott Roll," identified 166 households of Kialegee alone. The Parsons and Abbott Roll is seen as an authoritative and comprehensive list of Creek towns prior to removal.

30.     In 1836, General Winfield Scott took command of the Georgia and Alabama militias and forcibly rounded up Creeks and sent them to Indian Territory. This forcible removal of the Creeks and other tribes, one of the darkest chapters of American history, would come to be known as the "Trail of Tears." The 166 Kialegee families identified in the Parsons and Abbott Roll were among those who trekked to Indian Country of present-day Oklahoma.

31.     Yet, more sad history, when in 1837 some 4,000 Creeks were moved to concentration camps in Mobile, Alabama. When Creeks returned from fighting on behalf of the United States, they found their families in these camps. Soon all the Indians from the camps would be loaded onto ships and sent to the Indian territory, without regard to whom they supported.

32.     The United States' policy of removal ultimately resulted in the forcible relocation of the Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes to what is presently the state of Oklahoma. All Creeks, along with the other four "Civilized"[6] Tribes, and many other tribes, bore this horrendous saga of wholesale removal and extermination. The Creek experience in this saga was collective, i.e., all Creeks were impacted by removal that was addressed by the treaties regarding said removal. Moreover, because Kialegee was a signatory to the 1796 Treaty,

---

[6] The term "Five Civilized Tribes" was used by the United States during the mid-nineteenth century to refer to the Cherokee, Choctaw, Chickasaw, Creek, and Seminole nations. The usage of the term "Civilized" in this context is one of disrespect; in this context "civilized" meant a qualification to exist for entire races based solely on their willingness to adopt norms and values unilaterally imposed on them by non-native peoples.

Kialegee's place as a Creek treaty tribe was established well before the removal period of the nineteenth century.

33.     Following removal to Indian Country, the Creek people persisted in survival, including through the tálwas.  Creek tálwas continued their traditional ways within the Creek Reservation.  The United States attempted to suppress the traditional Creek style of government, but the tálwas remained in place.

34.     During the Civil War, the Creeks again suffered dearly.  It is estimated that more than one third of all Creeks perished.  George Cutler, President Lincoln's designated Creek Agent, wrote: "Numbers of families had become separated during the fight with the rebels, of whom many were captured and taken back … many of them were on foot" and "without shoes, and very thinly clad, and, having lost nearly all their bedding on the battle-field, their suffering was immense and beyond description."  Thus war, weather and disease ravaged the Creek Reservation during and after the Civil War.

35.     On June 14, 1866, a treaty was signed between the Creeks and the United States.  The Treaty of 1866 was forced upon the Creeks on the pretext that some Creeks engaged in anti-Union actions during the Civil War.  Due to this perceived infraction, the Creeks were forced to cede a western portion of their reservation:

> [T]he Creeks hereby cede and convey to the United States, to be sold to and used as homes for such other civilized Indians as the United States may choose to settle thereon, the west half of their entire domain, to be divided by a line running north and south; the eastern half of said Creek lands, being retained by them, shall, except as herein otherwise stipulated, be forever set apart as a home for said Creek Nation; and in consideration of said cession of the west half of their lands, estimated to contain three millions two hundred and fifty thousand five hundred and sixty acres, the United States agree to pay the sum of thirty (30) cents per acre.

> Treaty of 1866, Art. III.

36.     The Treaty of 1866 mandated another census of all Creeks and creation of a General Council.  Treaty of 1866, Art. X.  The General Council was to include a representative from each tálwa.  When the census was taken, the results showed a 24% decline of the total number of Creeks *since 1859*.

37.     On October 12, 1867, the Creeks adopted a constitution and a code of laws for the "Muskogee Nation" (referencing the shared Muskogee language and culture of the Creeks – not the present Muskogee Nation).  The constitution provided for executive, legislative, and judicial branches, and legislative power was lodged in a National Council, a bi-cameral body in which specifically acknowledged and provided for the tálwas.

38.     In 1889, the Bureau of Indian Affairs enumerated 146 members of Kialegee, and in 1895 listed 219.

39.     Still eager to formally strip the Creeks of all lands, the United States forced the Creeks to participate in an allotment program via the Curtis Act which became effective in 1898.  Under this program, all land was taken from the entire Creek people, and allotments were given to tribe members of no more than 160 acres per tract.  Kialegee were among those who received allotments.  The allotment process scattered many members of different tálwas (as was intended by the United States), but Kialegee community and culture persisted.  In fact, even today, Kialegees own various allotments.  *See* Exhibit "C."

40.     In his 1937 report, Morris Opler noted: "[i]t was thought that the allotting of the Creek Indians would destroy their town organization but this did not in fact occur as the members of the town took allotments in the same locality and continued their social and political organization."  Opler further wrote:

> But it is clear only that Congress has recognized the Creek Nation alone for the purpose of having one central, responsible agency with which to deal.  It is not clear

that Congress intended to deny the existence of the Creek towns as effective organizations. **Their existence is recognized and perpetuated in the constitution and laws of the Creek Nation, a fact of which Congress must be assumed to have had knowledge and to which it has given sanction in its continued dealing with the government of the Nation so constituted as a confederacy of towns**.

Opler Report at 5 (emphasis added). Here, the Defendants are denying the existence of the Kialegee Tribal Town, more ugly history that this Complaint seeks to remedy.

41.     In 1937, Acting Solicitor of the United States Department of Interior Frederic L. Kirgis, wrote a legal memorandum about recognition of certain tribes under the OIWA:[7]

A question has been raised by the Oklahoma Regional Coordinator in charge of organization as to whether the Keetoowah Society of Oklahoma Cherokees can be considered a band for the purposes of organization under the Oklahoma Indian Welfare Act.

…

**The Creek Tribal Towns, in so far as they have retained a recognized existence, were determined to be capable of consideration as bands because they possessed the indispensable political character of such bodies. Not only were they the functioning political subdivisions of the Creek Confederacy or Nation but they were the original independent units of government of the Creek Indians**. This essential character is not possessed by the Keetoowah Society nor any of its factions. It is neither historically nor actually a governing unit of the Cherokee Nation, but a society of citizens within the Nation with common beliefs and aspirations.

---

[7] Under the Oklahoma Indian Welfare Act of 1936 (the "OIWA"):

Any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe. The Secretary of the Interior may issue to any such organized group a charter of incorporation, which shall become operative when ratified by a majority vote of the adult members of the organization voting: Provided, however, That such election shall be void unless the total vote cast be at least 30 per centum of those entitled to vote. Such charter may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other rights or privileges secured to an organized Indian tribe under the Act of June 18, 1934.

> While I have come to the conclusion that the Keetoowah Society of Cherokee Indians cannot be considered a band for organization purposes, groups of its members might form a basis for cooperative associations under section 4 of the Oklahoma act. However, this may not satisfy the groups' wishes as any such association could not be limited to members of the society, since associations formed under that section must be open to all Indians residing within the district in which the association is formed. Another solution which might be considered as an administrative matter is the possibility of a society or organized faction or group borrowing as a unit from a tribal, cooperative or credit organization for such group enterprise as it could successfully carry on. I see no legal objection to such an arrangement.

Memorandum from Frederic L. Kirgis to the Commissioner on Indian Affairs, July 29, 1937.

42.     Based in part on the memorandum from Kirgis and the well-documented history of Kialegee, Kialegee was federally recognized as a tribe in 1936.  Kialegee has a constitution approved by the Assistant Secretary of the Interior on April 14, 1941, and ratified by the members of the town on June 12, 1941.  Kialegee also has a corporate charter approved by the Assistant Secretary on July 23, 1942, and ratified by town members on September 17, 1942.

43.     The approved charter also contains numerous explicit findings concerning Kialegee's powers, one of which is "[t]o protect all rights guaranteed to the Kialegee Tribal Town by treaty."  Kialegee Corporate Charter at p. 5.

44.     As approved and recognized by the United States Department of Interior:

> Any rights and powers heretofore vested in the Kialegee Tribal Town, not expressly referred to in the Constitution, By-laws or Charter of the said Tribal Town, shall not be abridged, but may be exercised by the people of the Kialegee Tribal Town, through the adoption of appropriate additions and amendments to the Constitution, By-laws or Charter of the said Tribal Town. **No property rights or claims of the Kialegee Tribal Town existing prior to the ratification of this Charter shall be in any way impaired by anything contained in this Charter. The Tribal Town ownership of unallotted lands, whether or not occupied by any particular individuals, is hereby expressly recognized**.

Kialegee Corporate Charter at p.6. (emphasis added).

**The Treaties Between the Creek Nation and the United States.**

14

45.     Between 1790 and 1866, the Creek Confederacy, as a collection of tálwas, entered into several treaties with the United States of America (collectively, the "Treaties").  The Treaties reserved lands to the tálwas and their larger use and subsistence areas held in common with other Creeks.  The Treaties referred collectively to a "Creek Nation," the "Creek Tribe," and "the Creeks," but did not identify the Treaties as being made with a General Council of a National Council.  These Treaties include:

(a) The Creek Treaty of August 7, 1790, (7 Stat. 35) promised in Article 5: "The United States solemnly guarantee to the **Creek Nation**, all their lands within the limits of the United States to the westward and southward of the boundary described in the preceding article" (emphasis added).

(b)     The Creek Treaty of August 9, 1814, (7 Stat. 120) promised in Article 2: "The United States will guarantee to the **Creek nation**, the integrity of all their territory eastwardly and northwardly of the said line to be run and described as mentioned in the first article" (emphasis added).

(c)     The Creek Treaty of January 8, 1821, (7 Stat. 215) promised in Article 2: "that the title and possession of the following tracts of land shall continue in the **Creek nation** so long as the present occupants shall remain in the personal possession thereof . . ." (emphasis added).

(e)     The Creek treaty of March 24, 1832, (7 Stat. 366) **stated** in Article 14: "The Creek country west of the Mississippi shall be solemnly guarantied [sic] **to the Creek Indians**, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which

Congress may think proper to exercise over them . . . as soon as the boundaries of the Creek country West of the Mississippi are ascertained, [Congress shall] cause a <u>patent or grant</u> to be executed to the Creek tribe" (emphasis added).

(f)      The Creek Treaty of February 14, 1833, (7 Stat. 417) Preamble, promised: ". . . to establish boundary lines which will secure a country and permanent home to **<u>the whole Creek nation of Indians</u>** . . . ."  These words made clear that the Creek Reservation in Eastern Oklahoma was to be the "permanent home to **<u>the whole Creek nation.</u>**" (emphasis added).

46.     The Treaty with the Creeks signed on February 14, 1833, was the first of several negotiated by the Stokes Commission.  The purpose of the Stokes Commission was to define the boundary between the Creek and Cherokee Nations in the Indian Territory and to affirm the sovereignty of the Creeks within their reservation.

47.     In interpreting treaties, courts must look to the plain language of the treaty itself, as well as the contemporaneous understanding of the parties.  The interpretation and implementation of a treaty in the years following its passage is also relevant.  Here, these factors point to a single conclusion – that the Treaty of 1833 that established the Creek reservation applies to all Creek Indians.  Prior Creek treaties had promised that if they ceded their lands, they would be guaranteed a permanent home or reservation. The phrases and concepts stated in the 1833 treaty were used in earlier treaties with the Creeks and were part of their understanding. Through the Treaties, the leaders of the tálwas gained the assurances that their reservation was permanent, was to be held in common, and their lands and rights would be protected.  The plain language of the Treaty indicates that the Creek Reservation is the property of all Creek Indians and as such all must be accorded the same rights, privileges, and benefits of ownership. The Treaty of 1833 states:

Preamble: . . . to establish boundary lines which will secure a country and permanent home to the whole Creek nation of Indians . . . .

Article 3: The United States will grant a patent, in fee simple, to the Creek Nation of Indians for the land assigned said nation by this treaty or convention, whenever the same shall be ratified by the President and Senate of the United States-and the right thus guaranteed by the United States shall be continued to said tribe of Indians, so long as they shall exist as a nation, and continue to occupy the country hereby assigned to them.

Article 4: It is hereby mutually understood and agreed between the parties to this treaty, that the land assigned to the Muskogee Indians, by the second article thereof, shall be taken and considered the property of the whole Muskogee or Creek nation, as well of those now residing upon the land….

48.     The 1833 treaty (i) defined a precise Creek Reservation within set boundaries; (ii) guaranteed the reservation as a "permanent home to the whole Creek nation of Indians;" (iii) promised "a patent in fee simple, to the Creek nation of Indians for the lands assigned to said nation," and (iv) affirmed that the permanent reservation was "in lieu of and considered to be the country provided or intended to be provided by the treaty …on the 24th day of January, 1826 under which they removed to this country."

49.     By its express terms, the Treaty of 1833 establishes that the land assigned to the Creek Indians "shall be taken and considered the property of the whole Muscogee or Creek Nation, as well as those now residing upon the land." "Whole" is an expansive word that means "the entire thing; the entire or total assemblage of parts."[8]   Thus the plain meaning of this Treaty language is that the reservation belongs to all Creek Indians without exclusion.   No legal basis suggests Kialegee's treaty rights have been surrendered.   Accordingly, the Creek Reservation established by treaty is also the reservation of the Kialegee and as such Kialegee may exercise jurisdiction over lands belonging to the Tribe and its members located within the Creek Reservation boundaries.   *United States v. Mazurie*, 419 U.S. 544, 557 (1975) supports the conclusion that a

---

[8] Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828 ed.).

tribe would have jurisdiction over land that it occupies as well as land that was allotted to, and is still owned in trust or restricted fee by its members. *Mazurie* also supports the conclusion that the tribe's jurisdiction would not extend to the trust or restricted allotments of members of the other tribe with an interest in the reservation. *See generally id.*; *see also* Cohen's Handbook of Federal Indian Law Section 4.01[2][e], at 220 (Nell Jessup Newton ed., 2012 ("[t]ribal jurisdiction based in membership finds support in *United States v. Mazurie*[.]").

### The Treaties Are Not Exclusive to the Muskogee.

50.     Defendants' position turns on one argument: that the treaties entered into by the Creeks do not pertain to Kialegee and that the Kialegee have no "treaty rights." More ugly history indeed. Solely on this false premise, Defendants conclude that Plaintiff therefore does not properly exercise "jurisdiction" over its own lands, resulting in the Kialegee not being able to succeed economically, living below poverty with no healthcare or education.

51.     The concept of jurisdiction is relevant to the ability of the Kialegee to even have a tribal court, regulate liquor and tobacco sales and gaming. In an attempt to further eliminate another Indian tribe, it is Defendants' position that the treaties render Plaintiff without jurisdiction.

52.     There is no authority that supports that only the Muskogee can exercise jurisdiction over treaty lands. No treaty or court opinion has ever held that the Muskogee exercise exclusive jurisdiction over the lands attained by the Creek Nation at the conclusion of its tragic saga of bait-and-switch with the government of the United States. History makes clear that the Creek Nation, as a whole, paid dearly for the relatively small carve-out it ultimately received. Yet the Defendants' position is that the Muskogee Tribe alone exercises jurisdiction over the entirety of those lands that were explicitly reserved for the **whole Creek Nation.**" This simply cannot be.

The Treaties are black-letter law, and their text indicating that title is transferred to the whole Creek Nation is clear.

53.     The Treaties make clear that the jurisdiction over the lands of the former Creek Reservation is shared.  These treaty rights have neither been abrogated nor modified by any subsequent treaty or act of Congress.

54.     The controlling canon of construction solidifies this point.  Specifically, the Indian Canon of Construction very clearly establishes (a) that treaties and statutes applicable in this case are meant to be understood ***as the Indian signatories understood them at the time***, and (b) that said treaties and statutes should be construed liberally in favor of all Indians and ***never to their prejudice***.  This special canon is stringently observed and upheld, and with good reason.  As Chief Justice John Marshall took specific care to mention in *Worcester v. Georgia*, 31 U.S. 515, 582 (1832): "The language used in treaties with the Indians should never be construed to their prejudice."   Justice Harlan F. Stone did the same in *Carpenter v. Shaw*, 280 U.S. 363, 367(1930) where he wrote that "[s]uch provisions [of agreements between Indians and the government] are to be liberally construed. Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith."

55.     The text of the controlling treaties and the clear guidance on their interpretation demonstrate that (1) the treaties were signed on behalf of the entire Creek Nation and (2) the Creeks understood the lands to be owned in common.  It is established that the Creeks viewed the ownership of their lands as being in common, and this view is supported by numerous sources including contemporaneous, firsthand accounts.  For example, Robert L. Owen, an Indian Agent for the United States who would go on to become one of Oklahoma's first senators, wrote that:

> The most striking feature in the governments of the Indian nations of this agency, when contrasted with that of their white neighbors, is that the title to their entire

domain is in the nation as a practically unqualified fee, and the individual has only the right to use and to occupy.

Report of Robert Owen to the Commissioner of Indian Affairs, September 20, 1886.

56.     The following year, 1887, Owen wrote again on Creek ownership, stating that "[t]he title of the land of the five nations is held in that nation itself, and each citizen has equal right to make a farm on the unoccupied domain or use the common pasturage."  Report of Robert Owen to the Commissioner of Indian Affairs, 1887.  In 1894, Dew Wisdom, another United States Indian Agent, located in Muscogee, wrote to the Commissioner of Indian Affairs that "[A]ll land in this agency is held in common, and only improvements segregated from the public domain are subject to individual ownership."

57.     Kialegee has constructed a restaurant facility known as the Embers Grill – and also known as Red Creek Dance Hall and Restaurant – which is located on an Indian allotment within the Creek Reservation.  The land happens to be located within the city limits of Broken Arrow, Oklahoma.  The allotment is owned by Bim Stephen Bruner, who is an enrolled member of Kialegee.

58.     Kialegee claims jurisdiction over the land on which it is constructing the Embers Grille, the Bruner allotment, as well as all lands within the Creek Reservation, in common with the other recognized Creek tribes in Oklahoma.  This shared jurisdiction is guaranteed by various Creek Treaties with the United States read in context with the Indian Canon of Construction.

59.     The land is located within the boundaries of the Creek Reservation set aside for, and occupied by, the Creek tribes constituting the former Creek Confederacy that was removed to Oklahoma by the United States pursuant to treaty provisions.

**Defendants' Argument Is Legally Untenable.**

60.     The Department of the Interior has explicitly stated, in a formal letter to the Muskogee Area Director of the Okaulgee Agency that:

> Since the Bureau of Indian Affairs has recognized the towns [of Thlopthlocco, Kialegee and Alabama-Quassarte] as independent government units, the Okaulgee Agency has become a multi-tribal agency.  **The rights that formerly accrued solely to the Creek Nation must now be shared with the towns' governing bodies**.

Department of Interior Letter to Muskogee Area Director, attached hereto as Exhibit "D." (emphasis added).

61.     Further, and equally fatal, when the Poarch Band of Creek Indians (the "Poarch Creeks") began to conduct gaming operations in Montgomery, Alabama, the National Indian Gaming Commission ("NIGC") undertook the legal analysis of whether the Poarch Creek's lands qualified for purposes of the Indian Gaming Regulation Act ("IGRA"), 25 USC § 2701 which it detailed in a May 19, 2008 letter to the Poarch Creeks (the "Poarch Creek Letter").  The Poarch Creek Letter is illuminating.  In it, the NIGC provided a legal analysis concluding that the Poarch Creek are historically Creek and thus had jurisdiction over the lands they inhabit:

> The United States recognized the Poarch Band of Creek Indians in June 1984. 49 Fed.Reg. 24083 (June 11, 1984). At the time, the Band had no land base.  Shortly after recognition, the Department of the Interior took into trust eight small parcels that together total some 229 ½ acres and proclaimed them to be reservation land. 50 Fed. Reg. 15502 (Apr. 18, 1985).

> These parcels serve basic tribal functions – a school house, powwow grounds, a tribal administration building, a gymnasium, a fire station, two small sites for tribal housing, and pasture lands for a tribal farm.  Affidavit of Eddie Tullis, ¶ 8 (Mar. 25, 2004).

> …

## LEGAL ANALYSIS

### I.  Indian lands, generally.

IGRA permits gaming only on Indian lands, 25 U.S.C. §§ 2710(b)(1), (2); 2710(d)(1), (2), which defines as:

 (A) all lands within the limits of any Indian reservation;  and

(B) any lands title to which is either held in trust by United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

…

### A.  Governmental power

The Band also exercises governmental power over the Tallapoosa Site. This conclusion, however, is not as straightforward as simply noting that the United States holds the Site in trust for the Band. In order to exercise governmental power over its land, the Band, like any other government, must first have jurisdiction to do so.

…

For jurisdictional purposes, there is no distinction between reservation land and trust land. Again, in *Potawatomie,* the Supreme Court unambiguously held that trust land is "validly set apart" and thus qualifies *as a reservation* for jurisdictional purposes. *Potawatomie,* 498 U.S. at 511 (emphasis added). *Accord, John,* 437 U.S. at 649.

…

Accordingly, the Band has jurisdiction to exercise governmental authority at the Tallapoosa Site.

### 1.  Exercise of governmental authority

In order for the Tallapoosa Site to be "Indian lands" within the meaning of IGRA, the Band must also exercise present-day, governmental authority on the land. How exactly a tribe does this IGRA does not say, though there are many possible ways in many possible circumstances.

…

[T]he Band's police have governmental offices within the Band's gaming facility at the Site. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson

& Perry, to Katherine L. Zebell, Esq., NIGC (Nov. 2, 2004). The Band provides law enforcement on the Site 24 hours a day. The Band is in the process of providing other governmental services, including additional law enforcement, through an agreement between the Band and the Montgomery County sheriff. … Further still, the Band has adopted a Class II gaming ordinance applicable to the Site and has formed a gaming commission to regulate the Band's Class II gaming operations there.

…

Given the foregoing, then, the Band exercises governmental authority over the Tallapoosa Site[.]

A.   The Band has been restored to federal recognition

To be an "Indian tribe that is restored to Federal recognition," a tribe must demonstrate a period of recognition by the United States, termination of that recognition, and reinstatement of recognition by the United States. *Grand Traverse III,* 369 F.3d at 967. The Band satisfies all three conditions.

**Put somewhat differently, the historic Creek Nation has greatly changed in form from the first half of the 19th century to today. The historic Creek Nation, politically organized around tribal towns, now exists as the Poarch Band of Creek Indians in Alabama, the Muskogee (Creek) Nation in Oklahoma, and recognized tribal towns - tribes with multi-branch governments established through tribal constitutions. *See, e.g., Constitution of the Poarch Band of Creek Indians,* Art, IV (June 1, 1985); *Constitution of the Muskogee (Creek) Nation,* Arts. V – VII (Feb. 18, 2006). To suggest that the United States' recognition of the historic Creek Nation is not recognition of the Band - or the Muskogee (Creek) Nation for that matter – because the Band is not identical in form to the historic Creek Nation is inconsistent with federal Indian policy generally and with case law.**

**The federal government's long-standing policy is to encourage tribal self-government, and numerous statutes, including IGRA, embody this policy**. … Federal law has thus consistently recognized and protected this right of self-government. *See,e.g., Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55-56. The right of self-government, of necessity, includes the ability of a tribe to make changes to the form and structure of its government, and this ability too is recognized in federal law. *See*, *e.g.,* 25 C.F.R. Parts 81 and 82 (procedures for Secretarial elections governing adoption, amendment or revocation of tribal constitutions, etc.).

Any self-governing entity will change in form and composition over time, and this is particularly true of the lndian tribes, who over the past centuries have also had such changes thrust upon them by federal law. Significantly, none of these changes in form or reorganizations are in any way inconsistent with federal recognition.

**Reflecting federal policies, a congressionally created confederated or consolidated tribe can be comprised of different tribes presently occupying the same reservation**, such as the Wind River Tribes (Shoshone and Arapaho). Or tribes may confederate for political purposes, forming governmental entities such as the Minnesota Chippewa Tribes or the Central Council of the Tlingit & Haida Indian Tribes, which have received federal recognition, in addition to their constituent tribes. Under the Indian Reorganization Act of 1934, Indians living on any given reservation were allowed to organize into federally recognized tribes, whether or not they were linguistically, culturally, or politically united.... **Other federally recognized entities represent fragments of previously unified peoples. The great Sioux nation, for example, was divided by federal law into geographically separated and independently recognized tribes in order to weaken the Sioux militarily. Other groups, such as the Oneida, the Cherokee, and the Choctaw are recognized as multiple separate nations, because some members moved to new territories as part of the federal removal process in the nineteenth century** and others refused to leave ancestral homelands.

*Cohen's Handbook of Federal Indian Law* ("Cohen"), § 302[2] at 137 (2005 ed.).  **To suggest, then, that the recognition of the historic Creek Nation docs not also apply to the Band because of the change in form and composition over time is inconsistent with the fundamental policy of encouraging tribal self-government.**

Poarch Creek Letter, at pp. 1-12 (emphasis added).  The Poarch Creek Letter is attached hereto as Exhibit "E."

62.     The Sixth Circuit Court of Appeals positively answered the question of shared ownership between the Grand Traverse Band and the combined Ottawa and Chippewa nations in *Grand Traverse III*, where that Court made no distinction between today's Grand Traverse Band and the combined Ottawa and Chippewa nations, whom the United States aggregated solely for the purposes of negotiating the 1836 Treaty of Washington.  369 F.3d 960, 970-71, n.2 (6th Cir. 2004).  The Grand Traverse Band was, as the Court acknowledged, a successor to the Ottawa and Chippewa as "a successor to a series of treaties with the United States in 1795, 1815, 1836 and 1855." *Id*. at 961.

63.     As a federally-recognized Creek tribe, Kialegee is entitled to exercise all the rights guaranteed to and understood by Creek Indians by various treaties with the United States.  These

rights are supported by the Creek understanding of the nature of land ownership within the

boundaries of all Creek tribal lands at the time the applicable treaties were negotiated and executed.

At that time, the historic political organization of the Creek Confederacy consisted of tribal towns,

each of which had an equal voice and role in the Creek Confederacy government, and all land was

owned by each tribal entity in common with all the other tribal entities within the Creek

Confederacy.  This understanding is directly supported by the applicable canons of interpretation,

as endorsed by the Supreme Court of the United States.

64.     As the United States Court of Appeals District of Columbia Circuit so thoughtfully

explained in *Harjo v. Andrus*:

> The Creek Nation, historically and traditionally, is actually a confederacy of
> autonomous tribal towns, or Tálwas, each with its own political organization and
> leadership. Membership in a town is a matter of birthright rather than residence,
> each Creek being, by birth, a member of his mother's town, or, if his mother is non-
> Indian, a member of his father's town. Originally, there were four "mother" towns,
> but the number was expanded by a transfer of town fires, until, by the time of the
> adoption of the 1867 Constitution, there were approximately forty-four Tálwas in
> existence. Tribal towns can also merge or dissolve, and there is at present some
> doubt as to the exact number of towns that are politically and socially active. See
> App. at 164. However, since membership is hereditary and towns may adopt new
> members, no Creek can ever actually be considered to be without tribal town
> affiliation, or the possibility of such affiliation.

581 F.2d 949, n.7 (D.C. Cir. 1978).

65.     In other words, the historic, accepted and treaty-protected understanding of land

ownership is that all land is owned by and between all Creeks in common.  This understanding is

relevant here, because it includes the principle that all Creek tribal entities share an undivided

ownership and jurisdiction of all Creek lands.  Yet Defendants disagree.  Defendants contend that

there is no multi-tribal jurisdiction over the former reservation lands and argue that the federally-

recognized Muskogee Creek Nation ("MCN") is the only recognized Creek tribe with any

jurisdiction over those lands.  This interpretation is wrong on many levels.  At minimum, this

contention would mean that Kialegee and the other two federally recognized Creek tribal towns in Oklahoma have no jurisdiction over any lands despite (a) treaty guarantees to the contrary and (b) allotment ownership of their enrolled members.   Defendants' rendition of the issue is that jurisdiction is mutually exclusive.   This argument, whether for political or economic reasons or for a miscomprehension of the law, is wrong.

66.     The only purported authority that Defendants can argue is the Muskogee (Creek) Constitution, adopted in 1979, which states that "the political jurisdiction of The Muskogee (Creek) Nation shall be as it geographically appeared in 1900 which is based upon those Treaties entered into by the Muskogee  (Creek) Nation and the United States of America[.]"  This does nothing to change the fact that Kialegee are Creek and were part of the Treaties.  Therefore, such exclusionary language has no effect because it is clear that the Muskogee were not representative of all Creek people and the conferral of treaty rights to the Creeks did not vest solely with the Muskogee.

67.     The language also has no effect because any exclusionary application of this text is not supported by law.  The United States District Court for the District of Columbia recently determined this with respect to the constitution of another tribe.  In that case, *Cherokee Nation v. Nash, et al.*, 1:13-cv-01313-TFH (D.D.C. Aug. 30, 2017), the Cherokee Nation attempted to claim that Cherokee Freedmen, as members of the historic Cherokee nation, should not be fully recognized as presently-enrolled members, amending its constitution to make this point clear and relying on sovereignty to justify its decision.  The United States District Court for the District of D.C. rejected this tactic.  The opinion rendered in the *Cherokee Nation v. Nash* is very instructive on this point: "Although the Cherokee Nation Constitution defines citizenship, Article 9 of the 1866 Treaty guarantees that the Cherokee Freedmen shall have the right to it for as long as native

Cherokees have that right. The history, negotiations, and practical construction of the 1866 Treaty suggest no other result." *Cherokee Nation v. Nash, et al.*, 1:13-cv-01313-TFH (D.D.C. Aug. 30, 2017) (Order denying  Cherokee Nation and Principal Chief Baker's Motion for Partial Summary Judgment).

68.     This situation is the same.  Kialegee, a federally-recognized tribe that is clearly part of the historic Creek Nation, is subject to yet more dark history as it is denied the protections of the Treaties.  It also bears mentioning that the Cherokee Freedmen were joined in support for their argument by the United States Department of the Interior.  *See Cherokee Nation v. Nash, et al.*, 1:13-cv-01313-TFH (DE 234) (The Department of the Interior's Motion for Summary Judgment, Memorandum of Points and Authorities In Support Thereof and Opposition to the Cherokee Nation and Principal Chief Baker's Motion for Partial Summary Judgment).

69.     Defendants have repeatedly violated 25 U.S.C. §476(f) by blocking the Kialegee from jurisdiction on lands located within the Creek Reservation.

70.     As stated *supra*, 25 USC §476 (f) mandates equal treatment of recognized tribes:

Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 *et seq.,* 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, **or diminishes the privileges** and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes. (bolding added for emphasis)

71.     Section 476 (f) specifically prohibits the Defendants from finding that the Kialegee lacks jurisdiction while other tribes have jurisdiction.  Kialegee, like the Muskogee Creek Nation, possess the authority to exercise jurisdiction over its tribal lands.

**Kialegee's Rights Are Being Violated and Its People Marginalized.**

72.     Perhaps the only thing more tragic than the government-sponsored policy of elimination endured by Kialegee is the present reality that Kialegee is now being marginalized

among its own brethren.  The present denial of Kialegee's rights suggests that Kialegee's fight for survival during removal times may well have been for naught.

73.     Despite its federally-recognized status and clear ability to self-govern, Kialegee has not acceded to the economic prosperity that its Creek brothers and sisters have so enjoyed.

74.     Kialegee has struggled economically and socially; they have little no healthcare or education.  This is in spite of its unquestioned status as an Indian Tribe.  The position asserted against Kialegee happens to be based on the viewpoint that only the "Muskogee (Creek) Nation" has jurisdiction over lands in Oklahoma.  There is no legal or factual basis for this argument.  It is a backward reading of black-letter law and an attempt to reverse-engineer historical recognition that was meant for an entire people onto a subgroup that straightforwardly decided to claim this recognition only for itself.  But, as explained herein, this fails under the law and has already been defeated before this Court.

75.     Granted, the Muskogee Nation is powerful.  Even the Chairman of the NIGC is of the Muskogee Creek Nation.  Kialegee, on the other hand, has no great wealth of capital and comparatively no influence.  Kialegee's people live a day-to-day struggle for existence.  This struggle for survival occurs **despite** the many purported protections and guarantees conferred on Kialegee.  Kialegee seeks to engage in economic development of lands located within the boundaries of the Creek Reservation as part of an effort to provide for its people.  This Court is Kialegee's only chance.

76.     It is a "paramount federal policy" to ensure that Indians do not suffer interference with their efforts to "develop ... strong self-government." *Pueblo of Pojoaque v. New* Mexico, 2015 WL 10818855, at *10 (D.N.M. Oct. 7, 2015), *aff'd sub nom.  New Mexico v. Trujillo*, 813 F.3d 1308 (10th Cir. 2016).  Plaintiff has chosen to pursue the enforcement of its economic rights

as a sovereign, which Plaintiff respectfully submits goes to the very heart of "develop[ing] ... strong self-government."

77.     Small in number – Kialegee boasts roughly 400 members – Kialegee resultantly lacks economic power and political influence wielded by larger Tribes.  Because of this deficit, its right to pursue economic activities is faced by the harsh reality of being out-spent, out-maneuvered and out-influenced in what amounts to the monopolization by a few Creeks of a right conferred on all Creeks.

78.     It is said, that during the time of removal, many of the talwás still maintained their sacred fire and brought it with them on their long journey.  Kialegee has experienced tumult and terror for more than two centuries, yet it has survived to exist in the present day.  Kialegee protected its sacred fire.  But Kialegee has not yet escaped oppression and marginalization – it again faces the baseless denial of its rights.  These rights were hard-fought and conferred unto Kialegee each time it put pen to paper with the United States.

79.     Kialegee is now before this Court asking that the law reflect what has already been written in history: that Kialegee is entitled to full treaty-guaranteed rights as a successor to the historic Creek Nation, and as a result has jurisdiction over its lands.

## COUNT I

**(Declaratory Judgment-Successor in Interest/Land Owned in Common)**

80.     Plaintiff realleges and incorporates by reference paragraphs 1-78 above.

81.     Plaintiff seeks a declaration that the Plaintiff is entitled to full treaty-guaranteed rights as a successor to the historic Creek Confederacy, as allowing it the right jurisdiction over its lands.

82.     Plaintiff's request is proper.  A declaratory judgment is appropriate when it will "terminate the controversy" giving rise on undisputed or relatively undisputed facts. Advisory

Committee Notes, Fed. R. Civ. P. 57. (emphasis added).  The existence or non-existence of any

right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal

relations depend, or of a status, may be declared.  *Id*.  The petitioner must have a practical interest

in the declaration sought and all parties having an interest therein or adversely affected must be

made parties or be cited.  *Id*.

83.     Plaintiff's requested relief directly concerns the existence of a right, duty, power

and/or privilege (its treaty-protected status as a successor to the historic Creek Nation, and Plaintiff

has a practical interest in the declaration sought.

## COUNT II

### (Injunction – Successor in Interest/Land owned in Common)

84.     Plaintiff realleges and incorporates by reference paragraphs 1 through 78 above.

85.     Kialegee is entitled to an injunction ordering the defendants to recognize that

Plaintiff is entitled to full treaty-guaranteed rights as a successor to the historic Creek Nation, as

allowing it the right jurisdiction over its lands.

## REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order as follows:

A.      Declaring that Kialegee and its members are a part of the "Whole Creek Nation of

Indians," as defined in Article 4 of the Creek Treaty of February 14, 1833, (7 Stat. 417),

B.      Declaring that the Kialegee are a beneficiary of the treaty of 1833 when it refers to

"the property of the whole Muskogee or Creek Nation as well as those residing upon the land,"

C.      Declaring that Kialegee has treaty-protected rights of shared jurisdiction within the

Creek Reservation and ownership of the Creek Reservation exists in common with all other Creek

tribes tracing to the Creek Confederacy within the State of Oklahoma,

D.      Mandatorily enjoining the defendants to recognize the Kialegee's status as a tribe for which the Creek Reservation was established which enjoys all full treaty-guaranteed rights by the Creek treaties relevant to this litigation, and

E.      Awarding plaintiff its costs, attorneys' fees, and all other expenses of this litigation.

Date: March 5, 2021                              Respectfully submitted,

                                                 By:     /s/ Moises T. Grayson, Esq.
                                                         D.C. Bar No. FL0067
                                                         BLAXBERG, GRAYSON, KUKOFF &
                                                         FORTEZA P.A.
                                                         730 Ingraham Building
                                                         25 Southeast Second Avenue
                                                         Miami, Florida 33131
                                                         Moises.Grayson@blaxgray.com

                                                         and

                                                         /s/ Tyler A. Mamone, Esq.
                                                         D.C. Bar No. FL0068
                                                         MAMONE VILLALON PLLC
                                                         Miami Tower – Suite 2000
                                                         100 Southeast Second Street
                                                         Miami, Florida 33131
                                                         tyler@mvlawpllc.com

MTG/jp/2798

# **<u>Exhibit A</u>**

Indian reserve. lands, that there shall be reserved, to be applied to the use of the Indians of the said village of St. Regis, in like manner as the said tract is to remain reserved, a tract of one mile square, at each of the said mills, and the meadows on both sides of the said Grass river from the said mill thereon, to its confluence with the river St. Lawrence.

IN TESTIMONY whereof, the said commissioner, the said deputies, the said agents, and the said William Constable and Daniel M'Cormick, have hereunto, and to two other acts of the same tenor and date, one to remain with the United States, another to remain with the state of New-York, and another to remain with the said Seven Nations or tribes of Indians, set their hands and seals, in the city of New-York, the thirty-first day of May, in the twentieth year of the independence of the United States, one thousand seven hundred and ninety-six.

| | |
|---|---|
| Abraham Ogden, | Ohaweio, (alias Goodstream), |
| Egbert Benson, | Otiatoharongwan, (alias Colonel Lewis |
| Richard Varick, | Cook.) |
| James Watson, | William Gray, |
| William Constable, | Teharagwanegen, (alias Thomas Williams). |
| Daniel M'Cormick, | |

SIGNED, SEALED AND DELIVERED IN THE PRESENCE OF

Samuel Jones, Recorder of the city of New-York. John Tayler, Recorder of the city of Albany. Joseph Ogden Hoffman, attorney-general of the state of New-York.

To the Indian names are subjoined a mark and seal.

---

# A TREATY OF PEACE AND FRIENDSHIP

June 29, 1796.

Proclamation, March 18, 1797.

*Made and concluded between the President of the United States of America, on the one Part, and Behalf of the said Part, and the undersigned Kings, Chiefs and Warriors of the Creek Nation of Indians, on the Part of the said Nation.* (a)

Subject to alterations of the 3d and 4th articles, as stated in the note.

THE parties being desirous of establishing permanent peace and friendship between the United States and the said Creek nation, and the citizens and members thereof; and to remove the causes of war, by ascertaining their limits, and making other necessary, just and friendly arrangements; the President of the United States, by Benjamin Hawkins, George Clymer and Andrew Pickens, Commissioners whom he

---

(a) This treaty was ratified by the President and the Senate of the United States on condition that the third and fourth articles should be modified as follows:

The Senate of the United States, two-thirds of the Senators present concurring, did, by their resolution of the second day of March instant, "consent to, and advise the President of the United States, to ratify the Treaty of Peace and Friendship, made and concluded at Coleraine, in the state of Georgia, on the 29th June, 1796, between the President of the United States of America, on the part and behalf of the said States, and the Kings, Chiefs and Warriors of the Creek nation of Indians, on the part of the said nation: *Provided, and on condition,* that nothing in the third and fourth articles of the said treaty, expressed in the words following, 'Article 3d, The President of the United States of America shall have full powers, whenever he may deem it adviseable, to establish a trading or military post on the south side of the Altamaha, on the bluff, about one mile above Beard's bluff; or any where from thence down the said river on the lands of the Indians, to garrison the same with any part of the military force of the United States, to protect the post, and to prevent the violation of any of the provisions or regulations subsisting between the parties: And the Indians do hereby annex to the post aforesaid, a tract of land of five miles square, bordering one side on the river, which post and the lands annexed thereto, are hereby ceded to, and shall be to the use, and under the government of the United States of America.

## TREATY WITH THE CREEKS.  1796.

hath constituted with powers for these purposes, by and with the advice and consent of the Senate; and the Creek Nation of Indians, by the undersigned Kings, Chiefs and Warriors, representing the whole Creek Nation, have agreed to the following articles:

### ARTICLE I.

The Treaty entered into, at New-York, between the parties on the 7th day of August, 1790, is, and shall remain obligatory on the contracting parties, according to the terms of it, except as herein provided for.

*Treaty at New York binding.*

### ARTICLE II.

The boundary line from the Currahee mountain, to the head, or source of the main south branch of the Oconeé river, called, by the white people, Appalatchee, and by the Indians, Tulapocka, and down the middle of the same, shall be clearly ascertained, and marked, at such time, and in such manner, as the President shall direct. And the Indians will, on being informed of the determination of the President, send as many of their old chiefs, as he may require, to see the line ascertained and marked.

*Boundary line.*

### ARTICLE III. (a)

The President of the United States of America shall have full powers, whenever he may deem it advisable, to establish a trading or military post on the south side of the Alatamaha, on the bluff, about one mile above Beard's bluff; or any where from thence down the said river on the lands of the Indians, to garrison the same with any part of the military force of the United States, to protect the posts, and to prevent the violation of any of the provisions or regulations subsisting between the parties: And the Indians do hereby annex to the post aforesaid, a tract of land of five miles square, bordering one side on the river; which post and the lands annexed thereto, are hereby ceded to, and shall be to the use, and under the government of the United States of America.

*President may establish a trading or military post.*

### ARTICLE IV. (a)

As soon as the President of the United States has determined on the time and manner of running the line from the Currahee mountain, to the head or source of the main south branch of the Oconee, and notified the chiefs of the Creek land of the same, a suitable number of persons on their part shall attend to see the same completed: And if the President should deem it proper, then to fix on any place or places adjoining the river, and on the Indian lands for military or trading posts; the Creeks who attend there, will concur in fixing the same, according to the wishes of the President. And to each post, the Indians shall annex a tract of land of five miles square, bordering one side on the river.

*Line to be run.*

*Trading or military posts to be established.*

"Art. 4th, as soon as the President of the United States has determined on the time and manner of running the line from the Currahee mountain, to the head or source of the main south branch of the Oconnee, and notified the Chiefs of the Creek land of the same, a suitable number of persons on their part shall attend, to see the same completed: And if the President should deem it proper, then to fix on any place or places adjoining the river, and on the Indian lands for military or trading posts: the Creeks who attend there, will concur in fixing the same, according to the wishes of the President. And to each post, the Indians shall annex a tract of land of five miles square, bordering one side on the river. And the said lands shall be to the use and under the government of the United States of America. *Provided always*, that whenever any of the trading or military posts mentioned in this treaty, shall, in the opinion of the President of the United States of America, be no longer necessary for the purposes intended by this cession, the same shall revert to, and become a part of the Indian lands,' shall be construed to affect any claim of the state of Georgia, to the right of pre-emption in the land therein set apart for military or trading posts; or to give to the United States without the consent of the said state, any right to the soil, or to the exclusive legislation over the same, or any other right than that of establishing, maintaining, and exclusively governing military and trading posts within the Indian territory mentioned in the said articles, as long as the frontier of Georgia may require these establishments."

(a) See note at the beginning of the treaty.

And the said lands shall be to the use and under the government of the United States of America. *Provided always*, that whenever any of the trading or military posts mentioned in this treaty, shall, in the opinion of the President of the United States of America, be no longer necessary for the purposes intended by this cession, the same shall revert to, and become a part of the Indian lands.

## ARTICLE V.

Chiefs to attend the running the line with Spain.

Whenever the President of the United States of America, and the king of Spain, may deem it advisable to mark the boundaries which separate their territories, the President shall give notice thereof to the Creek chiefs, who will furnish two principal chiefs, and twenty hunters to accompany the persons employed on this business, as hunters and guides from the Chocktaw country, to the head of St. Mary's. The chiefs shall receive each half a dollar per day, and the hunters one quarter of a dollar each per day, and ammunition, and a reasonable value for the meat delivered by them for the use of the persons on this service.

## ARTICLE VI.

Boundary line with Choctaws and Chickasaws.

The Treaties of Hopewell, between the United States and the Chocktaws and Chickasaws, and at Holston between the Cherokees and the United States, mark the boundaries of those tribes of Indians. And the Creek nation do hereby relinquish all claims to any part of the territory inhabited or claimed by the citizens of the United States, in conformity with the said treaties.

## ARTICLE VII.

Prisoners to be given up.

The Creek nation shall deliver, as soon as practicable, to the superintendant of Indian affairs, at such place as he may direct, all citizens of the United States; white inhabitants and negroes who are now prisoners in any part of the said nation, agreeably to the treaty at New-York, and also all citizens, white inhabitants, negroes and property taken since the signing of that treaty. And if any such prisoners, negroes or property should not be delivered, on or before the first day of January next, the governor of Georgia may empower three persons to repair to the said nation, in order to claim and receive such prisoners, negroes and property, under the direction of the President of the United States.

## ARTICLE VIII.

Presents to the Indians.

In consideration of the friendly disposition of the Creek nation towards the government of the United States, evidenced by the stipulations in the present treaty, and particularly the leaving it in the discretion of the President to establish trading or military posts on their lands; the commissioners of the United States, on behalf of the said states, give to the said nation, goods to the value of six thousand dollars, and stipulate to send to the Indian nation, two blacksmiths, with strikers, to be employed for the upper and lower Creeks with the necessary tools.

## ARTICLE IX.

Animosities to cease.

All animosities for past grievances shall henceforth cease, and the contracting parties will carry the foregoing treaty into full execution with all good faith and sincerity. *Provided nevertheless*, That persons now under arrest, in the state of Georgia, for a violation of the treaty at New-York, are not to be included in this amnesty, but are to abide the decision of law.

### ARTICLE X.

This treaty shall take effect and be obligatory on the contracting parties, as soon as the same shall have been ratified by the President of the United States, by and with the advise and consent of the senate.

*When to take effect.*

Done at Colerain, the 29th of June, one thousand seven hundred and ninety-six.

BENJAMIN HAWKINS.
GEORGE CLYMER.
ANDREW PICKENS.

*Cowetas.*
Chruchateneah,
Tusikia Mico,
Inclenis Mico,
Tuskenah,
Ookfuskee Tustuneka,
Clewalee Tustuneka.

*Cussitas.*
Tusikia Mico,
Cussita Mico,
Fusatchee Mico,
Opoey Mico.

*Broken Arrows.*
Tustuneka Mico,
Othley Opoey,
Opoey Tustuneka,
Oboethly Tustuneka.

*Euchees.*
Euchee Mico.

*Usuchees.*
Osaw Enehah,
Ephah Tuskenah,
Tusikia Mico.

*Chehaws.*
Chehaw Mico.

*Talehanas.*
Othley poey Mico,
Othley poey Tustimiha.

*Oakmulgees.*
Opoey Thloeco,
Parachuckley,
Tuskenah.

*Euphales.*
Pahose Mico,
Tustunika Chopeo.

*Ottassees.*
Fusatchee Hulloo Mico,
Tusikia Mico,
Mico Opoey.

*Tallessees.*
Tallessee Mico,
Othley poey Mico.

*Little Oakjoys.*
Meeke Matla.

*Hicory Ground.*
Opoey Mico.

*Kuyalegees.*
Kelese Hatkie.

*Weokis.*
Nedhomotea Opoey,
Tuscikia Mico.

*Cleewallees.*
Opoey-e-Matla.

*Coosis.*
Hosonupe Hodjo.

*Tukabathees.*
Holahto Mico,
Tustunika Thlocco.

*Oakfuskees.*
Pashphalaha.

*Abacouchees.*
Spani Hodjo,
Tustonika.

*Upper Euphaules.*
Opoey.

*Natchees.*
Chinibe.

*Upper Cheehaws.*
Spokoi Hodjo,
Tustunika.

*Mackasookos.*
Tuskeehenehaw.

*Oconees.*
Knapematha Thlocco.

*Cusetahs.*
Cusa Mico,
Tusekia Mico Athee,
Halartee Matla,
Talahoua Mico,
Neathlocto,
Nuckfamico,
Estechaco Mico,
Tuskegee Tuskinagee,
Cochus Mico,
Opio Hajo,
Oneas Tustenagee,
Alak Ajo,
Stilepeck Chatee,
Tuchesee Mico.

*Kealeegees.*
Cheea Hajo.

## TREATY WITH THE CREEKS.  1796.

*Hitchetaws.*
Talmasee Matla.

*Tuckabatchees.*
Tustincke Hajo.
Okolissa,
Coweta Matla,
Coosa Mico,
Fusatchee Mico,
Pio Hatkee,
Foosatchee Mico,
Neathlaco,
Tuchabatchee Howla,
Spoko Hajo.

*Kialeegees.*
Chuckchack Nincha,
Opoyo Matla,
Lachlee Matla.

*Big Tallasees.*
Chowostia Hajo,
Neathloco Opyo,
Neathloco,
Chowlactley Mico,
Tocoso Hajo,
Hoochee Matla,
Howlacta,
Tustinica Mico,
Opoy Fraico.

*Big Talassee.*
Houlacta,
Elcatee Hajo,
Chosolop Hajo,
Coosa Hajo.

*Tuchabatchees.*
Chohajo.

*Coosi's.*
Tushegee Tustinagee,
Talmasa Watalica.

*Euphalees.*
Tothes Hago.

*Otasees.*
Opio Tustinagee,
Yafkee Matle Hajo,
Oboyethlee Tustinagee,
Tustinagee Hajo,
Hillibee Tustinagee Hajo,
Effa Tuskeena,
Emathlee Loco,
Tustenagee Mico,
Yaha Tustinagee,
Cunctastee Justinagee.

*Ottasees.*
Coosa Tustanagee,
Neamatle Matla.

*Weeokee's.*
Tusticnika Hajo.

*Tuchabatchee's.*
Neamatoochee.

*Cussita's.*
Talewa Othleopoya,
Talmasse Matla,
Niah Weathla,
Emathlee-laco,
Ottessee Matla,
Muclassee Matla,
Eufallee Matla.

*Tuckabatchees.*
Cunipee Howla.

*Cowetas.*
Hospotak Tustinagee.

*Natchees.*
Spoko Hodjo.

*Uchee's.*
Tustinagee Chatee.

*Usuchees.*
Spokoca Tustinagee,
Othley poey Tustinagee,
Tuskeeneah.

WITNESS :—James Seagrove, superintendant Indian affairs, C. N.  Henry Gaither, lieutenant-colonel-commandant.   Const. Freeman, A. W. D. major artillery and engineers.  Samuel Tinsley, capt. 3d. sub-legion.   Samuel Allinson, ensign 2d. sub-legion.  John W. Thompson, ensign 1st U. S. sub-legion.   Geo. Gillasspy, surgeon L. U. S.  Timothy Barnard, D. A. and sworn Interpreter.  James Burges, D. A. and sworn Interpreter.  James Jordan.  Richard Thomas.  Alexander Cornels.  William Eaton, capt. 4th U. S. sub-legion, commandant at Coleraine and secretary to the commission.

# RELINQUISHMENT

*To New York, by the Mohawk nation of Indians, under the sanction of the United States of America, of all claim to lands in that state.*

<span style="float:right">March 29, 1797.<br>Proclamation,<br>April 27, 1798.</span>

At a treaty held under the authority of the United States, with the Mohawk nation of Indians, residing in the province of Upper Canada, within the dominions of the king of Great Britain, present, the honorable Isaac Smith, commissioner appointed by the United States to hold this treaty; Abraham Ten Broeck, Egbert Benson, and Ezra L'Hommedieu, agents for the state of New York; captain Joseph Brandt, and captain John Deserontyon, two of the said Indians and deputies, to represent the said nation at this treaty.

The said agents having, in the presence, and with the approbation of the said commissioner, proposed to and adjusted with the said deputies, the compensation as hereinafter mentioned to be made to the said nation, for their claim, to be extinguished by this treaty, to all lands within the said state: it is thereupon finally agreed and done, between the said agents, and the said deputies, as follows, that is to say: the said agents do agree to pay to the said deputies, the sum of one thousand dollars, for the use of the said nation, to be by the said deputies paid over to, and distributed among, the persons and families of the said nation, according to their usages.   The sum of five hundred dollars, for the expenses of the said deputies, during the time they have attended this treaty: and the sum of one hundred dollars, for their expenses in returning, and for conveying the said sum of one thousand dollars, to where the said nation resides.   And the said agents do accordingly, for and in the name of the people of the state of New York, pay the said three several sums to the said deputies, in the presence of the said commissioner.   And the said deputies do agree to cede and release, and these presents witness, that they accordingly do, for and in the name of the said nation, in consideration of the said compensation, cede and release to the people of the state of New York, forever, all the right or title of the said nation to lands within the said state: and the claim of the said nation to lands within the said state, is hereby wholly and finally extinguished.

<span style="float:right">Agents of New York pay to the Mohawk deputies, $1000 and their expenses.</span>

<span style="float:right">The Mohawks cede all right, &c. for ever.</span>

In testimony whereof, the said commissioner, the said agents, and the said deputies, have hereunto, and to two other acts, of the same tenor and date, one to remain with the United States, one to remain with the said state, and one delivered to the said deputies, to remain with the said nation, set their hands and seals, at the city of Albany, in the said state, the 29th day of March, in the year 1797.

ISAAC SMITH.

| | |
|---|---|
| Abm. Ten Broeck, | Jos. Brandt, |
| Egbt. Benson, | John Deserontyon. |
| Ezra L'Hommedieu, | |

Witnesses:—Robert Yates, John Tayler, Chas. Williamson, Thomas Morris, The mark of John Abeel, alias the Cornplanter, a chief of the Senekas.

To the Indian names is subjoined a seal.

[For a contract, dated Sept. 15, 1797, between Robert Morris and the Senecas, entered into under the sanction of the United States, see post, Appendix I. p. 601.]

F   (61)

# Exhibit B

Lapassine, or Ashenonquah, his x mark, [L. S.]
Osage, his x mark, [L. S.]
Natowcesa, his x mark, [L. S.]
Meshekeleata, or the Big man, his x mark, [L. S.]
Sananabhonga, or Stone Eater, his x mark, [L. S.]
Neshepehtah, or Double Tooth, his x mark, [L. S.]
Metoosania, or Indian, his x mark, [L. S.]
Chequia, or Poor Racoon, his x mark, [L. S.]
Wapepecheka, his x mark, [L. S.]
Chingomega Eboa, or Owl, his x mark, [L. S.]
Keweeokong, or Circular Travelling, his x mark, [L. S.]
Wapassbanah, or White Racoon, his x mark, [L. S.]
Chekemetine, or Turtle's Brother, his x mark, [L. S.]
Pocondoqua, or Crooked, his x mark, [L. S.]
Chequeah, or Poor Racoon, a Wea, or Little Eyes, his x mark, [L. S.]
Showilingeshua, or Open Hand, his x mark, [L. S.]
Okawen, or Porcupine, his x mark, [L. S.]
Shawanoe, his x mark, [L. S.]
Mawanae, or Young Wolf, his x mark, [L. S.]
Meshwawa, or Wounded, his x mark, [L. S.]
Sangweconsya, or Buffaloe, his x mark, [L. S.]
Pequia, or George, his x mark, [L. S.]

Keelswa, or Sun, his x mark, [L. S.]
Wabeea, or White Skin, his x mark, [L. S.]
Wanselpes, or Sunrise, his x mark, [L. S.]
Angatoka, or Pile of Wood, his x mark, [L. S.]

Pattawatimas:
Toopinnepe, his x mark, [L. S.]
Onoxa, or Five Medals, his x mark, [L. S.]
Metea, his x mark, [L. S.]
Conge, or Bear's foot, his x mark, [L. S.]
Nanowoseca, his x mark, [L. S.]
Chagobbe, or One who sees all over, his x mark, [L. S.]
Meshon, his x mark, [L. S.]
Pentoh, his x mark, [L. S.]
Checanoe, his x mark, [L. S.]
Neshecotawa, his x mark, [L. S.]
Tonguish, his x mark, [L. S.]
Nebaughkua, his x mark, [L. S.]
Wesuanesa, his x mark, [L. S.]
Chechock, or Crane, his x mark, [L. S.]
Kepoota, his x mark, [L. S.]
Mackoota, or Crow, his x mark, [L. S.]
Papeketcha, or Flat Belly, his x mark, [L. S.]

Kickapoos:
Ketoote, or Otter, his x mark, [L. S.]
Makotanecote, or Black Tree, his x mark, [L. S.]
Sheshepa, or Duck, his x mark, [L. S.]
Wapekonnia, or White Blanket, his x mark, [L. S.]
Accoche, or the Man Hun, his x mark, [L. S.]
Chekaskapalon, his x mark, [L. S.]

In presence of (the words "and the Wyandots, Delawares, Shawanees, and Senekas," interlined in the first article before signing).

James Dill, secretary to the commissioners,
Jno. Johnston, Indian agent,
R. F. Stickney, Indian agent,
James J. Nisbet, associate judge of court of common pleas, Preble County,
Thos. G. Gibson,
Antoine Boindl,
Wm. Walker,
William Connor,

J. Bts. Chandonnai,
Stephen Ruddeed,
James Pelteir,
Joseph Bertraud,
      sworn interpreters,
Thos. Ramsey, captain First Rifle Regiment,
John Conner,
John Riddle, colonel First Regiment Ohio Militia.

---

## TREATY WITH THE CREEKS, 1814.

*Articles of agreement and capitulation, made and concluded this ninth day of August, one thousand eight hundred and fourteen, between major general Andrew Jackson, on behalf of the President of the United States of America, and the chiefs, deputies, and warriors of the Creek Nation.*

Aug. 9, 1814.
7 Stat., 120.
Proclamation, Feb 16, 1815.

WHEREAS an unprovoked, inhuman, and sanguinary war, waged by the hostile Creeks against the United States, hath been repelled, prosecuted and determined, successfully, on the part of the said States, in conformity with principles of national justice and honorable warfare—And whereas consideration is due to the rectitude of proceeding dictated by instructions relating to the re-establishment of peace: Be it remembered, that prior to the conquest of that part of the Creek nation hostile to the United States, numberless aggressions had been committed against the peace, the property, and the lives of citizens of the

108                    TREATY WITH THE CREEKS, 1814.

United States, and those of the Creek nation in amity with her, at the
mouth of Duck river, Fort Mimms, and elsewhere, contrary to national
faith, and the regard due to an article of the treaty concluded at New-
York, in the year seventeen hundred ninety, between the two nations:
That the United States, previously to the perpetration of such out-
rages, did, in order to ensure future amity and concord between the
Creek nation and the said states, in conformity with the stipulations
of former treaties, fulfil, with punctuality and good faith, her engage-
ments to the said nation: that more than two-thirds of the whole num-
ber of chiefs and warriors of the Creek nation, disregarding the
genuine spirit of existing treaties, suffered themselves to be instigated
to violations of their national honor, and the respect due to a part of
their own nation faithful to the United States and the principles of
humanity, by impostures [impostors,] denominating themselves Proph-
ets, and by the duplicity and misrepresentation of foreign emissaries,
whose governments are at war, open or understood, with the United
States.    Wherefore,

<span style="font-size:smaller">Cession of territory<br>by the Creeks as equiv-<br>alent to the expenses<br>of the war</span>  1st—The United States demand an equivalent for all expenses
incurred in prosecuting the war to its termination, by a cession of all
the territory belonging to the Creek nation within the territories of
the United States, lying west, south, and south-eastwardly, of a line
to be run and described by persons duly authorized and appointed by
the President of the United States—Beginning at a point on the
eastern bank of the Coosa river, where the south boundary line of the
Cherokee nation crosses the same; running from thence down the said
Coosa river with its eastern bank according to its various meanders to
a point one mile above the mouth of Cedar creek, at Fort Williams,
thence east two miles, thence south two miles, thence west to the
eastern bank of the said Coosa river, thence down the eastern bank
thereof according to its various meanders to a point opposite the upper
end of the great falls, (called by the natives Woetumka,) thence east
from a true meridian line to a point due north of the mouth of Ofuc-
shee, thence south by a like meridian line to the mouth of Ofucshee on
the south side of the Taltapoosa river, thence up the same, according
to its various meanders, to a point where a direct course will cross the
same at the distance of ten miles from the mouth thereof, thence a
direct line to the mouth of Summochico creek, which empties into the
Chatahouchie river on the east side thereof below the Eufaulau town,
thence east from a true meridian line to a point which shall intersect
the line now dividing the lands claimed by the said Creek nation from
those claimed and owned by the state of Georgia: Provided, neverthe-
less, that where any possession of any chief or warrior of the Creek
nation, who shall have been friendly to the United States during the
war, and taken an active part therein, shall be within the territory
ceded by these articles to the United States, every such person shall
be entitled to a reservation of land within the said territory of one
mile square, to include his improvements as near the centre thereof as
may be, which shall inure to the said chief or warrior, and his descend-
ants, so long as he or they shall continue to occupy the same, who
shall be protected by and subject to the laws of the United States; but
upon the voluntary abandonment thereof, by such possessor or his
descendants, the right of occupancy or possession of said lands shall
devolve to the United States, and be identified with the right of
property ceded hereby.

<span style="font-size:smaller">Guaranty of other<br>territory of the Creeks.</span>  2nd—The United States will guarantee to the Creek nation, the
integrity of all their territory eastwardly and northwardly of the said
line to be run and described as mentioned in the first article.

<span style="font-size:smaller">Intercourse with<br>British or Spanish<br>posts to cease.</span>  3d—The United States demand, that the Creek nation abandon all
communication, and cease to hold any intercourse with any British or
Spanish post, garrison, or town; and that they shall not admit among

them, any agent or trader, who shall not derive authority to hold commercial, or other intercourse with them, by licence from the President or authorized agent of the United States.

4th—The United States demand an acknowledgment of the right to establish military posts and trading houses, and to open roads within the territory, guaranteed to the Creek nation by the second article, and a right to the free navigation of all its waters. <span style="float:right">Establishment of military posts</span>

5th—The United States demand, that a surrender be immediately made, of all the persons and property, taken from the citizens of the United States, the friendly part of the Creek nation, the Cherokee, Chickesaw, and Choctaw nations, to the respective owners: and the United States will cause to be immediately restored to the formerly hostile Creeks, all the property taken from them since their submission, either by the United States, or by any Indian nation in amity with the United States, together with all the prisoners taken from them during the war. <span style="float:right">All property taken to be surrendered</span>

6th—The United States demand the caption and surrender of all the prophets and instigators of the war, whether foreigners or natives, who have not submitted to the arms of the United States, and become parties to these articles of capitulation, if ever they shall be found within the territory guaranteed to the Creek nation by the second article. <span style="float:right">The prophets and instigators of the war to be given up</span>

7th—The Creek nation being reduced to extreme want, and not at present having the means of subsistence, the United States, from motives of humanity, will continue to furnish gratuitously the necessaries of life, until the crops of corn can be considered competent to yield the nation a supply, and will establish trading houses in the nation, at the discretion of the President of the United States, and at such places as he shall direct, to enable the nation, by industry and economy, to procure clothing. <span style="float:right">Supplies of corn to be presented to the Creeks.</span>

8th—A permanent peace shall ensue from the date of these presents forever, between the Creek nation and the United States, and between the Creek nation and the Cherokee, Chickesaw, and Choctaw nations. <span style="float:right">Permanent peace</span>

9th—If in running east from the mouth of Summochico creek, it shall so happen that the settlement of the Kennards, fall within the lines of the territory hereby ceded, then, and in that case, the line shall be run east on a true meridian to Kitchofoonee creek, thence down the middle of said creek to its junction with Flint River, immediately below the Oakmulgee town, thence up the middle of Flint river to a point due east of that at which the above line struck the Kitchofoonee creek, thence east to the old line herein before mentioned, to wit: the line dividing the lands claimed by the Creek nation, from those claimed and owned by the state of Georgia. <span style="float:right">Lines of the territory</span>

The parties to these presents, after due consideration, for themselves and their constituents, agree to ratify and confirm the preceding articles, and constitute them the basis of a permanent peace between the two nations; and they do hereby solemnly bind themselves, and all the parties concerned and interested, to a faithful performance of every stipulation contained therein.

In testimony whereof, they have hereunto, interchangeably, set their hands and affixed their seals, the day and date above written.

Andrew Jackson, major general
 commanding Seventh Military
 District,                             [L. S.]
Tustunnuggee Thlucco, speaker for
 the Upper Creeks, his x mark,  [L. S.]
Micco Aupoegau, of Toukaubat-
 chee, his x mark,                  [L. S.]
Tustunnuggee Hopolee, speaker of
 the Lower Creeks, his x mark,  [L. S.]
Micco Achulee, of Cowetau, his x
 mark,                                 [L. S.]

William McIntosh, jr., major of
 Cowetau, his x mark,          [L. S.]
Tuskee Eneah, of Cusetau, his x
 mark,                              [L. S.]
Faue Emautla, of Cusetau, his x
 mark,                              [L. S.]
Tookaubatchee Tustunnuggee, of
 Hitchetee, his x mark,        [L. S.]
Noble Kinnard, of Hitchetee, his x
 mark,                              [L. S.]

Hopoie Hutkee, of Souwagoolo,
his x mark,                    [L. S.]
Hopoiee Hutkee, for Hopoie Ye-
holo, of Souwagoolo, his x mark, [L. S.]
Folappo Haujo, of Eufaulau, on
Chattohoochee, his x mark,    [L. S.]
Puchee Haujo, of Apalachooola,
his x mark,                    [L. S.]
Timpoeechee Bernard, captain of
Uchees, his x mark,           [L. S.]
Uchee Micco, his x mark,      [L. S.]
Yoholo Micco, of Kialijee, his x
mark,                          [L. S.]
Socoskee Emautla, of Kialijee, his
x mark,                        [L. S.]
Choorchau Haujo, of Woccooci,
his x mark,                    [L. S.]
Esholoctee, of Nauchee, his x
mark,                          [L. S.]
Yoholo Micco, of Tallapoosa En-
faulau, his x mark,           [L. S.]
Stinthellis Haujo, of Abeccochee,
his x mark,                    [L. S.]
Oefuskee Yoholo, of Toutacaugee,
his x mark,                    [L. S.]
John O'Kelly, of Cocea,        [L. S.]
Eneah Thlucco, of Immookfau,
his x mark,                    [L. S.]

Espokokoke Haujo, of Wewoko,
his x mark,                    [L. S.]
Eneah Thlucco Hopoiee, of Tale-
see, his x mark,              [L. S.]
Efau Haujo, of Puccan Tallahassee,
his x mark,                    [L. S.]
Talessee Fixico, of Ocheobofau,
his x mark,                    [L. S.]
Nomatlee Emautla, or captain
Isaacs, of Cousoudtee, his x mark, [L. S.]
Tuskegee Emautla, or John Carr,
of Tuskegee, his x mark,      [L. S.]
Alexander Grayson, of Hillabee,
his x mark,                    [L. S.]
Lowree, of Ocmulgee, his x mark, [L. S.]
Nococoee Emautla, of Chuskee
Tallafau, his x mark,         [L. S.]
William McIntosh, for Hopoiee
Haujo, of Ooseoochee, his x
mark,                          [L. S.]
William McIntosh, for Chehahaw
Tustunnuggee, of Chehahaw, his
x mark,                        [L. S.]
William McIntosh, for Spokokee
Tustunnuggee, of Otellewhoyon-
nee, his x mark,              [L. S.]

Done at fort Jackson, in presence of—
    Charles Cassedy, acting secretary,
    Benjamin Hawkins, agent for Indian affairs,
    Return J. Meigs, A. C. nation,
    Robert Butler, Adjutant General U. S. Army,
    J. C. Warren, assistant agent for Indian affairs,
    George Mayfield,
    Alexander Curnels,
    George Lovett,
                Public interpreters.

---

### TREATY WITH THE POTAWATOMI, 1815.

July 18, 1815.

7 Stat., 123.
Ratified, Dec. 26,
1815

*A treaty of peace and friendship, made and concluded at Portage des
Sioux between William Clark, Ninian Edwards, and Auguste Chou-
teau, Commissioners Plenipotentiary of the United States of America,
on the part and behalf of the said States, of the one part; and the
undersigned Chiefs and Warriors of the Pontawatamie Tribe or
Nation, residing on the river Illinois, on the part and behalf of the
said Tribe or Nation, of the other part.*

THE parties being desirous of re-establishing peace and friendship
between the United States and the said tribe or nation, and of being
placed in all things, and in every respect, on the same footing upon
which they stood before the war, have agreed to the following articles:

Injuries, etc., for-
given

ARTICLE 1. Every injury or act of hostility by one or either of the
contracting parties against the other, shall be mutually forgiven and
forgot.

Peace and friend
ship perpetual

ART. 2. There shall be perpetual peace and friendship between all
the citizens of the United States of America, and all the individuals
composing the said Pontawatamie tribe or nation.

Prisoners to be de-
livered up.

ART. 3. The contracting parties hereby agree, promise, and bind
themselves, reciprocally, to deliver up all the prisoners now in their
hands, (by what means soever the same may have come into their pos-
session,) to the officer commanding at Fort Clarke, on the Illinois river,
as soon as it may be practicable.

# Exhibit C







# **<u>Exhibit D</u>**



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WASHINGTON, D.C.   20245

IN REPLY REFER TO:

Self-Determination Services
MS-4527-MIB

Memorandum

To:    Muskogee Area Director

From: Acting Deputy to the Assistant Secretary - Indian Affairs
      (Tribal Services)

Subject:  The Thlopthlocco, Kialegee and Alabama-Quassarte Tribal Towns
          And P.L. 93-638 Contracting

As you know, the above referenced towns are served by the Okmulgee
Agency.  Since the Bureau of Indian Affairs has recognized the towns as
independent government units, the Okmulgee Agency has become a multi-
tribal agency.  The rights that formerly accrued solely to the Creek
Nation must now be shared with the towns' governing bodies.  This means
that the governing bodies of each town must be considered in any
contracting, recontracting and grant award processes that the Muskogee
Area has ongoing with the Creek Nation, today, and any which may take
place in the future; i.e., FY 1991 awards.

In recent discussions held with the Town King of Thlopthlocco, Ms. Barbara
Kelly, we discussed the possibilities of applying New Tribes monies to the
towns.  This is not possible since the towns are not new tribes.  The
recognition of the towns as separate governmental bodies did not recognize
them anew.  The Bureau's action only identified the same Indian
constituency utilizing a different label.  As such, funds available at the
Okmulgee Agency identified as being available to serve the membership of
the Creek Nation must now be divided among four separate governing
bodies.  No additional funds will be made available.

If you have any questions regarding this memorandum, please contact
Mitchell L. Parks, Division of Self-Determination Services, or
Carol Bacon, Tribal Government Services, 343-2727 or 343-4334,
respectively.

Ronal &Den



cc:  Thlopthlocco, Kialegee and Alabama-Quassarte Tribal Towns
     Creek Nation

# Exhibit E



May 19, 2008


Buford L. Rolin, Tribal Chairman
Poarch Band of Creek Indians
5811 Jack Springs Road
Atmore, AL 36502

Dear Chairman Rolin:

The Poarch Band of Creek Indians (Band or Tribe) is conducting gaming at the Tallapoosa
Entertainment Center, which is located near the city of Montgomery, Alabama, on land
taken into trust on March 25, 1995 (Tallapoosa Site). Thank you for your extraordinary
patience as our office reviewed the question of the status of the Poarch Band's Tallapoosa
Site. I recognize that this review was disruptive to the Tribe financially and for that I
apologize. However, I am happy to inform you that our review is concluded and that we
continue to consider the Tribe's Tallapoosa site to be Indian lands on which the Tribe may
conduct gaming.

I recognize that this decision, coming from me and at this time, is a bit unusual. However,
the Department of the Interior is on the cusp of issuing its regulations interpreting parts of
25 U.S.C. § 2719. Those regulations should provide extremely helpful guidance for the
Commission in the future as it reviews the status of lands on which tribes hope to conduct
gaming. Asking the Tribe to start over in light of the Department's regulations, however,
would be significantly unfair and as such, I am persuaded that the Poarch Band, which has
worked tirelessly over the past several years to assist us in our review of the Tallapoosa site,
should have our views now. Further, I am persuaded that, to the extent my conclusions
might differ from the Department's regulations, this decision will not open the Indian
Gaming Regulatory Act (IGRA) to a number of far ranging and unexpected interpretations.

Our review was prompted by a November 20, 2003, letter from John Park Jr., Assistant
Attorney General for the State of Alabama, questioning whether the Band could lawfully
conduct gaming on the Tallapoosa Site. We reviewed numerous submissions from the tribe
and the record supporting the Band's 1984 recognition by the United States through the
federal acknowledgement process. As a result of our extensive review of the Tribe's
submissions and the Department of the Interior's records, I conclude that the Tallapoosa
Site is part of "the restoration of lands for an Indian tribe restored to Federal recognition"
within the meaning of the IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii), and that gaming on the land
is therefore permissible.

### THE TALLAPOOSA SITE

The United States recognized the Poarch Band of Creek Indians in June 1984. 49 Fed. Reg. 24083 (June 11, 1984). At the time, the Band had no land base. Shortly after recognition, the Department of the Interior took into trust eight small parcels that together total some 229½ acres and proclaimed them to be reservation land. 50 Fed. Reg. 15502 (Apr. 18, 1985).

These parcels serve basic tribal functions – a school house, powwow grounds, a tribal administration building, a gymnasium, a fire station, two small sites for tribal housing, and pasture lands for a tribal farm. Affidavit of Eddie Tullis, ¶ 8 (Mar. 25, 2004).

Given the location of these eight parcels, there are, as a practical matter, two reservations. The larger consists of seven of the eight parcels – approximately 193¾ acres – and is located near Atmore, Escambia County, in the southwestern part of Alabama, northeast of Mobile. The smaller reservation consists of approximately 36 acres and is located in the central part of the state, near Wetumpka, Elmore County, just northeast of Montgomery and more than 100 miles away from Atmore. As with so much of the geography relevant here, this is best conveyed visually. In Figure 1, below, the Atmore reservation land appears in a cluster as parcels 1, 2a, 2b, 3, 7, 8, and 9, while the Wetumpka reservation land appears as parcel 4:



**Figure 1: Poarch Band trust lands (Source: Poarch Band surveys)**

On November 14, 1988, four years after recognition, the Tallapoosa Site, containing just under 13 acres, was donated to the Band in fee, in part because Creek burial mounds are located there. The Tallapoosa Site is located approximately 12 miles from the Wetumpka reservation and appears on Figure 1 as tract 17. The legal description of the land is:

> Commence at the SW corner of Section 27, T-17-N, R-19-E, Montgomery County, Alabama and run EAST, 4340.49 feet; thence NORTH, 1806.29 feet to a point on existing fence line and being the Point of Beginning; Thence

> continue along said fence line S89°13'03"E, 136.34 feet; Thence continue
> along said fence line S23°49'20"E, 62.92 feet; Thence continue along said
> fence line N69°23'34"E, 219.92 feet to an existing iron pin; Thence continue
> along said fence line N17°23'26"W, 968.84 feet to an existing iron pin;
> Thence leaving said fence line N18°23'18"W, 503.62 feet to a point on the
> southeast edge of the Tallapoosa River; Thence along said edge
> S43°24'16"W, 618.01 feet; Thence leaving said edge S39°49'22"E, 150.00
> feet to a point on an existing fence line; Thence along said fence line
> S26°17'56"E, 374.05 feet; Thence continue along said fence line
> S39°39'24"E, 198.60 feet; Thence continue along said fence line
> S17°38'01"E, 386.15 feet to the Point of Beginning. All lying in the E 1/2
> Section 27, T-17-N, R-19-E, Montgomery County, Alabama, and containing
> 12.86 acres more or less.

Warranty Deed, Parcel 17 (Mar. 23, 1995).

On July 21, 1989, the Band wrote to the Area Director of the Bureau of Indian Affairs asking that the land be placed into trust. On March 23, 1995, after a delay of nearly six years, BIA's Eastern Area Office took the land into trust. Warranty Deed, Parcel 17 (Mar. 23, 1995).

LEGAL ANALYSIS

## I.  Indian lands, generally.

IGRA permits gaming only on Indian lands, 25 U.S.C. §§ 2710(b)(1), (2); 2710(d)(1), (2), which it defines as:

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). The National Indian Gaming Commission's implementing regulations clarify:

> Indian lands means:
>
> (a)  Land within the limits of an Indian reservation; or
>
> (b)  Land over which an Indian tribe exercises governmental power and that is either –
>
> > (1)  Held in trust by the United States for the benefit of any Indian tribe or individual; or
> >
> > (2)  Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12. I conclude that the Tallapoosa Site is "Indian lands" under these definitions. It is trust land over which the Band exercises governmental power.

## A.    Trust land

The Tallapoosa Site is, without question, trust land. Again, the Band received the land in fee as a gift in November 1988, and the BIA finished its fee-to-trust acquisition in March 1995. Warranty Deed, Parcel 17 (Mar. 23, 1995)
.

## B.    Governmental power

The Band also exercises governmental power over the Tallapoosa Site. This conclusion, however, is not as straightforward as simply noting that the United States holds the Site in trust for the Band. In order to exercise governmental power over its land, the Band, like any other government, must first have jurisdiction to do so. *See, e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F. 3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), *superseded by statute on other grounds, Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) (in addition to having jurisdiction, a tribe must exercise governmental power in order to trigger [IGRA]); *State ex. rel. Graves v. United States*, 86 F. Supp 2d 1094 (D. Kan. 2000), *aff'd and remanded, Kansas v. United States*, 249 F. 3d 1213 (10th Cir. 2001); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (a tribe must have jurisdiction in order to be able to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) (a tribe must first have jurisdiction in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4)).

### 1. Jurisdiction

Tribes are presumed to possess jurisdiction within "Indian Country." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998). Indian tribes are "invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982). Moreover, "Indian Country" refers to land that is subject to the "primary jurisdiction ... [of] the Federal Government and the Indian tribe inhabiting it." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). Thus, if the Tallapoosa Site is Indian Country, the Band possesses jurisdiction to exercise governmental authority there.

Whether land is Indian Country may be determined by reference to statute. Though there have been several definitions of Indian Country over the long history of federal Indian law, the definition accepted and commonly used today is:
>     (a) all land within the limits of any Indian reservation…,
>     (b) all dependent Indian communities…, and
>     (c) all Indian allotments , the Indian titles to which have not been
>           extinguished….

18 U.S.C. § 1151. Though by its terms, § 1151 applies to questions of criminal jurisdiction, it generally applies to questions of civil jurisdiction as well. *DeCoteau v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425, 427, n. 2, (1975).

In *Venetie*, the Court held that § 1151, enacted in 1948, codified a number of its earlier decisions concerning Indian lands. In each of those decisions, the Court held that Indian Country was distinguished by two essential characteristics: it is land set aside by the federal government for the use of Indian tribes, and the land remains under federal supervision or superintendence. *Venetie*, 522 U.S. at 530 ("Section 1151 does not purport to alter this definition of Indian country, but merely lists the three different categories of Indian country mentioned in our prior cases…").

Thus, paragraph (a) of 18 U.S.C. § 1151 equates Indian Country and reservation land. It adopts *Donnelly v. United States*, 228 U.S. 243, 269 (1913), which held, "not surprisingly," that Indian country includes lands within formal reservations. *Venetie*, 522 U.S. at 528 n. 3, 530. Paragraph (b) equates Indian Country and "dependent Indian communities." It adopts *United States v. McGowan*, 302 U.S. 535, 538-539 (1938) and *United States v. Sandoval*, 231 U.S. 28, 46 (1913), which held that Indian Country includes other lands such as Pueblos or federally created colonies, not formally designated as reservations, that nonetheless possess the attributes of federal set-aside and federal superintendence. *Venetie*, 522 U.S. at 528, 529-530. Finally, paragraph (c) equates Indian Country and Indian allotments where title has not been extinguished. It adopts *United States v. Pelican*, 232 U.S. 442, 449 (1914), which held that individual Indian allotments held in trust by the United States are Indian Country because they "remain Indian lands set apart for Indians under governmental care." *Venetie*, 522 U.S. at 529, 530.

Section 1151 does not, by its terms, address trust land such as the Tallapoosa Site. Nevertheless, several Supreme Court decisions hold that tribal trust lands are Indian Country, even if they are not part of a formal reservation. First and foremost, in *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505 (1991), the Supreme Court concluded that lands held in trust by the United States for the Tribe were "validly set apart for the use of the Indians as such, under the superintendence of the Government," and, therefore, were Indian Country. *Id.* at 511. As a consequence, the State did not have the authority to tax sales of goods to tribal members that occurred on those lands. The *Potawatomi* Court specifically rejected the contention that tribal trust land was not Indian Country because it was not a reservation, noting that no "precedent of this Court has ever drawn the distinction between tribal trust land and reservations that Oklahoma urges." *Id.*; *see also Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 452-453 and n.2 (1995) (treating tribal trust lands as Indian country); *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123-125 (1993) (same); *United States v. John*, 437 U.S. 634, 649 (1978) (observing that land "declared by Congress to be held in trust by the Federal Government for the benefit of the . . . Indians . . . [is a] 'reservation,' at least for the purposes of federal criminal jurisdiction").

Likewise, federal appellate courts unequivocally hold that trust lands are Indian Country. In *United States v. Roberts*, 185 F. 3d 1125 (10th Cir. 1999), for example, the Tenth Circuit held that "official 'reservation' status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian country pursuant to [18] U.S.C. § 1151." *Id.* at 1131. Similarly, in *Langley v. Ryder*, 778 F. 2d 1092 (5th Cir. 1985), the Fifth Circuit held that lands held in trust for the Coushatta Indian Tribe of Louisiana were Indian Country, regardless of whether they were proclaimed a reservation. *Id.* at 1095.

Further, not only do the courts hold that trust land is Indian Country, they hold that trust land is Indian Country under 18 U.S.C. § 1151(a). For jurisdictional purposes, there is no distinction between reservation land and trust land. Again, in *Potawatomie*, the Supreme Court unambiguously held that trust land is "validly set apart" and thus qualifies *as a reservation* for jurisdictional purposes. *Potawatomie*, 498 U.S. at 511 (emphasis added). *Accord*, *John*, 437 U.S. at 649.

Appellate courts hold the same. *See, e.g., HRI, Inc., v. Environmental Protection Agency*, 198 F. 3d 1224, 1249 (10ᵗʰ Cir. 2000) (following *Potawatomi*, "[u]nder Supreme Court and Tenth Circuit precedent, trust lands … are Indian country"); *Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665, 668 (10ᵗʰ Cir. 1980) (the court is "convinced that, barring possible specific exceptions to which our attention is not directed, lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)"); *United States v. Sohappy*, 770 F. 2d 816, 822-823 (9ᵗʰ Cir. 1985) (holding that trust lands are Indian Country and "amount to 'reservation lands'" for purposes of jurisdiction, following *John*).

Here, then, once the United States took the Tallapoosa Site into trust for the benefit of the Band, the land became "Indian Country" within the meaning of 18 U.S.C. § 1151. The Site was "validly set apart for the use of the Indians as such, under the superintendence of the Government." *Potawatomi*, 498 U.S. at 511. Accordingly, the Band has jurisdiction to exercise governmental authority at the Tallapoosa Site.

### 2. Exercise of governmental authority

In order for the Tallapoosa Site to be "Indian lands" within the meaning of IGRA, the Band must also exercise present-day, governmental authority on the land. How exactly a tribe does this IGRA does not say, though there are many possible ways in many possible circumstances. For this reason, NIGC has not formulated a uniform definition of "exercise of governmental power," but rather decides that question in each case based upon all the circumstances. *National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act*, 57 Fed. Reg. 12382, 12388 (Apr. 9, 1992).

The courts provide useful guidance. For example, governmental power involves "the presence of concrete manifestations of … authority." *Narragansett Indian Tribe*, 19 F.3d at 703. Examples include the establishment of a housing authority, administration of health care programs, job training, public safety, conservation, and other governmental programs. *Id.* Here, the Band has exercised, and it continues to exercise, governmental authority over the Tallapoosa Site in a variety of ways.

The Band's Constitution extends the Band's governmental jurisdiction to all of its lands, including its trust lands:

> The jurisdiction of the Poarch Band of Creek Indians shall extend to all lands now held in the name of the Band or which hereafter may be acquired for or by and held in the name of the Poarch Band of Creek Indians.

*Constitution of the Poarch Band of Creek Indians*, Art. III, § 1. Similarly, the Band's constitution gives the tribal council the authority to "[e]stablish and enforce ordinances governing the conduct and civil relations of the residents within the territorial jurisdiction of the Tribe...." Constitution of the *Poarch Band of Creek Indians*, Art. IV, § 4, ¶ k. In the exercise of that authority, the Band's council has adopted a tribal code that, among other things, establishes a tribal court system. *Porch Band of Creek Indians, Tribal Code*, § 3-1-1(a).

Further, the Band's police have governmental offices within the Band's gaming facility at the Site. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson & Perry, to Katherine L. Zebell, Esq., NIGC (Nov. 2, 2004). The Band provides law enforcement on the Site 24 hours a day. The Band is in the process of providing other governmental services, including additional law enforcement, through an agreement between the Band and the Montgomery County sheriff. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson & Perry, to Philip N. Hogen, Chairman, NIGC (Mar. 29, 2004). The Band is also implementing plans for the restoration of the burial mounds at the Site and has adopted a video monitoring system to protect the mounds from vandalism. Tullis Aff. ¶ 12.

Further still, the Band has adopted a Class II gaming ordinance applicable to the Site and has formed a gaming commission to regulate the Band's Class II gaming operations there. Letter from Anthony J. Hope, NIGC Chairman, to Eddie L. Tullis, Tribal Chairman, Poarch Band of Creek Indians (Aug. 2, 1993). Both the Band's gaming commission and police have offices within the Band's facility at the Site. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson & Perry, LLP to Katherine L. Zebell, Esq., NIGC, re: Poarch Band of Creek Indians (Nov. 2, 2004).

Given the foregoing, then, the Band exercises governmental authority over the Tallapoosa Site; it has jurisdiction to exercise that authority; and the land is held in trust for the Band by the United States. Accordingly, the Tallapoosa Site is Indian land within the meaning of IGRA. 25 U.S.C. § 2703(4)(B).

## II.    Gaming on after-acquired trust land

Meeting the definition of "Indian lands" does not finish the analysis, however. The United States took the Tallapoosa Site into trust in March 1995, and thus the land falls within IGRA's general prohibition against gaming on trust land acquired after October 17, 1988. 25 U.S.C. § 2719(a). As such, the question becomes whether the Tallapoosa Site meets any of the exceptions in § 2719. It is our opinion that the Site is the "restored land" of a tribe itself restored to federal recognition. 25 U.S.C. § 2719(b)(1)(B)(iii).

To meet this exception, a tribe must be an "Indian tribe that is restored to Federal recognition," and the acquisition of the land into trust must be part of a "restoration of lands" for the tribe. These terms are not defined in IGRA or the NIGC's implementing regulations, but there is precedent. The plain, primary meaning of the terms should be used. *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the W. Dist. of Mich. (Grand Traverse III)*, 369 F.3d 960, 967 (6th Cir. 2004), *aff'g* 198 F. Supp. 920, 928 (W.D.

Mich. 2002); *Confederated Tribes of Coos, Lower Umpqua & Suislaw Indians v. Babbitt* (*Coos*), 116 F. Supp. 2d 155, 161 (D.D.C. 2000).

## A.    The Band has been restored to federal recognition

To be an "Indian tribe that is restored to Federal recognition," a tribe must demonstrate a period of recognition by the United States, termination of that recognition, and reinstatement of recognition by the United States. *Grand Traverse III*, 369 F.3d at 967. The Band satisfies all three conditions.

### 1.    Recognition by the United States

In the first half of the 19th century, the Band was recognized by the United States as I understand the term. The record demonstrates this in two different, though equally sufficient, ways. First and foremost, the United States treated repeatedly with the Creek Nation. Second, separate and apart from any treaty-making, the record amply demonstrates a government-to-government relationship between the United States and a tribal town founded by the Band's progenitors. That town, like other Creek towns, was an autonomous political entity within the historic Creek Nation.

#### a. Treaties with the historic Creek Nation

For most of its history, the Creek Nation was a confederacy. One historian describes the confederacy at the time of first European contact in 1540 this way:

> The Creek Nation was a confederacy – an alliance of separate and independent tribes that gradually became, over a long period, a single political organization. Through most of its history, however, the Confederacy was a dynamic institution, constantly changing in size as tribes, for whatever reason, entered the alliance or left it. The evidence suggests that many more groups joined than withdrew….

BIA Office of Federal Acknowledgement memorandum recommending federal recognition of Poarch Band of Creek Indians, p. 67 of 130 (Dec. 29, 1983)("OFA memo"); *Michael D. Green, The Creeks: A Critical Bibliography* vii (1979). Even in Colonial times, the center of political life for the Creeks was the town, which exercised powers of broad self-government:

> The leading men of the town assembled everyday in council, either at the square or the chokofa. Here they made decisions involving war and peace, planting and hunting, disputes between citizens, the maintenance of order, the punishment of offenders, the care of the public building and grounds, the ceremonials and amusements….

*Angie Debo, The Road to Disappearance: A History of the Creek Indians*, 12 (1941). Beginning around 1780, the Band's direct, lineal ancestors migrated from a number of "Upper Creek" towns around the area of what is now Montgomery, Alabama, OFA memo, p. 4 of 130, and founded a tribal town on the Tensaw River in the southwestern part of the state, about 50 miles north of what is now Mobile. OFA memo, pp. 3, 4 of 130. The reasons

for the migration, which took place gradually over 20 years, OFA memo, p. 70 of 130, were cultural and political.

The Band's forebears were "half-bloods," a partially acculturated group, highly intermarried, and among whom were wealthy traders and landowners. OFA memo, pp. 5, 70 of 130. Although called "half-blood," it is probable that the blood quantum was higher than half. OFA memo, p. 4 of 130. This group, though increasingly influential among the Creeks in the late 18th and early 19th centuries, OFA memo, p. 5 of 130, nevertheless "did not live harmoniously with their full-blood kinsmen in the Upper Creek towns." OFA memo, p. 70 of 130.

The Band's forebears applied to the council of the Creek Convention for leave to settle on the Tensaw lands, which it received. OFA memo, pp. 4, 70 of 130. From its beginnings, the Tensaw settlement, like other Creek towns, was autonomous within the Creek Nation.

> Even in its embryonic stage, however, the community was both autonomous and sanctioned by the council of the Creek Confederacy…. The half-blood settlement near Tensaw was like the Yuchis, Shawnees, etc., a legitimate town of the Creek Confederacy maintaining full political relations with the Convention meeting alternately in Tuckabatchee and Coweta.

OFA memo, pp. 70-71.

Against this historical backdrop, the United States struck 13 treaties with the Creek Nation before 1833. Treaty of New York, 1790, Aug. 7, 1790, 7 Stat. 35; Treaty with the Creeks, 1796, June 29, 1796, 7 Stat. 56; Treaty with the Creeks, 1802, June 16, 1802, 7 Stat. 68; Treaty with the Creeks, 1805, Nov. 14, 1805, 7 Stat. 96; Treaty of Fort Jackson, 1814, Aug. 9, 1814, 7 Stat. 120; Treaty with the Creeks, 1818, Jan. 22, 1818, 7 Stat. 171; Treaty with the Creeks, 1821, Jan. 8, 1821, 7 Stat. 215; Treaty with the Creeks, 1821, Jan. 8, 1821, 7 Stat. 217; Treaty with the Creeks, 1825, Feb. 12, 1825, 7 Stat. 237; Treaty with the Creeks, 1826, Jan. 24, 1826, 7 Stat. 286; Treaty with the Creeks, 1827, Nov. 15, 1827, 7 Stat. 307; Treaty with the Creeks, 1832, Mar. 24, 1832, 7 Stat. 366; Treaty with the Creeks, 1833, Feb. 14, 1833, 7 Stat. 417. The first, the Treaty of New York, a "treaty of peace and friendship" was signed in 1790:

> There shall be perpetual peace and friendship between all the citizens of the United States of America, and all the individuals, towns and tribes of the Upper, Middle and Lower Creeks and Semanolies [sic] composing the Creek nation of Indians. 7 Stat. 35, Art. I. Among the last, in 1832, was the instrument of the Creek's removal to the Indian Territory.

7 Stat. 366 (March 24, 1832). The significance of these treaties is that they, *per se*, indicate a government-to-government relationship between the United States and the historic Creek Nation.

Before the modern era of federal Indian law, one way the United States recognized the governmental status of Indian tribes was by negotiating and entering into treaties with them. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675

(1979) ("A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations"); *Worcester v. Georgia*, 31 U.S. 515, 559 (1832) ("The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers who are capable of making treaties"); *United States v. Washington*, 898 F. Supp. 1453, 1458 n.7 (W.D. Wash. 1995), *aff'd in part, rev'd in part on other grounds*, 157 F.3d 630 (9th Cir. 1998) (treaty rights are "the result of the negotiation between two sovereigns, the United States and the Tribes"); *NIGC Karuk Lands Opinion* at 3 (Oct. 12, 2004) ("Based on the fact that the Tribe negotiated treaties with the United States it can clearly be stated that there existed a government-to-government relationship at one time").

Of course, one might reasonably suggest that while the United States certainly recognized and treated with the Creek Nation, now largely in Oklahoma, it did not do so with the Poarch Band of Creek Indians, which did not exist in the 19th century as such. In this view, treating with the Creek Nation says nothing about treating with, recognizing, or having a government-to-government relationship with the Band. The suggestion, however, draws a false distinction. The Poarch Band of Creek Indians *is now* what the historic Creek Nation *was* before removal – the Creeks in Alabama. This is a matter of historical fact, and treating with the historic Creek Nation says that there was once a government-to-government relationship with, and recognition by the United States of, the Band.

Under the 1832 removal treaty, all of the remaining Creek lands east of the Mississippi River were ceded to the United States, 7 Stat. 366 at Art. I, (see Figure 1), and tribal members were directed to relocate to Indian Territory. *Id.* at Art. XII. Despite the treaty's central purpose, it stopped short of mandating the immediate removal of all Creeks from Alabama, stating "this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please." *Id.* at Art. XII. The treaty facilitated this construction by providing for the conveyance of individual fee lands to Creek leaders and heads of families who remained in Alabama. *Id.* at Art. II.

The "Trail of Tears," the forced march of the Creeks to the Indian Territory, took place primarily between 1836 and 1837. By 1838, only a handful of Creeks remained in Alabama, among them the Band's forebears at Tensaw. OFA memo, p. 86 of 130. The community subsequently "shifted within a small geographic area until it settled permanently near present-day Atmore, Alabama." OFA memo, p. 2 of 130.

By according the Band recognition under the federal acknowledgement process, the Department of the Interior concluded that the Band, following the removal of most Creeks, maintained a continuous and distinct cultural, political, and social identity up to the current day. 25 C.F.R. § 83.7. The OFA memo finds:

> The Poarch Band of Creeks forms a community distinct from other populations in the area. Its members are descended from the historic Creek Nation, from a community within that nation which developed in the late 18th Century. This community developed into several Indian settlements in Escambia County, Alabama, which form the Poarch Band of Creeks today.

OFA memo, p. 5 of 130. There is, in short, an unbroken historical line or connection between the historic Creek Nation in Alabama and the Band, and the Department of the Interior thus concluded that the Band is the successor to the Creek Nation: "[t]he contemporary Poarch Band of Creeks is a successor of the Creek Nation of Alabama prior to its removal to Indian Territory." OFA memo, p. 2 of 130. Consequently, by treating with the Creek Nation in Alabama, the United States once had a government-to-government relationship with, and once recognized, the Band.

Put somewhat differently, the historic Creek Nation has greatly changed in form from the first half of the 19th century to today. The historic Creek Nation, politically organized around tribal towns, now exists as the Poarch Band of Creek Indians in Alabama, the Muskogee (Creek) Nation in Oklahoma, and recognized tribal towns – tribes with multi-branch governments established through tribal constitutions. *See, e.g., Constitution of the Poarch Band of Creek Indians*, Art. IV (June 1, 1985); *Constitution of the Muscogee (Creek) Nation*, Arts. V – VII (Feb. 18, 2006). To suggest that the United States' recognition of the historic Creek Nation is not recognition of the Band – or the Muskogee (Creek) Nation for that matter – because the Band is not identical in form to the historic Creek Nation is inconsistent with federal Indian policy generally and with case law.

The federal government's long-standing policy is to encourage tribal self-government, and numerous statutes, including IGRA, embody this policy. *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987); 25 U.S.C. § 2702(1) ("The purpose of this chapter is to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments"). Federal law has thus consistently recognized and protected this right of self-government. *See, e.g., Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56. The right of self-government, of necessity, includes the ability of a tribe to make changes to the form and structure of its government, and this ability too is recognized in federal law. *See, e.g.,* 25 C.F.R. Parts 81 and 82 (procedures for Secretarial elections governing adoption, amendment or revocation of tribal constitutions, etc.).

Any self-governing entity will change in form and composition over time, and this is particularly true of the Indian tribes, who over the past centuries have also had such changes thrust upon them by federal law. Significantly, none of these changes in form or reorganizations are in any way inconsistent with federal recognition.

> Reflecting federal policies, a congressionally created confederated or consolidated tribe can be comprised of different tribes presently occupying the same reservation, such as the Wind River Tribes (Shoshone and Arapaho). Or tribes may confederate for political purposes, forming governmental entities such as the Minnesota Chippewa Tribes or the Central Council of the Tlingit & Haida Indian Tribes, which have received federal recognition, in addition to their constituent tribes. Under the Indian Reorganization Act of 1934, Indians living on any given reservation were allowed to organize into federally recognized tribes, whether or not they were linguistically, culturally, or politically united…. Other federally recognized entities represent fragments of previously unified peoples. The great Sioux nation, for example, was divided by federal law into geographically separated

and independently recognized tribes in order to weaken the Sioux militarily. Other groups, such as the Oneida, the Cherokee, and the Choctaw are recognized as multiple separate nations, because some members moved to new territories as part of the federal removal process in the nineteenth century and others refused to leave ancestral homelands.

*Cohen's Handbook of Federal Indian Law* ("Cohen"), § 302[2] at 137 (2005 ed.). To suggest, then, that the recognition of the historic Creek Nation does not also apply to the Band because of the change in form and composition over time is inconsistent with the fundamental policy of encouraging tribal self-government.

It is also inconsistent with the Sixth Circuit's decision in *Grand Traverse III*. There, the court determined that the Grand Traverse Band of Ottawa and Chippewa Indians met the plain-language, three-part test for a restored tribe set out above. In so doing, the court made no distinction between today's Grand Traverse Band and the combined Ottawa and Chippewa nations, whom the United States aggregated solely for the purposes of negotiating the 1836 Treaty of Washington (and which was subsequently dissolved by the 1855 Treaty of Detroit). *Id.* at 962 n. 2.

The Grand Traverse Band was, the court found, the successor to the Ottawa and Chippewa, and it described the Grand Traverse Band's relationship to its predecessor and to the United States this way:

> The Band is a federally recognized Indian tribe presently maintaining a government-to-government relationship with the United States. The Band previously maintained a government-to-government relationship with the United States from 1795 until 1872, and is a successor to a series of treaties with the United States in 1795, 1815, 1836 and 1855.

*Id.* at 961. In short, the court found that because the Grand Traverse Band was the successor to the Ottawa and Chippewa, and because the United States treated with the Ottawa and Chippewa, the Grand Traverse Band was once recognized by the United States. The change in form of the tribe – from the disaggregation of the Ottawa and Chippewa in 1855 to the present day Grand Traverse – was immaterial:

> The district court appropriately looked to the dictionary definitions of "restore" and "restoration," which include the following meanings: to give back, return, make restitution, reinstatement, renewal, and reestablishment. The court then correctly held that the Band clearly was a "restored tribe" under these definitions. The Band had treaties with the United States and a prior relationship with the Secretary of the Interior at least as far back as 1795. Until 1872, the Secretary had treated the Band as a recognized tribe.

*Id.* at 967. (Internal citations omitted.)

So too here. There is no legal significance to the change in form over time from the historic Creek Nation to the Poarch Band of Creek Indians, its successor. The Band

had treaties with the United States as far back as 1790 and, therefore, was once recognized by the United States.

###### b.      Relationship with the town at Tensaw

Even if one does not accept the United States' treaties with the historic Creek Nation as a basis for finding a period of recognition for the Band, a separate, equally sufficient basis appears in the record. The United States had a government-to-government relationship with the town at Tensaw founded by the Band's forebears. The record shows this not through treaty but rather through "the empirical indicia of recognition, namely, a 'continuing political relationship with the group, such as by providing services through the Bureau of Indian Affairs.'" *Grand Traverse III* at 968, *citing* Cohen at 6 (1982).

Again, the town at Tensaw, like Creek towns generally, was autonomous within the Creek Nation. Benjamin Hawkins, U.S. Agent to the Creek Nation from 1795 to 1826, appears to have had many interactions with the Band's ancestral community. He is described as a "prolific correspondent and journalist," and he provided "the first significant direct accounts of the history and activities of the ancestors of the present Poarch Band of Creeks…." OFA memo, p. 72 of 130. Hawkins referred to a "community of half-bloods in Tensaw" as an autonomous town within the Creek Nation, and was "personally familiar with several half-bloods there with whom he had working relations." OFA memo, p. 64 of 130. Hawkins's significance, however, was not merely as an observer. It was through Hawkins that the United States had a government-to-government relationship with the Tensaw town.

The Bureau of Indian Affairs was established in 1824 by administrative directive of then-Secretary of War, John C. Calhoun. H.R. Doc. No. 19-146 (1824). That office was created without congressional authority and lacked formal control over Indian agents. COHEN, § 103[4][b] at p. 56. Thus, in 1832, Congress created the position of Commissioner of Indian Affairs, 4 Stat. 564 (July 9, 1832), to supervise "all matters arising out of Indian relations." *Id.* at § 1. The BIA was transferred to the Department of the Interior in 1849. 9 Stat. 395 (March 3, 1849), *codified at* 25 U.S.C. §§ 1-2. Prior to the creation of the BIA, then, relationships between the United States and the Indian tribes was conducted through War Department or presidential agents and commissioners such as Hawkins.

Hawkins, living among the Creeks at Tensaw, sometimes dealt with them individually rather than governmentally. He was "personally familiar with several half-bloods there with whom he had working relations." OFA memo, p. 64 of 130. In his writings, he mentions several half-blood ancestors of the Poarch Band by name, and places "certain of its [Tensaw's] principal members as originally from the Upper Creek country." OFA memo, p. 72 of 130. He refers to Tensaw as the "Creek half-blood colony," writing that "many of the half bloods were raised with a high degree of Creek customs and world view, and identified more as Creek than white." *Id.*

Hawkins also, however, dealt with the Tensaw community as an autonomous political entity. This occurred most notably during the Creek War of 1813-14, when the Band's forebears at Tensaw broke ties with the Creek Nation and formed an alliance with the United States military against the Hostile Creeks. Members of the Band fought as a separate unit alongside the United States military at the battle of Burnt Corn:

> Having procured arms and ammunition in Pensacola, the hostiles started
> back to the Nation, and were met by a 180-man force of whites under
> Colonel James Caller to the Nation, and half-bloods under Captain Dixon
> Bailey, David Tate, and James Cornells at Burnt Corn.

OFA memo, p. 75 of 130. Under the command of Dixon Bailey, the half-blood unit also
fought with the military commander of the region, General Ferdinand Claiborne, in the
battle of Fort Mims, where the Hostile Creeks overran the defenders and killed almost all of
the refugees. *Id.*

This alliance was actively sought and encouraged by the United States government. Just two
weeks after Fort Mims, Hawkins sent letters to "public offices in that quarter," *i.e.* to Creek
towns at Fort Stoddert and Tensaw, seeking military allies. OFA memo, p. 77 of 130. He
wrote, "directing the half-breeds there to unite with their white brethren and that the people
in the fork of the Alabama should put themselves into the best situation they could to resist
an attack." *Id., quoting Letters, Journals and Writings of Benjamin Hawkins, Vol. II, 1802-1816,* 664
(C.L. Grant, ed. 1980). Again, Creek towns like Tensaw made decisions about a wide variety
of their own affairs, including "decisions involving war and peace…." *Angie Debo, The Road to
Disappearance: A History of the Creek Indians,* 12 (1941). As such, Hawkins's letter to Tensaw
was not only a suggestion for how the town could best defend itself. It was also a self-
interested request from the agent of the United States government to the Tensaw
government for a military alliance.

One consequence of Tensaw's choosing to break with the hostile faction of the Creek
Nation and ally itself with the United States during the Creek War is that it increased the
estrangement that already existed between the half-blood community and other Creeks. The
town's decision served "to place the pro-American half-blood community of former Upper
Town Creeks into highlight, contraposing them with the hostile or anti-American faction…."
OFA memo, p. 74 of 130. The friction is evident from this description:

> The white and half-blood settlements in and around the Nation began
> bracing themselves for an all-out attack by the hostiles, who by August had
> worked themselves into a religious fervor under the promise of expelling the
> whites and redeeming their pristine aboriginal state.

OFA memo, p. 75 of 130. Further, in a June 23, 1813 letter to General Ferdinand Claiborne,
Harry Toulmin, a local judge, acknowledged the half-bloods' estrangement from the hostile
Creeks and described the reaction in the Tensaw area:

> The half-breeds, however, do not think fit to trust themselves with them [the
> hostiles] or to embark in their measures. They have fled and have left behind
> them their crops & other property. I visited them yesterday. They are in
> confusion and distress. Not less so are my white neighbors on Tensaw.

*Id.*

The 1814 Treaty of Fort Jackson, entered into between the Creek Nation and the United States at the end of the Creek War, recognized the Tensaw alliance with the United States and rewarded the Tensaw Creeks with land grants and placed them under the protection of the United States:

> Provided, nevertheless, that where any possession of *any chief or warrior of the Creek Nation, who shall have been friendly to the United States during the war*, and taken an active part therein, shall be within the territory ceded by these articles to the United States, *every such person shall be entitled to a reservation of land within the said territory of one mile square*, to include his improvements as near the center thereof as may be, which shall inure to the said chief or warrior, and his descendants, so long as he or they shall continue to occupy the same, who shall be protected by and subject to the laws of the United States: but upon the voluntary abandonment thereof, by such possessor or his descendants, the right of occupancy or possession of said lands shall devolve to the United States and be identified with the right of property ceded hereby.

7 Stat. 120, Art. I. (Emphasis added.) By contrast, there were massive land cessions required of the Creek Nation – approximately half of what is today the State of Alabama. (See Figure 1.)

Given the foregoing, the record demonstrates a government-to-government relationship between the United States and the Band's forebears at Tensaw. The United States, through its agent to the Creeks, sought a military alliance with the Tensaw town. Having succeeded in forming an alliance against the Hostile Creeks, the 1814 Treaty of Fort Jackson rewarded allied Creeks with land and the protection of the United States. In view of this relationship, the United States recognized Tensaw as an autonomous entity separate and apart from the historic Creek Nation.

### 2. Non-recognition

The second condition for demonstrating that a tribe is restored to Federal recognition is the termination of prior recognition by the United States. Such a loss may occur through legislative action – *e.g.*, by statute or treaty – or by administrative action. *Grand Traverse III*, 369 F.3d at 968-72; *TOMAC v. Norton*, 193 F. Supp. 2d 182, 193-94 (D.D.C. 2002); *Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. United States*, 78 F. Supp. 2d 699, 705-07 (W.D. Mich. 1999), *vacated on other grounds*, 288 F.3d 910 (6th Cir. 2002). The Band lost its recognition by the United States as early as 1837, under the terms of a treaty with the historic Creek Nation, recognition it did not regain until 1984.

Again, the 1814 Treaty of Fort Jackson provided the Tensaw Creeks, and other allied Creeks, with land grants and placed them under the protection of the United States. 7 Stat. 120, Art. I. The 1832 removal treaty provided for cession of all remaining Creek lands east of the Mississippi River, 7 Stat. 366 at Art. I; removal of most, but not all, Creeks, *Id.* at Art. XII; a general land grant for the Creeks in the Indian Territory, *Id.* at Art. XIV; and conveyance of lands to Creek leaders and heads of families who remained in Alabama, *Id.* at Art. II, among them the Band's forebears at Tensaw. OFA memo, pp. 3, 5 of 130.

However, for the community of the Band's ancestors who remained, the 1832 Treaty explicitly terminated federal protection of their lands after five years, or by 1837, if they chose to remain in Alabama:

> The United States engage to survey the [ceded] land as soon as the same can be conveniently done, after the ratification of this treaty, and when the same is surveyed to allow ninety principal Chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for the term of five years....
>
> \*\*\*
>
> At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefore in fee simple, from the United States.

7 Stat. 366, Art. 2, 4.

The Band's forebears, of course, remained. "Most of the families in the [Tensaw] community acquired title to their lands after the cession of this area to the United States under the 1814 Treaty of Fort Jackson and most remained after the Creek Nation was removed to Indian Territory in the 1830's." OFA memo, p. 5 of 130. As a practical matter, federal protection of the Band's land already disintegrated by 1837, the stated time that federal protection was to expire. OFA memo, p. 85 of 130. The Band then "shifted within a small geographic area until it settled permanently near present-day Atmore, Alabama." OFA memo, p. 2 of 130.

In short, by its terms, the 1832 treaty ended federal recognition of the Band in 1837. Most Creeks were removed to the Indian Territory, and federal protection for those who remained expired at a time certain. The record bears this reading out. From 1837 forward, the United States disclaimed relationship of any kind with the Creeks in Alabama.

For example, for many years, an annual report was published by the Commissioner of Indian Affairs which summarized, on a state-by-state (or territory-by-territory) basis, the activities of the federal government with respect to all recognized tribes. This report, called the Annual Report of the Commissioner of Indian Affairs (Annual Report), described both the implementation of federal Indian policy and the general conditions of each recognized tribe. During the 1840's, the Annual Reports noted the diminishing number of Creeks remaining in Alabama. *Annual Report of the Commissioner of Indian Affairs* 1845-46 at 1 (Nov. 21, 1845). By 1849, the removal of the Creeks was deemed essentially complete, and the Commissioner reported that from the next year forward, the Creeks who remained in Alabama were to be left alone:

> Within the last year, forty-four of the few Creek Indians remaining in Alabama, and five hundred and forty-seven Choctaws from the State of Mississippi, have removed to the country of their brethren west, leaving about two thousand five hundred of the latter people still east of the

Mississippi River, notwithstanding the great exertions and the large expenditures that have been made for some years past in endeavoring to effect their emigration. These Indians were made citizens by the laws of the States where they are, and the effort to remove them was an obligation voluntarily assumed by the government for their benefit and the advantage of those States. New arrangements have been adopted for a final effort to effect that object, which it is hoped will be attended with success. *All that can be induced to go will probably be removed within another year, at the end of which all further proceedings and expenses should be terminated, and those that shall then remain be permitted to do so in the quiet enjoyment of their rights as citizens.*

*Annual Report of the Commissioner of Indian Affairs* at 948 (Nov. 30, 1849). (Emphasis added.)

Subsequent Annual Reports reflect an uninterrupted absence of federal involvement over a span of many years. Creeks outside of Oklahoma are rarely mentioned. In the 1856 Annual Report, for example, there is only a passing reference to the sale of 34 sections of Creek Indians lands, presumably fee lands originally set aside in the 1832 removal treaty. In the 1871 Annual Report, there is a passing reference to "some indigent Creeks remaining in Alabama…." *Report of the Commissioner of Indian Affairs,* 1856 at 19 (Nov. 22, 1856); *Report of the Commissioner of Indian Affairs,* 1871 at 576 (Nov. 15, 1871).

Further, express and implied disclaimers of any federal relationship with the Band continued into the 20th century. Ongoing efforts by concerned individuals to gain federal assistance for the Band were repeatedly rebuffed by federal officials. For example, in 1906, an attorney wrote to President Roosevelt seeking federal help for the Creek Indians in Alabama. The Acting Commissioner of Indian Affairs, to whom the letter had been forwarded, responded:

this Office knows of no band of Indians located in the southern part of Alabama. It is possible, of course, that there are persons of Indian or part Indian blood located in Alabama, as there are in many other States, but these people are in no way connected with the tribes of Creeks, Chickasaws and Cherokees that are located in the Indian Territory. The Creeks, Chickasaws and Cherokees that are now in the Indian Territory located there many years ago by virtue of treaties made between their leaders and the United States, and the individual members of such tribes that may have elected to and did remain east of the Mississippi River when the general emigration of the tribes took place, surrendered any right to share in the property of the tribes as at present constituted in the Indian Territory. *Such Indians as may be found in southern Alabama at the present time are the descendants of those who chose to remain there rather than emigrate to what is now the Indian Territory, and so far as this Office is concerned, are citizens of the State and are entitled to no consideration not due to other citizens who may be of white blood.*

Letter from Acting Commissioner of Indian Affairs to John D. Beck 1-2 (Dec. 31, 1906). (Emphasis added.)

In 1931, an Episcopal clergyman who was working among the Creek near Atmore, Alabama, wrote to the Commissioner of Indian Affairs seeking land and protection for "a small tribe

of Indians located near here." Letter from Rev. Edgar Van W. Edwards to Charles J. Rhoads, Commissioner of Indian Affairs (Sept. 10, 1931). The Assistant Commissioner of Indian Affairs replied that since 1912, "we have had little or nothing to do with any Creek Indians in Alabama," and concluded that the federal government is "not in a position to grant the relief requested." Letter from Henry J. Scattergood, Assistant Commissioner of Indian Affairs to Rev. Edgar Van W. Edwards (Sept. 25, 1931).

A similar letter, written by the same Episcopalian minister to the BIA in 1936, also sought federal assistance for the Band. The Commissioner of Indian Affairs responded, "[t]here is reason to doubt whether this Office has authority to assume jurisdiction over the affairs of the Indians of Alabama…," and he indicated that the BIA "would have to refuse all help on the basis of information now available." Letter from John Collier, Commissioner of Indian Affairs, to Rev. Edgar Van W. Edwards (Apr. 21, 1936).

Correspondence in 1938 from the BIA's Director of Education, Willard W. Beatty, also reveals an unwillingness to provide any assistance to the Band:

> We have given a great deal of thought to the status of the Indian group near Atmore since my visit to you early this spring. In general, the Office appears to take the same position toward these Indians that I expressed to you on the last day of my visit: that *it might be far wiser for the federal government not to interfere.* Any attempt on the part of the government to develop reserved lands or to raise the educational standards through the payment of tuition would tend to relieve the local community of any feeling of responsibility for this group of Indians as citizens.

Letter from Willard W. Beatty, Director of Education, BIA to Rev. Edwin Edwards, (May 27, 1938).(Emphasis added.)

That same year, Mr. Beatty wrote to the Episcopal Missionary in New York, urging the Church to assist the Indians in Alabama because the federal government could not, stating:

> [t]here are no tribal Indian reserves in Alabama, and while many of these Indians were given individual pieces of property by the federal government many years ago, most of this land has been sold. . . . *Special legislation would be required to enable the Indian Office to assume any responsibility for this group* and a careful consideration of the situation and the growing assimilation of the group by the surrounding community raises serious questions as to the advisability of the federal government stepping in.

Letter from Willard W. Beatty, Director of Education, BIA to Theodora Wade, National Council of Protestant Episcopal Church (May 27, 1938). (Emphasis added.)

With each request for assistance during this period for the Creek Indians in Alabama, the federal government disclaimed any relationship with the Poarch Band in Alabama and communicated that the educational and other needs of the Band had to be met through non-Federal sources. The Band's former Chairman, Eddie L. Tullis, recollects that

> [f]rom 1964 until the Tribe gained federal recognition in 1984, the federal government did not provide to Poarch Creek or its members the programs, benefits and services that the government provided to tribes that were federally recognized and their members. For example, during this period the Bureau of Indian Affairs provided no funds to the Tribe, and no services to our people, for any purpose. Likewise, our tribal members received no health care services from Indian Health Service . . . and no funding from HUD for purposes of establishing or implementing a Tribal housing program. While the Administration for Native Americans (ANA) provided the tribe with a small amount of grant funds in this period, those were specifically limited to tasks relating to our efforts to gain federal recognition . . . .

Supplemental Affidavit of Eddie L. Tullis at ¶ 2 (May 26, 2005). He concludes by summarizing that "the Tribe and tribal members received no funds appropriated by Congress for purposes of serving federally recognized tribes during the period from 1964 until recognition in 1984" and notes that "this pattern by the federal government of not treating Poarch Creek as it treated all federally recognized tribes extended back to the time of removal in the 1840's." *Id.*

Given the foregoing, the Band, while once recognized by the United States, lost federal recognition under the terms of the 1832 treaty removing the Creeks to Oklahoma and ending federal superintendence over the Creeks in Alabama in 1837. Recognition of the Band was then absent well into the 20th Century.

### 3. Reinstatement of recognition

Finally, a tribe with a history of governmental recognition, withdrawal of recognition and then reinstatement of recognition has been "restored" under IGRA, whether the reinstatement of recognition was achieved through Congressional action, the administrative federal acknowledgment process, or administrative recognition. *Grand Traverse III*, 369 F.3d at 967, 969-72; *Ione Indian Lands Opinion* (Sept. 19, 2006.)

Here, the Department of the Interior issued a final determination in June 1984 recognizing the Band. 49 Fed. Reg. 24083 (June 11, 1984). In this determination, Interior expressly found that "the contemporary Poarch Band of Creeks is a successor of the Creek Nation of Alabama prior to its removal to Indian territory [Oklahoma]," and that the Poarch Band of Creeks were those Creeks who "remained in Alabama after the Creek removal of the 1830's...." *Id.*

In sum, over its history, the Poarch Band of Creek Indians was recognized by treaty and by military alliance with the United States, lost this recognition by treaty and federal action, and was reinstated to federal recognition through the federal acknowledgement process. Therefore, the Band is a "tribe that is restored to Federal recognition" within the meaning of 25 U.S.C. § 2719(b)(1)(B)(iii).

## B.    The Tallapoosa Site was taken into trust as part of the Band's restoration

Given that the Band is a restored tribe, the Tallapoosa Site only satisfies the requirements of § 2719(b)(1)(B)(iii) if it was taken into trust as part of the Band's restoration. Nothing in IGRA requires that this be done by Congressional action or in the very same transaction that restored the Tribe. Lands may be restored to a tribe through the administrative fee-to-trust process. *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F. Supp. 2d 920, 935-36 (W.D. Mich. 2002)("Grand Traverse II"), *aff'd, Grand Traverse III*; *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 161-64 (D.D.C. 2000); *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 46 F. Supp. 2d 689, 699-700 (W.D. Mich. 1999)("Grand Traverse I").

Still, not every trust acquisition for a restored tribe meets this exception. There must be some limiting condition – something that ties the trust acquisition to, or shows it to be a part of, the tribe's restoration. *Grand Traverse II*, 198 F. Supp. 2d 920 at 935. This avoids the result that "any and all property acquired by restored tribes would be eligible for gaming." *Coos*, 116 F. Supp. 2d at 164; *Grand Traverse I*, 46 F. Supp. 2d at 700.

Accordingly, both the NIGC and the courts that have considered the question find the necessary limiting condition in the factual circumstances of the trust acquisition, the location of the trust acquisition, and the temporal relationship of the trust acquisition to the tribal restoration. *See, e.g., Coos*,116 F. Supp. 2d at 164; *Grand Traverse II*, 198 F. Supp. 2d at 935; *In Re Sault Ste. Marie Tribe of Chippewa Indians, Resolution No. 2006-101, amendment to Tribal Code § 42.801, Gaming Ordinance* (restored lands opinion, September 1, 2006); *In Re Karuk Tribe of California* (restored lands opinion, October 12, 2004).

At the same time, in response to overly narrow interpretations, several courts have noted that Section 2719 should be read broadly. It is possible to adopt a reasonably limited construction of the exception while rejecting overly narrow interpretations. Courts have already indicated instances in which the interpretation was unduly narrow. *Roseville v. Norton*, 348 F.3d 1020, 1027 (D.C. Cir. 2003) (rejecting the Secretary's interpretation of "restoration of lands" to "be strictly limited to land constituting a tribe's reservation immediately before federal recognition was terminated"); *Coos*, 116 F. Supp. 2d at 164 (rejecting the Secretary's requirement that an act of Congress restoring the tribe to federal recognition must explicitly provide for the restored lands).

### 1. Factual circumstances surrounding the trust acquisition

In 1984, when the Band regained its federal recognition, it was landless. The Band requested that the BIA take several parcels into trust for its benefit. Memorandum from Bill D. Ott, Area Director, Eastern Area Office to Acting Assistant Secretary – Indian Affairs, re: Request for Reservation Proclamation – Poarch Band of Creek Indians of Alabama (Feb. 12, 1985). The Eastern Office Area Director forwarded the request to the Acting Assistant Secretary – Indian Affairs, noting:

> It is recommended that favorable action be taken on the Poarch Band resolution with two exceptions. After a close review of the total enrollment, land area, and the location of the primary portion of the Poarch Band of

Indians, I feel it would not be in the best interests of the Bureau of Indian Affairs and the United States Government to create one-acre reservations in Monroe County, Alabama, and Escambia County, Florida. Those plots were taken into trust at the request of the Tribe; however, the plots are not in the immediate proximity of the major Poarch holdings.

I am, therefore, recommending reservation status be granted for those holdings in Elmore County and Escambia County, Alabama.

It is noted that the Poarch Band holdings in Elmore County [Wetumpka] consists of approximately 36 acres which is a site of particular historical significance to the Tribe. Although there is no significant population of Poarch Band Indians in that immediate area, I am including that site in my recommendation since Reservation status will provide the Poarch Band with additional jurisdictional control.

*Id.*

Accordingly, on April 12, 1985, BIA declared eight parcels, amounting to approximately 229½ acres, to be reservation land. 50 Fed. Reg. 15502-03 (Apr. 12, 1985). Again, seven of the parcels were located in Escambia County, Alabama. Figure 1, parcels 1, 2a, 2b, 3, 7, 8, and 9. The eighth, the Wetumpka site, was over 100 miles away in Elmore County. Figure 1, parcel 4.

Another two parcels, totaling 1 acre each, were taken into trust in 1984, and a parcel of 10.9 acres was taken into trust in 1989. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson & Perry to Andrea Lord, Esq. NIGC (July 18, 2007)).

On November 14, 1988, the Tallapoosa Site, known to have two Creek burial mounds, was donated to the Band. The Site is located between Wetumpka and Atmore, but is closer to the former (approximately 12 miles) than to the latter (approximately 110 miles). Figure 1, parcel 17.

The Band asked the BIA to take the Tallapoosa Site, and two others, into trust on July 27, 1989. Letter from Cielo I. Gibson, Planning Director, Poarch Band of Creek Indians to B.D. Ott, Area Director, Bureau of Indian Affairs (July 27, 1989). The Eastern Office Area Director required additional information before doing so:

In regard to Parcel 17, which is located a distance from the main reservation and is not included in your current Comprehensive Tribal and Community Development Plan, the application will be held in abeyance pending additional justification for Trust Status.

Letter from B.D. Ott, Eastern Office Area Director, to Eddie Tullis, Chairman, Poarch Band of Creek Indians (Aug. 7, 1989).

Accordingly, the Band commissioned a report of the Tallapoosa Site by Dr. Diane Silvia, a local expert in archaeology and anthropology. Letter from Chairman Eddie L. Tullis, to B.D.

Ott, Eastern Office Area Director (June 1, 1990). Dr. Silvia's study confirmed that a portion of the Site contained two historically and culturally significant Creek burial mounds and the aboriginal Creek village of Kolomi. Diane E. Silvia, PhD, Report on the Cultural Significance of the Poarch Band of Creek Indians' Parcel 17, Montgomery County, Alabama.

On the basis of this report, the BIA concluded that the Site "is probably significant" and "may be important to the Tribe culturally." Letter from B.D. Ott, Eastern Office Area Director, to Eddie Tullis, Chairman, Poarch Band of Creek Indians (Oct. 22, 1990). However, BIA completed the trust acquisition of the Tallapoosa Site only on March 23, 1995 – a five-year delay. Warranty deed (March 23, 1995).

In the interim, BIA took five more sites totaling just under 133 acres in trust for the Band, all in 1992. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson & Perry, to Andrea Lord, Esq., NIGC (July 18, 2007). The Band thus had approximately 242 acres in trust when it applied to have the Site placed into trust and approximately 375½ acres in trust when the Tallapoosa Site acquisition was complete.

These facts suggest that the Tallapoosa Site is restored land, for they show that the Site was part of the Band's "first systematic effort to restore tribal lands." *Grand Traverse II*, 198 F. Supp. 2d at 936. Of course, at first, Area Director Ott referenced the Band's systematic plan for restoring its land base, the Comprehensive Tribal and Community Development Plan, and noted that the Tallapoosa Site was not in it.

However, the Tallapoosa Site contains an ancestral Creek village and burials, and, importantly, was known to be associated with the Upper Creeks from whom the Poarch descend. The Site was donated to the Band in order to transfer the land into tribal ownership. At the time, the Band was newly restored, had limited funds, took the donation of culturally significant lands when offered only 4 years after restoration, and requested within a year that the land be put into trust. This was consistent with the Band's trust land acquisition goals of fostering economic development, self-determination, and cultural survival through cultural preservation and religious activities. Tullis Aff. ¶¶ 5-6. In addition, the Tribe requested that the Tallapoosa Site be taken into trust before many of the other parcels that were accepted into trust on its behalf, and the United States had determined that the land should be taken into trust five years before it acted to do so.

Even though, then, the Tallapoosa Site was not part of the Band's initial development plan, the BIA nevertheless took the fortuitous acquisition into trust while taking other land into trust in furtherance of that plan. Acquisition of the Tallapoosa Site was thus part of the Band's first systematic effort to restore tribal lands.

### 2.   Location of the Trust Acquisition

The location of a trust acquisition is "arguably the most important" component of the restored lands factors. *Wyandotte*, 437 F. Supp. 2d at 1214. What is significant here is a tribe's historical and modern ties to the land. *Id.* at 1216 (court "agrees with the NIGC that in order to evaluate this issue fully, the agency must evaluate the present circumstances of the Tribe and its relationship with the land at issue").

The Tallapoosa Site is only 12 miles from the Band's Wetumpka reservation. Commonly known as "Hickory Ground," Wetumpka was the last governmental center of the Creek Nation before the Nation's removal westward in the 1830's. Letter from Roger Sumner Babb, Regional Solicitor, DOI Southeast Regional Office, to Michael Cox, General Counsel, NIGC (Aug. 3, 1995). Wetumpka was also "the site of the Creek Nation's sacred fire, the ashes of which were transported to and rekindled at Hickory Ground in the present State of Oklahoma. The Hickory Ground in Alabama was also the site of a trading post, an inn, an Indian ball court, and a horse racing track where gaming frequently occurred." *Id.* Accordingly, Wetumpka was said to be "of particular historical significance" to the Band by the Eastern Office Area Director when recommending that it be proclaimed a reservation. Letter from Bill D. Ott to Acting Assistant Secretary – Indian Affairs re: Request for Reservation Proclamation (Feb. 12, 1985).

Although the Band's members and main affiliations were with Atmore, Alabama, at the time of removal, OFA memo, p. 3 of 130, the Band has both familial and tribal ties to the Tallapoosa and Wetumpka area. Located on the southeast bank of the Tallapoosa River in Montgomery County, Alabama, near the confluence of the Coosa and Tallapoosa Rivers, the Tallapoosa Site lies in the center of an area that was exclusively lands of the historic Creek Nation from aboriginal times until removal. Figure 1; *and see* Aug. 27, 2004 affidavit of University of Auburn Professor of Anthropology John Cottier at ¶ 12 ("[T]he Tallapoosa Site currently owned by the Poarch Band of Creek Indians is within what was once the historic Creek town of Kolomi. Kolomi was geographically a central area of the Creek Nation in historic times – and could by no means be viewed as a fringe area within the 18th and 19th century Creek Nation").

Of equal importance is the fact that members of the Poarch Band trace their lineage directly from the Upper Creeks and their villages, including Kolomi, along the drainage of the Coosa and Tallapoosa Rivers in northeastern Alabama within an area ceded to the United States by the 1814 Treaty of Fort Jackson. Figure 1; Cottier Aff. at ¶ 7. It was known to the public that the Tallapoosa Site contains two aboriginal Creek earthen burial mounds, and the previous land owner was aware of their importance and prevented uncontrolled excavation or farming activities that would disturb the site. Silvia report at 2.

Even after relocating south to Tensaw and Atmore, the Band continued to maintain its connection to Wetumpka. Many of the Band's ancestors were political leaders, such as Alexander McGillivray, who stayed connected to Hickory Ground (Wetumpka) and the region through their participation in governmental matters. OFA memo, pp. 16, 69-73. Indeed, Alexander McGillivray was a signatory to the Treaty of New York, and he was accompanied on his trip by his nephews, Lachlan Durant and David Tate, also Poarch Band forebears. OFA memo, p. 16, 71 of 130. Many of the Band's ancestors also had land holdings in both the Tensaw region and in the Upper Creek towns. OFA memo, pp. 70-72 of 130. The lands were commonly used for hunting, trading and farming.

The Poarch Band also has important modern ties to the area, other than through its affiliation with the historic Creek Nations. The Band's Historical Preservation Officer, for example, protects and preserves the burial mounds located on the Tallapoosa site and from there gathers plants used in traditional Creek ceremonies as the plants are not available on the Atmore reservation. Decl. of Robert Thrower (Mar. 22, 2007). It is in view of such ties

that the BIA's Division of Trust Services found the Tallapoosa Site to be "probably significant" and "may be important to the Tribe culturally." Letter from Eastern Office Area Director to Eddie Tullis, Chairman, Poarch Band of Creek Indians (Oct. 22, 1990).

Given these facts, there is a nexus between the Poarch Band and the Tallapoosa Site consistent with that found in our previous opinions. Past indicators of a connection we have examined include how significant the land is to the tribe, whether the gaming site is within a former reservation or ceded lands of the tribe, and whether the land is near to a tribal center or tribal programs.

First, we have looked at the significance of the gaming site and nearby area to the tribe. In *Grand Traverse*, we found that restoration was shown by the "Band's substantial evidence tending to establish that the…site has been important to the tribe throughout its history and remained so immediately on resumption of federal recognition." *NIGC Grand Traverse Opinion* at 15. The Grand Traverse Band had lived and worked near the Turtle Creek site from the time of its first recorded history, *Id.* at 18, and the land had "been at the heart of the Band's culture throughout history…" *Id.* at 19. Additionally, the *Coos* tribes were "seeking to game on land which has been historically tied to the Tribes and has a close geographic proximity to the Tribes." *DOI Coos Opinion* at 14.

Here, the Site is at the core of the Creek Nation's former territory and is additionally the site of an ancestral Poarch Band village. In addition, the Tallapoosa Site was known to contain Creek burial mounds. Several other Indian lands opinions have mentioned as a consideration that the local community had known for years the land was closely tied to that tribe. *NIGC Grand Traverse Opinion* at 18-19; *DOI Coos Opinion* at 13.

Beyond containing burial mounds and an ancestral village itself, the Tallapoosa Site is also near the spiritually important site of the former Creek sacred fire at Wetumpka, 12 miles away. Previous positive opinions have found a nexus when the proposed gaming site was near ancestral villages and religious sites.

In our *Mechoopda* opinion, three buttes that figured prominently in a tribal myth were located one mile from the parcel, a historic trail linking several tribal villages crossed the parcel, and several Mechoopda villages were located in close proximity to the site. *NIGC Mechoopda Opinion* at 10-11. In our *Rohnerville* opinon, the parcel was located within one mile of two aboriginal villages and two major tribal trails and was within three miles of five aboriginal villages. *NIGC Rohnerville Opinion* at 11. Also, the site of a mythic flood in tribal lore was within three or four miles from the Rohnerville site.

We have also examined whether the proposed gaming land is within a former reservation or land ceded to the United States by treaty. Both the *Grand Traverse I* and *Coos* courts held that "[p]lacement within a prior reservation is significant evidence that the land may be considered in some sense restored." *See Grand Traverse I*, 46 F. Supp. 2d at 702; and *Coos*, 116 F. Supp. 2d at 164. A historical nexus has also been found when the gaming site was ceded to the United States via treaty. *NIGC Sault Ste. Marie Opinion* at 11-12. In *Grand Traverse II*, the Court held that the lands lay within counties that had previously been ceded by the tribe to the United States. 198 F. Supp. 2d at 936. The Sault Ste. Marie Tribe was one of a number of separately recognized Chippewa bands that ceded lands in the Treaty with the Ottawa,

Etc., Mar. 28, 1836 (7 Stat. 491). Here, the Tallapoosa Site was ceded to the United States by the Creek Confederacy in 1814 as a result of the war against the Hostile Creeks.

Next, the NIGC has taken into consideration the proximity of the land in question to the tribal center, programs, and membership. The Tallapoosa Site is only 12 miles from a portion of the Poarch reservation. Many of our previous positive opinions have dealt with smaller distances. *NIGC Rohnerville Opinion* (6 miles from original rancheria); *NIGC Mechoopda Opinion* (10 miles from original rancheria).

Accordingly, the facts show that the Band has strong historical and modern ties to the Tallapoosa Site. Those ties are sufficient to show that the Site is land restored to the Band.

### 3. Temporal relationship of the trust acquisition to tribal restoration

Finally, there is the question of whether the timing of the acquisition of the Site supports a conclusion that the land is restored. Again, when the Band regained recognition in 1984, it had no land base at all. In late 1984, eight small parcels amounting to approximately 229½ acres were taken into trust and made the Atmore and Wetumpka reservation. These acquisitions constituted the beginning of the Band's plan to reestablish a post-recognition land base.

As discussed above, the acquisition of the Tallapoosa site occurred in the middle of the time frame to re-establish a land base. Again, the Band's fee acquisition of the Tallapoosa Site occurred in 1988, only four years after the Band's restoration to federal recognition, when it was donated to the Band by a local private owner. In 1989, one year later, within five years of restoration, the Band applied to the BIA to have the Site taken into trust. When the Eastern Office Area Director sought more information, the Band provided the report of Dr. Silva in 1990, six years after restoration. Letter from B.D. Ott, Eastern Office Area Director, to Eddie Tullis, Chairman, Poarch Band of Creek Indians (June 1, 1990).

For whatever reasons, it took an additional four years for the BIA to complete the Tallapoosa trust acquisition. In the meantime, it took five more sites totaling just under 133 acres in trust for the Band, all in 1992. Letter from William R. Perry, Esq., Sonosky, Chambers, Sachse, Endreson & Perry, to Andrea Lord, Esq., NIGC (July 18, 2007). The acquisition of the Tallapoosa Site, then, was contemporaneous with the trust acquisitions for the Band that occurred after the proclamation of its initial reservations. Accordingly, the timing supports a finding that the Site acquisition was part of a larger process of restoring lands for the Band.

## III. Conclusion

Given all of the foregoing, and in light of the factual circumstances of the Tallapoosa acquisition, the Band's modern and historical connections to it, and the timing of the acquisition in the middle of the Band's efforts to acquire other lands, the Tallapoosa Site is "restored lands." As the Band is a "restored tribe," the Tallapoosa Site is Indian land that falls within the exception of 25 U.S.C. § 2719(b)(1)(B)(iii) and is eligible for gaming notwithstanding its acquisition after the effective date of IGRA.

Thank you for patience on this matter. For me, the status of the Tallapoosa Site is resolved and we will continue to regulate the Band's facility.


Sincerely,

Philip N. Hogen
Chairman


Cc:    William Perry, Sonsoky, Chambers, Sachse, Endreson & Perry
       Aurene Martin, Ietan Consulting
       Cindy Altimus, Region Director
       Carl Artman, Assistant Secretary – Indian Affairs
       Edith Blackwell, Acting Associate Solicitor
       George Skibine, Director, Office of Indian Gaming
       Troy King, Attorney General, State of Alabama

# **Exhibit F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIALEGEE TRIBAL TOWN,<br><br>          Plaintiff<br><br>     v.<br><br>RYAN K. ZINKE, in his official capacity as SECRETARY of the DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>          Defendants. | Civil Action No. 17-cv-1670 (CKK) |

### <u>MEMORANDUM OPINION</u>
(September 7, 2018)

This suit arises from Plaintiff Kialegee Tribal Town's request that this Court grant declaratory and injunctive relief in its favor in connection with its claims that Plaintiff is a successor to the Creek Nation, and as such, has treaty-protected rights of shared jurisdiction over land within the boundaries of the historic Creek Nation reservation.  Pending before this Court is Federal Defendants' Motion to Dismiss Plaintiff's Amended Complaint, brought by Ryan K. Zinke, in his official capacity as Secretary of the United States Department of the Interior; John Tahsuda, III, in his official capacity as Acting Assistant Secretary for Indian Affairs; and the United States Department of the Interior ("Interior") (collectively, the "Federal Defendants"). Federal Defendants have moved to dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure Rule 12(b)(1), for lack of subject matter jurisdiction, and Rule 12(b)(6), for failure to state a claim.

After reviewing the parties' submissions,[1] relevant case law and applicable statutory authority, the Court GRANTS Defendants' Motion to Dismiss on grounds that Plaintiff's Amended Complaint fails to state a claim.   A separate Order accompanies this Memorandum Opinion.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

### A.  History of the Creek Nation and Kialegee Trial Town

Plaintiff Kialegee Tribal Town ("Plaintiff" or "Kialegee") is "an Indian Tribe that is federally-recognized pursuant to the provisions of the Oklahoma Indian Welfare Act of June 26, 1936, 49 Stat. 1967."  Am. Compl., ECF No. 27, ¶ 3.[2]  This case centers on the issue of whether Plaintiff, a member of the historic Creek [N]ation, is included under the treaties signed by the historic Creek Nation.  Plaintiff's position is that, "as a federally-recognized Indian Tribe and member of the historic Creek Nation, [it] has jurisdiction over all lands within the Creek Reservation as land owned in common with two other federally-recognized Creek Tribal Towns and the federally recognized Muskogee Creek Nation ("MCN") in accordance with treaties entered into between Kialegee and the United States and as read in context with the Indian Canon of Construction."  *Id.*  Defendant's position is that, "since the removal of the Creeks in 1832 to what is now Oklahoma, federal treaties and federal legislation pertaining to the Creek Reservation

---

[1] The Court's consideration focused on the following documents:
- Fed. Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Fed. Defs.' Mot."), ECF No. 28, and the Mem. of Points and Auth. in support thereof ("Fed. Defs.' Mem."), ECF No. 28-1
- Pl.'s Opp'n to Fed. Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 30
- Fed. Defs.' Reply in Support of Mot. to Dismiss ("Fed. Defs.' Reply"), ECF No. 31.

In an exercise of discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[2]    While much of the historical background in this Memorandum Opinion derives from the Plaintiff's Amended Complaint, the Court has also referenced legislation and caselaw.

in Oklahoma have been exclusively with the Muscogee (Creek) Nation, not the tribal towns." Fed. Defs.' Mem. at 8.[3]

To put this argument in historic context, the Court looks briefly at the history of the Creek Nation. The Creek Nation, "historically and traditionally, is actually a confederacy of autonomous tribal towns, or Talwa, each with its own political organization and leadership." *Harjo* v. *Andrus*, 581 F.2d 949, 951 n.7 (D.C. Cir. 1978). "Between 1790 and 1866, the Creek Confederacy, as a collection of talwas, entered into several treaties with the United States[,]" and those treaties, which "collectively referred to a 'Creek Nation', the 'Creek Tribe' and 'the Creeks'" reserved lands to the "talwas and their larger use and subsistence areas held in common with other Creeks." Am. Compl. ¶ 44.[4]

After the ratification of the United States Constitution in 1788, the United States entered into a treaty with the Creeks on June 29, 1796 (the "1796 Treaty"), and one of the signatories to the 1796 Treaty is the Kialegee. *See* Am. Compl., Ex. A [1796 Treaty]. In March 1814, General Andrew Jackson led a force that killed more than 1,000 Creeks in Alabama during the Red Stick War, and that controversy was concluded by the Treaty of Fort Jackson (also known as the "Treaty With The Creeks, 1814"), which involved the Creeks' ceding 22 million acres of land in the Southeast United States to the United States. Am. Compl. ¶¶ 21-22; *see also* Am. Compl. Ex. B [Treaty With The Creeks, 1814]. Two signatories to the Treaty of Fort Jackson are identified as "Kialijee," designating the Kialegee people from the Kialijee Creek, "which was

---

[3] The page numbers cited herein reference the page numbers assigned by the Court's Electronic Case Filing ("ECF") system.

[4] Plaintiff references: (1) The Creek Treaty of August 7, 1790; (2) The Creek Treaty of August 9, 1814; (3) The Creek Treaty of January 8, 1821; (4) The Creek Treaty of March 24, 1832; and (5) The Creek Treaty of February 14, 1833. Some of these treaties are discussed in more detail in this Memorandum Opinion.

part of the Creek Confederacy as it existed in Alabama prior to removal."  Am. Compl. ¶¶ 22-23.

"In the 1820's, the federal government adopted a policy to forcibly remove the Five Civilized Tribes [which included the Creek Nation] from the southeastern United States and relocate them west of the Mississippi River, in what is today Oklahoma."[5] *Indian Country, U.S.A., Inc. v. State of Oklahoma*, 829 F.2d 967, 971 (10th Cir. 1987) (citation omitted); *see* Am. Compl. Paragraphs 25-27.  This policy became formal law on May 28, 1830, when then-President Andrew Jackson signed into law the "Indian Removal Act."  Am. Compl. ¶ 26.  This policy of removal "ultimately resulted in the forcible relocation of the Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes to what is presently the state of Oklahoma."  Am. Compl. ¶ 31.  Plaintiff claims that Kialegee's "place as a Creek treaty tribe was established well before [this] removal period" because it was "a signatory to the 1796 Treaty."  *Id.*

By means of the Treaty With The Creeks, 1832 ("Treaty of 1832"), the Creeks ceded their homelands in the eastern United States in exchange for lands in the western United States.  *See* 7 Stat. 366 (1832) (stating that "The Creek country west of the Mississippi shall be solemnly guarantied [sic] to the Creek Indians[.]") (art. 14); Am. Compl. ¶ 27.  The Creek Treaty of February 14, 1833, between the Creeks and the United States, was supposed to "establish boundary lines which [would] secure a country and permanent home to the whole Creek nation of Indians[.]"  Am. Compl. ¶ 44(f) (emphasis omitted).  By its terms, the Treaty of 1833 establishes that land assigned to the Creek Indians "shall be taken and considered the property of

---

[5] Plaintiff notes that "[t]he term "Five Civilized Tribes" was used by the United States during the mid-nineteenth century to refer to the Cherokee, Choctaw, Chickasaw, Creek, and Seminole nations," but the word "Civilized" was disrespectful because it "meant a qualification to exist for entire races based solely on their willingness to adopt norms and values unilaterally imposed on them by non-native peoples."  Am. Compl. at 10, n. 6.

4

the whole Muscogee or Creek Nation, as well as those now residing upon the land."   Am. Compl

Paragraph 48.   On June 14, 1866, a treaty was signed between the Creeks and the United States

whereby the Creeks were to cede a western portion of their territory to the United States for

payment in a certain amount.   Am. Compl. ¶ 34 (citing Treaty of 1866, Art. III).

On October 12, 1867, the Creeks adopted a constitution and a code of laws for the

"Muskogee Nation" (which differs from the present Muskogee Nation).   Am. Compl. ¶ 36.   "In

1893, Congress created the Dawes Commission to negotiate with the Five Civilized Tribes" to

extinguish tribal land title and develop an allotment plan."   *Indian Country*, 829 F.2d at 977

(citation omitted).   In 1898, Congress enacted the Curtis Act, whereby "all land was taken from

the entire Creek people, and allotments were given to tribe members of no more than 160 acres

per tract."   Am. Compl. ¶ 38.

### B.  The Kialegee Tribal Town

In 1934, Congress passed the Indian Reorganization Act ("IRA") of 1934, ch. 576, 48

Stat. 984 (codified as amended at 25 U.S.C. §§ 5101, *et seq.*), which was "designed to improve

the economic status of Indians by ending the alienation of tribal land and facilitating tribes'

acquisition of additional acreage and repurchase of former tribal domains."   Fed. Defs.' Mem. at

11 (citing *Cohen's Handbook of Federal Indian Law*, Section 1.05 at 81 (Nell Jessup ed., 2012)).

That Act provided for tribal self-government pursuant to tribally adopted constitutions.   25 U.S.C.

§ 5123.   Pursuant to Section 5108, the Secretary of the Interior was authorized "to acquire . . .

any interest in lands . . . for the purpose of providing land for Indians."   25 U.S.C. § 5108; *Match-

E-Be-Nash-She Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226 (2012)

(recognizing that "[l]and forms the basis of [tribal] economic life, providing the foundation for

tourism, manufacturing, mining, logging, . . . and gaming") (internal quotation marks and

citations omitted)).  Certain sections of the IRA are inapplicable to tribes in Oklahoma.  *See* 25 U.S.C. § 5118.

In 1936, Congress passed the Oklahoma Indian Welfare Act of 1936 ("OIWA"), which allowed "any recognized tribe or band of Indians residing in Oklahoma . . . . to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe."  Am. Compl. ¶ 40, n. 7.  Plaintiff Kialegee is a federally recognized Indian tribe, organized under Section 3 of the OIWA, which first received federal recognition in 1936, and is governed in accordance with a constitution and bylaws that were approved by the Assistant Secretary of the Interior, on April 14, 1941, and ratified by the town members on June 12, 1941.  Am. Compl. ¶ 41; *see Oklahoma v. Hobia*, 775 F.3d 1204, 1205 (10th Cir. 2014), *cert den.*, 136 S. Ct. 33 (2015).  Kialegee also has a corporate charter that was approved by the Assistant Secretary of the Interior on July 23, 1942, and ratified by town members on September 17, 1942, which states that "[n]o property rights or claims of the Kialegee Tribal Town existing prior to the ratification of this Charter shall be in any way impaired by anything contained in this Charter [and further,] [t] the Tribal Town ownership of unallotted lands, whether or not occupied by any particular individuals, is hereby expressly recognized."  Am. Compl. ¶¶ 41, 43 (referencing the Kialegee Corporate Charter at 6) (emphasis omitted).

C. **The Lawsuit**

Plaintiff filed its initial Complaint on August 17, 2017, against the Federal Defendants and the Chairman of the National Indian Gaming Commission ("NIGC").  Plaintiff sought a declaratory judgment that it exercises concurrent jurisdiction over the Creek Reservation in Oklahoma with all Creek tribes, and an injunction that all lands within the Creek Reservation are Plaintiff's "Indian lands" for purposes of the Indian Gaming Regulatory Act ("IGRA").  Compl.,

ECF No. 1, ¶¶ 38, 40, 42, 44.  More specifically, Plaintiff referred to the construction of a restaurant facility known as the Red Creek Dance Hall and Restaurant, located on an Indian allotment within the Creek Reservation in Broken Arrow, Oklahoma, where the allotment was owned by Bim Stephen Bruner, an enrolled member of Kialegee (the "Bruner Allotment"). Compl., ECF No. 1, ¶ 8.  Plaintiff indicated further that "Defendant [had] publicly declared their intention to take administrative and legal steps to oppose the Kialegee development of the Bruner allotment."  Compl., ECF No. 1, ¶ 17.

In its Amended Complaint, for which a motion to amend was filed, unopposed, and leave to file was granted, Plaintiff deliberately removed the Chairman of the NIGC as a defendant and deleted several of the specific references to the Bruner allotment, seeming to focus instead on a more general request that this Court enforce Plaintiff's "rights" under historical treaties.[6] Plaintiff alleges that because Kialegee is a signatory to the Treaty of 1833 establishing the Creek Reservation, the Creek Reservation is also considered Plaintiff's Reservation and accordingly, Kialegee may exercise jurisdiction over lands within the boundaries of the historic Creek Reservation.  Am. Compl., ECF No. 27, ¶¶ 2, 46-48, 56.  Plaintiff alleges further that the "[Federal] Defendants' position is that the Muskogee Tribe alone exercises jurisdiction over the entirety of those lands that were explicitly reserved for the 'whole Creek Nation,'" Am. Compl. ¶¶ 51 (emphasis omitted), 64-65, and Defendants have "repeatedly violated 25 U.S.C. §[5123](f) by blocking [Plaintiff] from jurisdiction on lands located within the Creek Reservation."  Am.

---

[6] Plaintiff's Complaint, dated August 17, 2017, initially focused more specifically on Defendants' opposition to the development of the Bruner allotment and Plaintiff's jurisdiction over that land, but because that issue was the subject of an April 26, 2017 decision by the Bureau of Indian Affairs, which was appealed to the IBIA, and Plaintiff had not exhausted its administrative remedies, Plaintiff shifted the focus in its Amended Complaint to an alleged general violation of its rights under various treaties.

Compl. ¶ 68.[7]   In the instant case, Kialegee mentions its construction of a restaurant facility located on an Indian allotment within the Creek Reservation (the aforementioned "Bruner allotment"), and Kialegee claims jurisdiction over the land on which it is constructing the restaurant facility as well as all lands within the Creek Reservation, in common with other recognized Creek tribes in Oklahoma, based upon "various Creek Treaties with the United States read in context with the Indian Canon of Construction." Am. Compl. ¶¶ 56-57.

## II. LEGAL STANDARD

### A. Subject Matter Jurisdiction under Rule 12(b)(1)

A court must dismiss a case pursuant to Federal Rule 12(b)(1) when it lacks subject matter jurisdiction.  In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.")

In reviewing a motion to dismiss pursuant to Rule 12(b)(1), courts must accept as true all

---

[7] Plaintiff references 25 U.S.C. Section 476(f) in the Amended Complaint, but that section was transferred to 25 U.S.C. Section 5123(f).

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 . . ., or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. Section 5123(f).

factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007) ("[A] court accepts as true all of the factual allegations contained in the complaint and may also consider 'undisputed facts evidenced in the record'") (internal citations omitted). Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint. . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasam v. Allain*, 478 U.S. 265, 286 (1986)).

### B. Failure to State a Claim under Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a party may move to dismiss a complaint on grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint is not sufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on

its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "In evaluating a motion to dismiss, the

Court must accept the factual allegations in the complaint as true and draw all reasonable

inferences in favor of plaintiff."  *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d

24, 27 (D.D.C. 2006).

When considering a Rule 12(b)(6) motion, courts may consider "the facts alleged in the

complaint, documents attached as exhibits or incorporated by reference in the complaint" or

"documents upon which the plaintiff's complaint necessarily relies even if the document is

produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."  *Ward*

*v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)

(internal quotation marks and citations omitted).  The court may also consider documents in the

public record of which the court may take judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508

F.3d 1052, 1059 (D.C. Cir. 2007).

### III. ANALYSIS

When bringing a lawsuit against the United States, a plaintiff must identify: (1) a source of

subject matter jurisdiction; (2) a waiver of sovereign immunity; and (3) a cause of action.  *United*

*American, Inc. v. N.B.C.-U.S.A. Housing, Inc. Twenty-Seven*, 400 F. Supp. 59, 61 (D.D.C.

2005); *see also Am. Rd. & Transp. Builders Ass'n v. Envtl. Prot. Agency*, 865 F. Supp. 2d 73, 80

(D.D.C. 2012), (where the court noted with approval the Government's argument that neither

statute relied upon by the plaintiff waived sovereign immunity nor provided a cause of action, and

indicated further that the plaintiff needed to identify a source of jurisdiction), *aff'd per curiam*,

2013 WL 599474 (D.C. Cir.  Jan. 28, 2013)

### A. Subject Matter Jurisdiction

There is no disagreement among the parties in this case that Plaintiff relies upon 28 § 1331, the federal question jurisdictional statute, and 28 U.S.C. § 1362, governing actions brought by tribes, to provide a source for this Court's subject matter jurisdiction.  Am. Compl. ¶ 6.  Pursuant to 28 U.S.C. § 1362, district courts are granted "original jurisdiction of all civil actions, brought by any Indian tribe or band with a government body duly recognized by the Secretary to the Interior, wherein the matter in controversy arises under the Constitution, laws or treaties of the United States."  28 U.S.C. §1362.

Plaintiff relies further on 25 U.S.C. § 5123 of the IRA as a source for subject matter jurisdiction.   Am. Compl. ¶ 6; *see* 25 U.S.C. Section 5123(d)(2) ("Actions to enforce the provisions of this section may be brought in the appropriate Federal district court.)  This Court notes however that "[t]he Act merely provides the authority and procedures whereby an Indian tribe may organize itself and adopt a tribal constitution and bylaws, [and it] makes no mention of jurisdiction in any sense and such is not within its purview." *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe*, 370 F.2d 529 (8th Cir. 1967).

Accordingly, Plaintiff has established a source for this Court's subject matter jurisdiction, pursuant to 28 U.S.C. Sections 1131 and 1362, which is uncontested by the Federal Defendants. The Court now turns to the issue of Federal Defendants' immunity from suit and whether Plaintiff has demonstrated a basis for waiving that immunity.

### B.  Waiver of Sovereign Immunity

There is no dispute that the United States is immune from suit unless it consents to be sued.  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Nor is there any dispute that, in suits against the government, a court must consider first, whether Congress provided an

affirmative grant of subject matter jurisdiction, and second, whether Congress waived the United States' immunity to being sued. *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017). In its Opposition to Federal Defendants' Motion, Plaintiff acknowledges that "§ 5123, § 1331 and § 1362 have been determined not to waive sovereign immunity on their own." Pl.'s Opp'n at 14; *see Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 139 (D.D.C. 2015) ("[T]he IRA does not itself contain language that amounts to a waiver of sovereign immunity."), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016), *cert denied*, 137 S. Ct. 638 (2017). Accordingly, in the absence of an express sovereign immunity waiver, Kialegee "must look beyond [its] jurisdictional statute[s] for a waiver of sovereign immunity with respect to [its] claim." *United States v. Mitchell*, 445 U.S. 535, 538 (1980).

Although Plaintiff affirmatively states that its cause of action is not based upon the Administrative Procedure Act (the "APA"), Plaintiff relies upon Section 702 of the APA to support a waiver of sovereign immunity. That Section provides that:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. <u>An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.</u> The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:
> *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. Section 702 (emphasis added). Kialegee contends that because it seeks declaratory and injunctive relief, as opposed to monetary damages, it may rely upon the APA for a waiver of sovereign immunity. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (stating that "insofar

as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages"); *McKoy v. Spencer*, 271 F. Supp. 3d 25, 32 (D.D.C. 2017) (Kollar-Kotelly, J.) (finding that section 702 of the APA waived sovereign immunity as to plaintiff's claims for declaratory and injunctive relief).  Nor does Kialegee need to allege the APA as a cause of action to benefit from waiver under Section 702.  *Jack's Canoes & Kayaks v. Natl. Park Serv.*, 937 F. Supp. 2d 18, 35 (D.D.C. 2013) (citing *Trudeau v. Federal Trade Comm'n,* 456 F.3d 178, 186 (D.C. Cir. 2006)); *see also McKoy*, 271 F. Supp. 3d at 32 (to benefit from an APA waiver of sovereign immunity, a plaintiff need not even mention the APA in its complaint, but instead "[i]t is sufficient that Plaintiff correctly argued that the APA provides the requisite waiver of immunity in [its] opposition to Defendant's motion to dismiss.")

Federal Defendants concede that "a suit need not have been brought pursuant to the APA to receive the benefit of that statute's sovereign immunity waiver; indeed, the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not.'"  *Z Street, Inc. v. Koskinen*, 44 F. Supp. 3d 48, 64 (D.D.C. 2014) (quoting *Chamber of Commerce v. Reich*, 74 F. 3d 1322, 1328 (D.C. Cir. 1996) (emphasis omitted)), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015). Federal Defendants contest however whether Kialegee has fulfilled the requirement of Section 702 in terms of stating a claim that "an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  Fed. Defs' Mem. at 17-18 (citing Section 702); *see Mackinac Tribe*, 87 F. Supp. 3d at 142 (noting that a Section 702 waiver applies when the two requirements therein — an agency, officer or employee acts or fails to act in an official capacity or under color of authority, and the relief sought is in a form other than money damages — have been met).

Federal Defendants interpret Section 702 as requiring a "final agency action," but the

*Mackinac Tribe* case makes it clear that a "final agency action" is not required.  In that case, "although Defendant argue[d] that Plaintiff need[ed] to fulfill an additional requirement in order to be able to rely on the APA's sovereign immunity waiver — namely, that the agency action that Plaintiff s[ought] to challenge must be a "final" agency action . . . [the Court found that] the D.C. Circuit rejected this very argument in *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006)." *Mackinac*, 87 F. Supp. 3d at 142-3 (internal citations and quotation marks omitted). Plaintiff cites *Trudeau* for the proposition that "even though what plaintiff had complained of was not even "agency action" at all as defined in the APA, let alone "final," it made no difference" because two of the plaintiff's causes of action therein did not involve judicial review under the APA.  Pl.'s Opp'n at 16; *see Trudeau*, 456 F. 3d at 187.  In *Trudeau*, the Court of Appeals concluded that there was jurisdiction pursuant to 28 U.S.C. Section 1331, and a waiver of sovereign immunity pursuant to Section 702 of the APA because the plaintiff sought a declaratory judgment and injunction, and he stated a claim based on an FTC press release.  *Id*. at 185-87.

Federal Defendants challenge whether Plaintiff has "stat[ed] a claim" regarding any specific agency action or inaction, which is sufficient to comply with Section 702.  Federal Defendants argue that "[a]lthough Plaintiff asserts that Federal Defendants have not recognized it as part of the "whole Creek Nation," Am. Compl. ¶ 2, Plaintiff fails to cite to any discrete [ ] decision made by Federal Defendants. [and] instead cites to positions it believes Federal Defendants will take or arguments Federal Defendants may assert."  Fed. Defs.' Mem. at 20; *see* Am. Comp. ¶¶ 19, 39, 49, 50, 51, 64, 65, 68, 73.  Plaintiff asserts however that "Kialegee [ ] "need not identify <u>any</u> "agency" action or inaction, as made clear under *Trudeau*."  Pl.'s Opp'n at 18. (emphasis added).  In *Trudeau*, the Court of Appeals noted that "[w]hile the [second] sentence [of Section 702] does refer to a claim against an "agency" and hence waives immunity

only when the defendant falls within that category, it does not use either the term "final agency action" or the term "agency action."" 456 F.3d at 187.  Accordingly, this Court's interpretation of *Trudeau* does require that Plaintiff <u>state a claim</u> that an <u>agency</u> or an officer or employee thereof <u>acted or failed to act</u> in an official capacity or under color of legal authority.  *See, e.g., Mackinac Tribe v. Jewell,* 87 F. Supp. at 143, finding that:

> To the extent that Plaintiff Mackinac Tribe is here seeking to proceed under the IRA, it is sufficient that its complaint alleges that the agency has failed to act where the law provides it must, and Plaintiff need not identify a final agency action in order to avail itself of APA's sovereign immunity waiver, despite Defendant's assertions to the contrary.  The Court is mindful, however, that "other limitations on judicial review or the power or duty of the court to dismiss any action or deny any relief on any other appropriate legal or equitable ground" may nevertheless preclude this action. 5 U.S.C. § 702.

Assuming *arguendo* that Kialegee's claim in Paragraph 68 of its Amended Complaint that Federal Defendants have "repeatedly violated 25 U.S.C. § [5123](f) by blocking the Kialegee from jurisdiction on lands located within the Creek Reservation" is enough to satisfy "stating a claim" for purposes of applying Section 702 to effect a waiver of sovereign immunity, the Court next turns to whether Kialegee has identified a cause of action and stated a claim upon which relief can be granted.

## C. Cause of Action

The Court of Appeals in *Trudeau* explained that whether Plaintiff states a claim upon which relief can be granted:

> depends in part on whether there is a cause of action that permits plaintiff to invoke the power of the court to redress the violations of law that he claims that FTC has committed. *See generally Davis v Passman,* 442 U.S. 228, 239-40 & n. 18, 999 S. Ct. 2264, 60 L. Ed. 2d 846 (1979).  It also depends on whether the allegations of [plaintiff's] complaint are legally sufficient to state the violations he claims.  We consider the cause of action question [first] and the sufficiency of [plaintiff's] claims [next].

*Trudeau*, 456 F. 3d at 188.[8]

As a preliminary matter, Federal Defendants assert that Plaintiff's seeming reliance on either 28 U.S.C. Section 1331 or Section 1362 as a cause of action is misplaced.  *See* Fed. Defs.' Mem. at 15-16; *see also McGuirl v. United States*, 360 F. Supp. 2d 129, 131 (D.D.C. 2004) ("[S]ection 1331 requires that the plaintiff[ ] allege another basis for jurisdiction in addition to section 1331, i.e., a cause of action created by a substantive federal statute."), *aff'd per curiam*, 167 Fed. App'x 808 (D.C. Cir. 2005); *Little River Band of Ottawa Indians v. Nat'l Labor Relations Bd.*, 747 F. Supp. 2d 872, 883 (W.D. Mich. 2010) ( noting that "invoking § 1362 does not change a plaintiff-tribe's duty to show that its complaint raises a substantial federal question").

Furthermore, Federal Defendants dispute Plaintiff's presumed reliance on the Creek Nation treaties as a cause of action, on grounds that Plaintiff makes no attempt to show whether such treaties provide it with a private right of action.  *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 489 (D.C. Cir. 2008) (Treaties, "even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.")

Plaintiff affirmatively states that its cause of action is not based upon the Administrative Procedure Act.  Pl.'s Opp'n at 15.  Plaintiff relies instead upon the Indian Reorganization Act, 28 U.S.C. Section 5123, and asserts that, under that Act, "Kialegee specifically has a cause of action against the government of the United States if it enhances, or diminishes the privileges and immunities available to an Indian tribe relative to other federally recognized tribes."  Pl.'s Opp'n at 17.  Pursuant to Section 5123(f),

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 . . ., or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies,

---

[8] Ultimately, the Court of Appeals affirmed the judgment of the district court dismissing plaintiff's complaint for failure to state a claim upon which relief could be granted.

enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. Section 5123(f).

Federal Defendants acknowledge that "detailed factual allegations" are not necessary to withstand a 12(b)(6) motion, *Twombly*, 550 U.S. at 555, but assert that Plaintiff must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted). Plaintiff contends that Kialegee "has set forth the actions of Defendants, explained why it violates that law and how this has deprived and harmed Kialegee — that is, Defendants expressly refuse to acknowledge that Kialegee has jurisdiction over its lands as a successor to the historic Creek Nation." Pl.'s Opp'n at 18-19. Plaintiff argues further that it "need not plead this with specificity, as under Rule 9(b), rather, Kialegee's Amended Complaint need only comport with the notice-pleading requirements of Rule 8" and it has done this by putting "Defendants on notice of what Kialegee alleges to be wrong and its recourse sought for the same[,]" in part by referencing a letter in which the rights of other Creek successors are acknowledged, where such letter includes "findings from Defendant the Department of Interior."[9] Pl.'s Opp'n at 19.

Plaintiff indicates that it has constructed a restaurant facility known as the Embers Grill, which is located on an Indian allotment within the Creek Reservation and within the city limits of Broken Arrow, Oklahoma, and Plaintiff claims jurisdiction over this land, in common with the

---

[9] Attached as Exhibit E to the Amended Complaint, ECF No. 27-1, is a lengthy letter from the Chairman of the National Indian Gaming Commission to the Tribal Chairman of the Poarch Band of Creek Indians. The letter begins by indicating that a review has been conducted and the NIGC "continue[s] to consider the Tribe's Tallapoosa site to be Indian lands on which the Tribe may conduct gaming." Ex. E at 1. This letter is discussed in detail in Paragraph 60 of the Amended Complaint, but the Court notes that when Plaintiff amended its Complaint in this case, it no longer named The Chairman of the National Indian Gaming Commission as a defendant.

other recognized Creek tribes in Oklahoma and pursuant to "various Creek Treaties with the United States read in context with the Indian Canon of Construction."  Am. Compl. ¶¶ 56-57. Plaintiff asserts also that "Defendants have repeatedly violated 25 U.S.C. Section [5123](f) by blocking the Kialegee from jurisdiction on lands located within the Creek Reservation," but this general assertion fails to state a claim that supports Plaintiff's request for declaratory and injunctive relief.  What is missing from the Amended Complaint is any connection between Plaintiff's claim to jurisdiction over the land where the restaurant facility is located, and any actions taken by Defendant in response to such claim of jurisdiction, which violate Section 5123, or alternatively, any other actions taken by the Defendant that violate Section 5123, which are actionable by the Plaintiff.  More succinctly, Plaintiff's Amended Complaint fails to provide this Court with any information about how and when the Defendants have "block[ed] the Kialegee from jurisdiction" over land with the effect that the Kialegee's privileges and immunities have been diminished relative to other federally recognized tribes.  Plaintiff's allegations against Defendants — presumably relating to its cause of action pursuant to 25 U.S.C. Section 5123 — are fleshed out in somewhat more detail in the context of the briefing on Defendants' Motion to Dismiss.

In its Opposition, Plaintiff refers to three specific instances where Defendants have failed to recognize Kialegee as a Creek successor having jurisdiction over its lands: (1) a pending appeal before the Indian Board of Indian Appeals ("IBIA") of an April 26, 2017 decision by the Bureau of Indian Affairs, Eastern Oklahoma Regional Director, declining to approve a resolution of the Kialegee Tribal Town Business Committee on grounds that Kialegee lacks jurisdiction over any area of Indian Country over which it could enact and apply a liquor ordinance; (2) a 1991 IBIA decision captioned *Kialegee Tribal Town of Oklahoma v. Muskogee Area Dir., Bureau of Indian*

*Affairs*, 19 IBIA 296, 303 (1991), upholding a decision by the Regional Director that Plaintiff did not exercise jurisdiction over the Muscogee (Creek) Nation lands; and (3) a May 24, 2012 Memorandum regarding review by the National Indian Gaming Commission ("NIGC") of a proposed gaming facility in Broken Arrow, Oklahoma (the "proposed Site"), which concludes that the facility "does not qualify as Kialegee's Indian lands eligible for gaming because Kialegee has not established that it has legal jurisdiction over the Proposed Site for purposes of [the Indian Gaming Regulatory Act]," and expressly stating that "the Department of the Interior (DOI), Office of the Solicitor, concurs with this opinion."[10]  *See* Pl.'s Opp'n at 19-21; *see also* May 24, 2012 Memorandum.

In their Reply, Defendants explain why none of these three instances is currently actionable by the Plaintiff, for the following reasons: (1) the Regional Director's April 26, 2017 decision is on appeal before the IBIA, and Plaintiff must exhaust its administrative remedies before seeking a judicial review of that decision;[11] (2) any challenge to the 1991 decision is untimely because, pursuant to 28 U.S.C. Section 2401(a), a civil action against the United States is barred if not filed within six years after the right of action accrues; and (3) the May 24, 2012 Memorandum is not an agency action for which Plaintiff may seek judicial review as it does not constitute a "final agency action" pursuant to 25 U.S.C. Section 2714, nor has Plaintiff demonstrated how the 2012 Memorandum "violates the IRA in any way."  *See* Fed. Defs.' Reply at 5-7.

This Court agrees with the Federal Defendants' analysis of these three "instances," and as

---

[10] Plaintiff indicates that this Memorandum is part of the public record and provides a website address for the NIGC website, which contains the May 24, 2012 Memorandum.  Pl.'s Opp'n at 21, n. 9.

[11] Federal Defendants indicate that "[i]t may be that in the future, after the IBIA issues its final decision on Plaintiff's challenge to the Regional Director's April 26, 2017 decision, Plaintiff will have an action for which it may want to seek judicial review[.]"  Fed. Defs' Reply at 8.

such, finds that while the Plaintiff has alleged that it has a cause of action pursuant to 28 U.S.C.

Section 5123, Plaintiff has not indicated any conduct by Federal Defendants that is actionable

under this cause of action.  A claim is facially plausible when the plaintiff pleads factual content

that is more than "'merely consistent with' a defendant's liability," which "allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678 (citing *Twombly*, 550 U.S. at 556-57, 127 S. Ct. 1955); *see also Rudder v. Williams*,

666 F.3d 790, 794 (D.C. Cir. 2012) (same).  In the instant case, Plaintiff alleged initially a more

specific claim against the Federal Defendants (and then-defendant NIGC), based on the

development of the Bruner allotment and its jurisdiction over that land, but because that claim was

not yet ripe, Plaintiff amended its Complaint, with the effect that its claim against the Federal

Defendants was made more general.  It is not enough for Plaintiff to simply claim that a statute

has been violated, which affects Plaintiff in a negative way, and to make conclusory statements

regarding Federal Defendants' position.  Instead, Plaintiff needs to allege with some specificity

the actions allegedly taken by Federal Defendants, which give rise to Plaintiff's cause of action.

Accordingly, because this Court finds that Plaintiff fails to state a claim, its Amended Complaint

shall be dismissed without prejudice

DATED: September 7, 2018

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

# **Exhibit G**



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240

KIALEGEE TRIBAL TOWN,                    )
                                         )
                    *Appellant,*         )
                                         )
         v.                              )
                                         )
REGIONAL DIRECTOR,                       )
EASTERN OKLAHOMA REGION,                 )
BUREAU OF INDIAN AFFAIRS,                )
                                         )
                    *Appellee.*          )
                                         )

---

### Decision

The Kialegee Tribal Town (KTT; the Tribe) submitted a Tribal Liquor Control Ordinance (LO) to the Bureau of Indian Affairs (BIA).  The Eastern Oklahoma Regional Director (RD) declined to approve the LO, reasoning that "[KTT] does not have jurisdiction over any area of Indian Country in which it could enact and apply a liquor ordinance, and, as such, the Secretary is not authorized to certify [KTT's Ordinance]."[1]  KTT has appealed the Regional Director's decision (RD's decision) to me.

I find the RD's decision to be well-reasoned and supported by the administrative record (AR).  Because KTT does not now exercise jurisdiction over any area of Indian country, governing federal statutes do not authorize me to approve KTT's liquor control ordinance.

## I.       Background.

### 1.   Indian Country liquor laws.

Title 18 of the United States Code sets out federal criminal statutes relating to Indians.  Several sections address the possession, consumption, transportation, and sale of alcoholic beverages in Indian country.[2]  Federal law defines "Indian country" as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian

---

[1] Regional Director's Decision rejecting Kialegee Tribal Town Liquor Ordinance (RD's decision) at 1 (Apr. 26, 2017). Region's administrative record (AR) 19.
[2] *See* 18 U.S.C. §§ 1154, 1156, 3113, 3488, and 3669.

1

communities ... and (c) all Indian allotments, the Indian titles to which have not
been extinguished, including rights-of-way running through the same. [3]

Federal law also provides that where these statutes criminalize or otherwise limit liquor in Indian
country, such prohibitions do not apply –

> [T]o any act or transaction within any area of Indian country provided such act or
> transaction is in conformity both with the laws of the State in which such act or
> transaction occurs and with an ordinance duly adopted by the tribe having
> jurisdiction over such area of Indian country, certified by the Secretary of the
> Interior, and published in the Federal register.[4]

In *McGirt v. Oklahoma*, discussed more fully below, the Supreme Court ruled that the Muscogee
Creek reservation remains intact, such that all of the land within the reservation boundaries, as
established by treaty in 1866, remain Indian country as defined in 18 U.S.C. § 1151.[5]

Pursuant to 18 U.S.C. § 1161, many tribes have enacted liquor control ordinances which have
been approved by the Assistant Secretary – Indian Affairs (AS-IA) and published in the Federal
Register.  As the RD noted, the Muscogee (Creek) Nation (MCN) enacted a liquor control
ordinance, which was approved by the AS-IA and published in the Federal Register in 2008.[6]

In 2016, the BIA Director issued guidance explaining that responsibility for reviewing and
approving tribal liquor ordinances prior to approval by AS-IA is vested in BIA Regional Offices
and Regional Solicitors.[7]

### 2. Procedural background.

KTT submitted liquor ordinances to the BIA in 2011, 2012 and 2016.[8]  After modifying the 2016
LO pursuant to BIA's technical assistance, KTT adopted a Tribal Resolution[9] to enact its revised
LO on February 22, 2017, and submitted the Resolution and LO to the BIA Okmulgee Agency
on March 14, 2017.[10]

---

[3] 18 U.S.C. § 1151.  Two sections, 18 U.S.C. §§ 1154 and 1156, provide that, for purposes of those sections, "Indian
country" does not include "fee-patented lands in non-Indian communities or rights-of-way through Indians
reservations."  But since sections 3113, 3488, and 3669 use the term "Indian country" without any modification, the
broader definition in § 1151 applies to § 1161.  *See Rice v. Rehner*, 463 U.S. 713, 715, n.1 (1983).
[4] 18 U.S.C. § 1161.
[5] *McGirt v. Oklahoma*, 591 U.S. --, No. 18-9526, 140 S. Ct. 2452, 2020 WL 3848063 (July 9, 2020).
[6] RD's decision at 4 (AR 19), citing Muscogee (Creek) Nation Liquor and Beverage Code, 73 Fed. Reg. 14,997
(Mar. 20, 2008) (AR 5).
[7] Memorandum from Director of Bureau of Indian Affairs to Regional Directors, "Publication of Tribal Liquor
Control Ordinance and Publication of Federal Register Notices" (Jan. 22, 2016).
[8] Memorandum from Okmulgee Agency Superintendent to E. Okla. Region Tribal Government Officer re KTT LO
(Feb. 1, 2017) (AR 7).
[9] "A Resolution of the Kialegee Tribal Town Business Committee Enacting the Kialegee Tribal Town Liquor
Control Ordinance," Kialegee Tribal Town Resolution TR-2017-02-22 (Feb. 22, 2017) (AR 11).
[10] Memorandum, Okmulgee Agency Superintendent to E. Okla. Region Tribal Government Officer re corrected
KTT LO (Mar. 14, 2017) (AR 11).

On April 26, 2017, the RD issued the decision that is the subject of this appeal, declining to certify KTT's LO. The RD's decision included a statement that KTT had the right to appeal the decision to the Interior Board of Indian Appeals (IBIA).[11] Consistent with the RD's appeals rights notice, on May 5, 2017, KTT appealed the RD's decision to the IBIA, submitting a Notice of Appeal and Statement of Reasons (NOA and SOR).[12] Three months later, on August 17, 2017, KTT filed suit in federal court, seeking declaratory and injunctive relief with respect to KTT's jurisdiction over parcels of Indian country within the Creek reservation.[13] The parties asked the IBIA to stay further proceedings on the administrative appeal pending the outcome of the district court litigation – a request the IBIA granted on October 23, 2017.[14] On September 7, 2018, the district court issued its order, dismissing without prejudice the KTT's lawsuit because the Secretary of the Interior (Secretary) had not taken any final action over which the court could exercise jurisdiction.[15]

On November 19, 2018, the IBIA issued an order lifting the stay of proceedings, and directing the parties to submit briefing on the question of whether the IBIA has jurisdiction over KTT's challenge to the RD's decision to not certify the LO.[16] The parties submitted briefing.[17] The RD argued that, because final authority to approve a liquor ordinance rests with the AS-IA, "the Board should dismiss this appeal for lack of jurisdiction and remand this matter back to the Regional Director with instructions to give Appellant the right to appeal the Regional Director's disapproval of the liquor ordinance to AS-IA."[18] On May 12, 2019, the IBIA dismissed the appeal, noting that its governing regulations vest it with authority to review BIA decisions "issued under 25 CFR chapter I."[19] Finding that the RD's "decision declining to approve the Appellant's Resolution was not issued under 25 C.F.R. Chapter I," the IBIA dismissed the appeal for lack of jurisdiction.[20]

In its decision dismissing the appeal, the IBIA noted that "the parties are free to follow the course of action recommended by the Regional Director."[21] On May 15, 2019, KTT submitted its appeal to the AS-IA. For reasons not apparent in the record, KTT resubmitted its appeal to AS-IA on June 13, 2019. On or about February 12, 2020, the RD transmitted the AR to AS-IA.

---

[11] *Ibid.*

[12] KTT Notice of Appeal and Statement of Reasons (NOA and SOR) (May 6, 2017) (AR 23).

[13] *Kialegee Tribal Town v. Zinke*, D.D.C. No. 1:17-cv-01670 (complaint filed Aug. 17, 2017). The documents cited in this decision use the terms "former Creek reservation or "historic Creek reservation." In light of the Supreme Court's recent decision in *McGirt v. Oklahoma*, 2020 WL 3848063, supra, finding that the Creek reservation has never been diminished, it is appropriate to refer simply to "the Creek reservation."

[14] *Kialegee Tribal Town v. E. Okla. Reg'l Dir.*, "Order Lifting Stay and Order Soliciting Briefing on Jurisdiction," IBIA No. 17-094, at 1 (Nov. 19, 2018).

[15] *Kialegee Tribal Town v. Zinke*, 330 F. Supp. 3d 255 (D.D.C. 2018).

[16] *Kialegee Tribal Town*, IBIA No. 17-094, Order Lifting Stay.

[17] Appellee Regional Director's "Response to Board's Order Soliciting Briefing on Jurisdiction," *Kialegee Tribal Town*, IBIA No. 17-094 (Dec. 13, 2018) (RD's jurisdictional brief); Appellant KTT's "Jurisdiction Brief," *Kialegee Tribal Town*, IBIA No. 17-094 (Dec. 20, 2018).

[18] RD's jurisdiction brief at 2.

[19] *Kialegee Tribal Town v. E. Okla. Reg'l Dir.*, 66 IBIA 145, 147 (2019), *citing* 43 C.F.R. § 4.1(b)(1)(i).

[20] *Id.* at 147.

[21] *Id.* at 148 n.3.

### 3.  The Regional Director's Decision.

In his decision of April 26, 2017, the RD assessed the LO and the assertions and arguments made by the Tribe in its Resolution endorsing the LO.  The RD construed the relevant statute, 18 U.S.C. § 1161, as "mak[ing] clear that liquor transactions may only occur in an 'area of Indian country' if, among other things, they are in conformity with an ordinance adopted by 'the tribe having jurisdiction over such area of Indian country.'"[22]  Based on that statutory language, the RD determined that "[i]f the tribe does not have jurisdiction over such area of Indian Country, the Secretary must decline to certify the ordinance."[23]

The RD noted KTT's assertion of jurisdiction over "Kialegee Indian Country," defined in the LO as –

> all land within the Former Creek Reservation that was allotted to an individual from the Kialegee Tribal Town pursuant to the provisions of the Curtis Act of June 28, 1898, is otherwise set apart or held in trust or restricted status by the United States for or on behalf of any individual member of the Kialegee Tribal Town, or is otherwise set apart or held in trust or restricted status by the United States for or on behalf of the Kialegee Tribal Town.[24]

The RD also noted KTT's claim that its jurisdiction "extends to all territory within the boundaries of Kialegee Indian Country, and to all other territory within the boundaries of the Former Creek Reservation to the fullest extent not prohibited by Federal law."[25]  The RD also noted KTT's claim that it shares jurisdiction with MCN over the entire Creek reservation.

The RD set out the history of the MCN, the Creek Tribal Towns, and the Creek reservation.[26]  The RD explained that the United States does not hold any land in trust for KTT, and pointed out that KTT stated in 1990 that it did not have any land.[27]

The RD pointed out that allotment of the Creek reservation occurred prior to KTT's organization and federal recognition, and that the allotments were made to members of "the Creek Nation" and "not to any band or specific subdivision of the Creek Nation."[28]  The RD also pointed out that in 2008, the Secretary approved a Liquor Ordinance for the MCN, which by its terms applied to "the same Creek allotments which the Tribal Town now seeks to regulate."[29]

---

[22] RD's decision at 1 (AR 19).
[23] *Ibid.*
[24] *Id.* at 2 (quoting KTT LO, Article I, Sec. 4(G). (AR 6, Attachment 1)).
[25] *Id.* at 2 (quoting KTT LO, Article I, Sec. 2(G). (AR 6, Attachment 1)).
[26] *Id.* at 2-3.
[27] *Id.* at 3.  KTT presented evidence showing that KTT citizens held or may hold original restricted fee allotments within the Creek reservation, AR 6, attachment 4, but at no point does KTT claim that the United States holds land in trust for it or for any of its members.  Instead, KTT emphasizes the possibility that land could be taken in trust for its benefit in the future.  NOA and SOR at 6.
[28] RD's Decision at 3-4.
[29] *Id.* at 4.

4

The RD further noted that decisions from federal court, the IBIA, and the National Indian Gaming Commission (NIGC) have all rejected KTT's claim to exercise jurisdiction over parcels within the Creek reservation.[30] The RD concluded that "because the Tribal Town does not have jurisdiction over any area of Indian country, it cannot enact a valid liquor ordinance, and the Secretary is not authorized to certify [KTT's LO] or publish it in the Federal Register."[31]

### 4. The Kialegee Tribal Town's Arguments.

KTT's NOA and SOR, filed with the IBIA on May 6, 2017, and forwarded to this office on May 15, 2019, and June 13, 2019, attempted to rebut the RD's decision.

KTT asserted that it shares jurisdiction over the Creek reservation with MCN and the other two federally recognized Tribal Towns and therefore it "can exercise its sovereign authority over all lands within the boundaries of the former Reservation that qualify as Indian country as that term is defined in 18 U.S.C. §1151, to the fullest extent not prohibited by federal law."[32]

KTT asserted that Creek allotments to Kialegee Town members are Indian country, and that KTT "has exclusive jurisdiction over them."[33]

KTT reasoned that even if it did not currently exercise jurisdiction over any area of Indian country, "the possibility of the creation of Kialegee Indian country through the acquisition of trust land on the Town's behalf provides sufficient ground on which the Regional Director should have approved the ordinance."[34]

KTT cited a 1985 decision by the IBIA[35] and a 2012 decision by AS-IA[36] in support of its argument that the Creek reservation should also be considered the former reservation of the KTT.[37] In its four-page SOR consisting chiefly of conclusory statements of fact and law, these are the only two authorities cited in support of KTT's arguments.

## II.   Analysis

As explained below, KTT has not shown that it currently exercises jurisdiction over any area of Indian country. Nor has it demonstrated that it would be appropriate to approve a liquor ordinance based on the possibility of exercising such jurisdiction in the future.

### 1. The Muscogee (Creek) Nation Lands in Oklahoma.

Analysis of this appeal requires understanding the history of the MCN and the Creek lands in Oklahoma. Case law makes clear that the entire Creek reservation was established for the MCN.

---

[30] *Id.* at 3.
[31] *Id.* at 4.
[32] NOA and SOR at 2. (AR 23).
[33] *Id.* at 6.
[34] *Ibid.*
[35] *Thlopthlocco Tribal Town v. Deputy Assistant Secretary – Indian Affairs (Operations)*, 13 IBIA 302 (1985).
[36] Decision Letter, AS-IA Mike Black to Honorable George Wickliffe (Jul. 30, 2012).
[37] NOA and SOR at 6-7.

The Creek Indians "originate[d] from Mexico but, in the 1500s, migrated to what is now Georgia and Alabama."[38]  "The Creek Nation, historically and traditionally, is actually a confederacy of autonomous tribal towns, or Talwa, each with its own political organization and leadership."[39]

> The term "talwa" was generally translated into the English word 'town,' but rather covers the conception contained in the word 'tribe.' ... Thus, the Creek town represented an autonomy such as is usually implied by the term 'tribe.' Though autonomous, the many talwa were closely affiliated throughout most of the Creeks' history, giving rise to references to the "Creek Confederacy" or the "Muscogee Nation," named for the talwa's shared language.[40]

In the early nineteenth century, the United States acquired title to most of the Creek lands in the southeast:

> In the year 1790 the Creek Nation exercised the right of occupancy over a wide area of land located in a part of the present States of Alabama, Georgia and Mississippi. . . . By various treaties thereafter made the Creeks ceded most of their tribal domain to the United States, and in 1826 were confined to a comparatively small domain in eastern Alabama and western Georgia.[41]

The United States set aside lands for the Creek Indians in the Indian Territory (now eastern Oklahoma):

> By the treaty of January 24, 1826, 7 Stat. 286, the Creek Nation had ceded certain of its territory, lying in the State of Georgia, to the United States.  One of the considerations of the cession was the promise of the United States (article 6 of the treaty) to purchase a new territory, west of the Mississippi River, as a future home of such of the tribe as might wish to emigrate there.[42]

> Shortly after the Creeks' arrival in Oklahoma in the 1820s and 1830s, the Creek talwa came together to take several unified actions.  First, they jointly entered into several treaties with the United States; during these treaty discussions, the United States interacted with chiefs or commissioners, who represented the Creeks at large rather than individual talwa.[43]

"In a treaty concluded in 1832, the Creeks ceded their eastern homelands to the United States, in exchange for lands west of the Mississippi River."[44]  A treaty ratified the next year set the

---

[38] *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1229 (10th Cir. 2014).
[39] *Harjo v. Andrus*, 581 F.2d 949, 952 n.7 (D.C. Cir. 1978).
[40] *Thlopthlocco*, 762 F.3d at 1229-30.
[41] *United States v. Creek Nation*, 201 Ct. Cl. 386, 389-90 (Ct. Cl. 1973).
[42] *The Creek Nation v. United States*, 77 Ct. Cl. 226, 230 (Ct. Cl. 1933).
[43] *Thlopthlocco*, 762 F.3d at 130.
[44] *Indian Country, U.S.A., Inc. v. State of Okla. ex rel. the Okla. Tax Comm'n*, 829 F.2d 927, 971 (10th Cir. 1987).

boundaries to the Creek lands in Oklahoma.[45]  Via an 1856 treaty, the Creeks agreed to cede
some of their lands to the Seminole Tribe.[46]  In 1860, the Creeks adopted a constitution.[47]

In 1866, the United States entered into another treaty with "the Creek Nation," pursuant to which
"the Tribe was forced to cede the western portion of its [Oklahoma] domain. . . . The Creek
Nation retained title to its 'reduced . . . reservation,'. . . which was promised to be 'forever set
apart as a home for said Creek Nation.'"[48]

> In 1867, the Creeks revised their constitution and created a centralized
> government that, to some extent, mirrored the United States' federal structure.
> For instance, the constitution provided that each of the then 44 talwa were entitled
> to one representative in each house of the National Council, the centralized
> government's legislative branch.[49]

In the later part of the nineteenth century, the Federal government implemented measures
designed to open Indian reservations to settlement by non-Indians.[50]  In 1898, Congress enacted
the Curtis Act, which "provided for forced allotment and termination of tribal land ownership
without tribal consent unless the tribe agreed to allotment."[51]  The Curtis Act also abolished the
Creek Nation's courts.[52]

Congress put an end to treaty-making with Indian nations in 1871.[53]  "The substance of treaty-
making was destined, however, to continue for many decades."[54]  After 1871, the Tribes and the
Federal government negotiated agreements which become effective when enacted as any other
federal statute.[55]

---

[45] 7 Stat. 417 (Feb. 14, 1833).
[46] *Indian Country, U.S.A.*, 829 F.2d at 971 (citing Treaty of 1856, 11 Stat. 699 (Aug. 7, 1856)).
[47] *Thlopthlocco*, 762 F.3d at 130.
[48] *Indian Country, U.S.A.*, 829 F.3d at 971 (citing Treaty with the Creek Nation, 14 Stat. 785 (Jun. 14, 1866)).
[49] *Thlopthlocco*, 762 F.3d at 1229-30 (internal cites omitted). The Circuit Court went on to say, "Despite several
efforts to challenge it, the 1867 constitution remained the Creeks' governing document until, in conjunction with the
Curtis Act's and the Dawes Allotment Act's attempt to assimilate the tribes, the United States abolished the tribal
governments and incorporated the Creek citizens and territory into the new state of Oklahoma in 1907."
*Thlopthlocco Tribal Town*, 762 F.3d at 1230. The *Thlopthlocco* Court's statement that the Creek Nation's
government had been "abolished" is dicta, and conflicts with prior and subsequent holdings by the Circuit Court:
"We are not persuaded that Congress intended or acted to completely abolish Creek National jurisdiction over Tribal
lands." *Indian Country, U.S.A.*, 829 F.2d at 978 (10th Cir. 1987); "Congress never dissolved the Creek government;
it has enjoyed continuous and uninterrupted existence." *Murphy v. Royal*, 875 F.3d 896, 935 (10th Cir. 2014) (*aff'd
sub nom. Sharp v. Murphy*, 140 S. Ct. 2412, 2020 WL 3848060 (2020). (See fuller discussion of erroneous
precedents in *Murphy*, 875 F.3d at 962-63). And in the recent *McGirt* decision, the Supreme Court found that
"Congress never withdrew its recognition of the Tribal government." *McGirt*, 2020 WL 3848063 at *8.  I conclude
that the Tenth Circuit's statement in *Thlopthlocco* that the Creek tribal government was abolished is not correct.
[50] *See generally, Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1441-42 (D.C. Cir 1988) (finding that the
Curtis Act of 1898 abolished Creek Tribal courts, but that the Oklahoma Indian Welfare Act, 49 Stat. 1967 (Jun. 26,
1936), repealed the Curtis Act and permitted the Creek Nation to establish a tribal court system).
[51] *Id.* at 1441 (citing Curtis Act, 30 Stat. 495 (Jun. 28, 1898)).
[52] *Indian Country, U.S.A.*, 829 F.2d at 978.
[53] 16 Stat. 544, at 566 (Mar. 8, 1871).  *See Antoine v Washington*, 420 U.S. 194, 201-04 (1975).
[54] Felix S. Cohen, *Handbook of Federal Indian Law* 67 (1942).
[55] *Ibid.*

The Tribe entered into agreements with the United States in 1901[56] and 1902,[57] pursuant to which the Creek Nation allotted reservation lands to Tribal members.  The 1901 agreement directed that "[a]ll lands of said tribe, except as herein provided, shall be allotted among the citizens of the tribe . . . so as to give each an equal share of the whole in value. . . ."[58]  After the 1901 and 1902 Acts, "the vast majority of Creek Nation lands were allotted or sold."[59]  Congress prohibited further Creek allotments in 1917, and prohibited all further allotments of any tribal land in 1934.[60]

Under the 1901 agreement, the Tribal government of the Creek Nation was to be abolished no later than March 4, 1906, "subject to such further legislation as Congress may deem proper."[61]  Preparations for terminating the Tribe's government were not completed within the statutory timeframe.[62]

In 1906, Congress enacted the Five Tribes Act[63] and the Oklahoma Enabling Act.[64]  The Tenth Circuit explained that, while these two Acts "seriously undermined the authority of the Creek Nation, we are not persuaded that Congress intended or acted to completely abolish Creek Nation jurisdiction over tribal lands."[65]  For example, the Five Tribes Act specifically provided for the continuation of the tribal governments of the Five Tribes.[66]

In 1943, the Supreme Court explained that, notwithstanding statutes implementing a "policy of assimilating the Indians through dissolution of tribal governments and the compulsory individualization of Indian land . . . Congress has not terminated that [guardianship] relation with respect to the Creek Nation and its members.  That Nation still exists, and has recently been authorized to resume some of its former powers."[67]

As the above authorities make clear, even though the federal government was aware of the Creek Tribal Towns (Talwa) throughout its interactions with the Creek in the nineteenth and early twentieth centuries,[68] the Creek reservation in Oklahoma was established through treaties with the Creek Nation, held in fee by the Creek Nation, and administered by the government of the Creek Nation under its Constitution.

---

[56] 31 Stat. 861 (Mar. 1, 1901).

[57] 32 Stat. 500 (Jun. 30, 1902).

[58] 31 Stat. 861, 862 (Mar. 1, 1901).

[59] *Indian Country, U.S.A.*, 829 F.2d at 978.

[60] 39 Stat. 986 (Mar. 2, 1917); 48 Stat. 984 (Jun. 18, 1934) (codified at 25 U.S.C. § 5101).

[61] *Harjo*, 420 F. Supp. at 1124 (quoting 31 Stat. 861, 872, sec. 46).

[62] *See generally id.* at 1126.

[63] 34 Stat. 137 (Apr. 26, 1906).

[64] 34 Stat. 267 (Jun. 16, 1906).

[65] *Indian Country, U.S.A.*, 829 F.2d at 978.

[66] *Harjo*, 420 F. Supp. at 1129.  *See also Creek Nation v. United States*, 318 U.S. 629, 638 (1943) ("Congress determined to continue the tribal existence.").

[67] *Bd. of County Comm'rs of Creek County v. Seber*, 318 U.S. 705, 716, 718 (1943) (noting the recent enactment of the Oklahoma Indian Welfare Act).

[68] *See Thlopthlocco*, 762 F3d at 1229 (discussing the Talwa).

The vast majority of the Creek reservation was either sold or allotted to citizens of the Creek Nation prior to 1934.[69]

After enactment of the Oklahoma Indian Welfare Act (OIWA) in 1936,[70] three of the Creek Tribal Towns – KTT, Thlopthlocco, and Alabama-Quassarte – organized as Tribes pursuant to 25 U.S.C. § 5203:[71]

> In 1937, some 16 Creek tribal towns remained active . . . Those towns totaled 2,666 people, a small minority of the Creek Nation, whose population had reached 30,000 or more by that time. In 1941, . . . the Kialegee Tribal Town organized and adopted the "Constitution and By–Laws of the Kialegee Tribal Town, Oklahoma." Members of the Kialegee Tribal Town may also be members of the Muscogee (Creek) Nation. Two other Creek tribal towns—the Thlopthlocco Tribal Town and the Alabama–Quassarte Tribal Town—also met the BIA's guidelines necessary for organization pursuant to the OIWA. Thus, three of the Creek tribal towns are federally recognized. As entities separate from the Creek Nation, the tribal towns are entitled to receive BIA funding and services directly, rather than through the Muscogee (Creek) Nation."[72]

In 1941, 1948, 1949, and 1978, the Secretary took land into trust for the benefit of the Thlopthlocco Tribal Town.[73] In 1980, the Department's land acquisition regulations went into effect (now codified at 25 C.F.R. part 151). Section 151.8 provides in part that "[a]n individual or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition."[74] Since enactment of the Part 151 regulations, no additional lands have been taken into trust for the Thlopthlocco Tribal Town.[75] It appears that no land has ever been taken into trust for KTT[76] or the Alabama-Quassarte Tribal Town (AQTT).[77]

To summarize: The United States entered into treaties with the MCN, set aside land for the MCN in what is now Oklahoma, and patented that land in fee to the MCN. Much of that land was

---

[69] *Indian Country, U.S.A.*, 829 F.2d at 978.

[70] 49 Stat. 1967 (Jun. 26, 1936); 25 U.S.C. §§ 5201 – 5210.

[71] *Alabama-Quassarte Tribal Town v. United States*, No. 06-cv-558, 2016 WL 93848 at *1 n.1 (E.D. Okla. Jan. 7, 2016); *Oklahoma v. Hobia*, No. 12-cv-054, 2012 WL 2995044 at *1 (N.D. Okla. Jul. 20, 2012).

[72] *Hobia*, 2012 WL 2995044 at *7-8 (internal citations omitted); *revised* 2012 WL 3112306 (N.D. Okla. Jul. 31, 2012); *reversed and remanded* 771 F.3d 1247 (10th Cir. 2014); *vacated and superseded* 775 F.3d 1204 (10th Cir. 2014). None of the subsequent rulings in this case disturb the district court's recitation of the history of the Creek Tribal Towns.

[73] *See* Decision, Eastern Oklahoma Regional Director, BIA, to Michael G. Rossetti, affirming the Superintendent's denial of a fee to trust application by Thlopthlocco Tribal Town, at 3 (May 15, 2019) (reciting history of trust acquisitions for Thlopthlocco).

[74] 25 C.F.R. § 151.8 (1980).

[75] Decision, Eastern Oklahoma Regional Director, BIA, to Michael G. Rossetti (May 19, 2019), at 3 ("The most recent acquisition [of trust lands for Thlopthlocco] was in 1978.").

[76] *Hobia*, 2012 WL 2995044 at *2 (quoting KTT's statement that it had no land).

[77] *See generally Alabama-Quassarte Tribal Town v. United States*, No. 6:06-cv-558, 2016 WL 7495806 (E.D. Okla. Dec. 30, 2016) (finding that the title to lands set aside for the benefit AQTT in the 1940s was never transferred to AQTT).

allotted to Creek tribal members early in the twentieth century. After the 1936 passage of the OIWA, the United States recognized three Creek Tribal Towns. The United States took some land into trust for the Thlopthlocco Tribal Town prior to enactment of 25 C.F.R. Part 151, but does not hold any land in trust for KTT.

### 2.   KTT lacks jurisdiction over the former Creek reservation.

Before proceeding with my analysis of jurisdiction within the Creek reservation, I note two very important recent decisions from the United States Supreme Court.[78] In *McGirt v. Oklahoma* and *Sharp v. Murphy*, the Court concluded that the entire Creek reservation, as defined in the 1866 Treaty, has never been disestablished and remains Indian country over which the United States has exclusive jurisdiction to prosecute "major crimes" as defined in 18 U.S.C. § 1153.[79] While the Court's decisions will affect many aspects of Indian law in Oklahoma, they provide no independent support for KTT's claim to exercise jurisdiction over lands within the Creek reservation.

Tribes exercising jurisdiction over Indian county are entitled to certain federal benefits. In support of its quest for such benefits, KTT asserts that it "has jurisdiction over the allotments granted to Creek Indians who belonged to the Kialegee Tribal Town, and over all Indian country within the former Creek Reservation."[80] But the tribunals that have examined this claim have invariably determined that KTT does not have jurisdiction over any Indian country.[81]

The courts have explained that an inquiry into whether a tribe has jurisdiction over an area of Indian country "focuses principally on congressional intent and purpose."[82] The Tenth Circuit laid the foundations for the analysis of jurisdiction of the lands of the Creek reservation in 1985. In *Indian Country, U.S.A., v. State of Oklahoma ex rel. Oklahoma Tax Commission*, the Court cited treaties and statutes to support its conclusion that "the country in the Indian Territory provided for the Creek Nation was granted to it in fee simple. The treaties between the United States and the Creek Nation expressly recognized and preserved the Tribe's title and its right of self-government over its lands."[83] Following *Indian Country, U.S.A.*, federal courts and administrative tribunals have ruled that MCN exercises jurisdiction over Indian country within the Creek reservation, to the exclusion of the Tribal Towns.[84]

---

[78] *McGirt v. Oklahoma*, 591 U.S. --, No. 18-9526, 140 S. Ct. 2452, 2020 WL 3848063 (July 9, 2020); *Sharp v. Murphy*, 591 U.S. --, No. 17-1107, 140 S. Ct. 2412, 2020 WL 3848060 (July 9, 2020).
[79] Originally enacted 23 Stat. 362, at 238 (Mar. 3; 1885).
[80] NOA and SOR at 7. KTT presented the RD with considerable documentation purporting to identify Creek allotments originally made to, and still held by, Kialegee members. AR 6. The issue presented in this appeal, however, is not whether allotments held by KTT members meet the statutory definition of Indian country, but whether KTT has jurisdiction over those parcels. The RD based his decision on finding that KTT does not exercise jurisdiction anywhere within the boundaries of the Creek reservation, not on the legal status of the land itself.
[81] RD's decision at 3 (AR 19).
[82] *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001).
[83] *Indian Country, U.S.A.*, 829 F. 2d at 974.
[84] As noted in the previous section, the United States took land in trust for the Thlopthlocco Tribal Town prior to enactment of 25 C.F.R. § 151.8. Thlopthlocco operates a casino on its lands, subject to oversight by the NIGC. The General Counsel for NIGC has stated "The Thlopthlocco Creek Tribal Town has 19 parcels of trust land within the former reservation over which it exercises jurisdiction." *Memorandum for the Chairwoman* from Heather Corson to Chairwoman of the National Indian Gaming Commission, July 18, 2013, at 13 (AR 15) [hereinafter "Corson

First, the Indian Gaming Regulatory Act (IGRA) provides that a tribe may conduct gaming under IGRA only on Indian lands under the tribe's jurisdiction.[85]  In response to KTT's efforts to develop gaming, the NIGC and federal courts have assessed whether KTT has jurisdiction over Indian lands.  The NIGC rejected two requests to approve gaming for KTT on restricted fee parcels within the Creek reservation, finding that MCN has jurisdiction over the reservation, and therefore KTT does not have such jurisdiction.[86]  In 2012, the NIGC determined that KTT did not exercise jurisdiction over a restricted fee parcel known as "the Burgess parcel" in Broken Arrow, Oklahoma.[87]  In 2013, the NIGC also determined that KTT did not exercise jurisdiction over a restricted fee parcel known as "the Freeman parcel."[88]

Second, the question of KTT's jurisdiction over the Burgess Parcel in Broken Arrow was also addressed in federal district court.[89]  In *Oklahoma v. Hobia*,  the district court found that Congress intended to give the MCN jurisdiction over the reservation: "Every federal treaty or law related to the property recognizes the Muscogee (Creek) Nation's authority."[90]  The court then determined that "the Kialegee Tribal Town does not share jurisdiction with the Muscogee (Creek) Nation over the Broken Arrow Property.  The Muscogee (Creek) Nation alone, as successor in interest to the historical Creek Nation, has jurisdiction over restricted allotment (sic) which constitutes the Broken Arrow Property."[91]  Upon determining that KTT did not have jurisdiction over the Broken Arrow property, and did not exercise governing authority over the parcel, the court ruled that KTT's operation of a casino on the Broken Arrow property would violate IGRA, and on that basis granted the State's motion for a preliminary injunction.[92]

KTT sought reconsideration of the district court's decision based on the fact that the two Creek Indians who owned the Broken Arrow property (Giles and Capps) had become enrolled members of KTT.  The court declined to reconsider, concluding:

> [I]n light of congressional intent and purpose reflected in the relevant legislation and treaties, the recent enrollment of Giles and Capps as members of the Kialegee Tribal Town does not create jurisdiction over the Broken Arrow Property or otherwise alter the court's previous conclusion that the Tribal Town does not have jurisdiction over the property.[93]

---

Memorandum"].  The lands within the Creek reservation held in trust by the United States for the benefit of the Thlopthlocco Tribal Town may be an exception to the rule in *Indian Country, U.S.A.*  But since the United States does not hold land in trust for KTT, no such exception applies in my analysis in this matter.

[85] 25 U.S.C. § 2710(b)(1), (d)(1).

[86] RD's decision at 3 (AR 19) (citing NIGC memoranda).

[87] Memorandum from Lawrence S. Roberts, Jo-Ann M. Shyloski, and Dawn Sturdevant Baum to Tracie Stevens, May 24, 2012 (AR 15); Letter from Tracie Stevens to Town King Tiger Hobia, June 8, 2012 (AR 15) (determining that KTT does not have jurisdiction over a restricted fee parcel, the Burgess Parcel).

[88] *See generally* Corson Memorandum (determining that KTT does not have jurisdiction over a restricted fee parcel, the Freeman parcel).

[89] *Hobia*, 2012 WL 2995044 at *9.

[90] *Id.* at *16.

[91] *Id.* at *18.

[92] *Id.* at *21-22.

[93] *Oklahoma v. Hobia*, Opinion and Order, 2012 WL 3096634 at *4 (Jul. 30, 2012).  On appeal, the Tenth Circuit found that, by alleging that the parcel on which KTT was building a casino was not Indian country, the State had

Third, since 1980, the regulations governing BIA's decision-making on whether to take a parcel of land into trust provide that "[a]n individual Indian or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition."[94]  This provision has required the BIA to assess the relationship between MCN and the Creek Tribal Towns.  BIA decisions have been appealed to the IBIA, requiring the IBIA to rule on the precise question of whether Tribal Towns can exercise jurisdiction over Indian lands within the Creek reservation.

In its Statement of Reasons, KTT invoked a 1985 IBIA decision in support of its argument that the Creek reservation should be considered the former reservation of the Tribal Towns as well as of MCN.[95]  In *Thlopthlocco Tribal Town v. Deputy Assistant Secretary – Indian Affairs (Operations)*, the IBIA ruled that, in assessing whether to take land within the Creek reservation into trust for the benefit of the Thlopthlocco Tribal Town, BIA should have considered the land to be within the former reservation of the Thlopthlocco Tribal Town.[96]

KTT apparently overlooks the significance of a later opinion by the IBIA, deciding an appeal filed by KTT itself, in which the IBIA "clarified"[97] its decision in *Thlopthlocco Tribal Town*. The basis of the dispute in *Kialegee Tribal Town of Oklahoma v. Muskogee Area Director* was the BIA's determination that all of the lands within the Creek reservation were under the jurisdiction of MCN, and therefore the Department's regulations prohibited the BIA from taking any such lands into trust for KTT without MCN's consent.  The IBIA affirmed the BIA's determination that MCN has jurisdiction over the Creek reservation:

> The former Creek Indian Reservation has consistently been recognized by the Federal government as the [Muscogee Creek] Nation's reservation, over which the Nation has authority to exercise jurisdiction . . . The Secretary's longstanding recognition of the former Creek Reservation as the Nation's reservation is manifest. . . .[98]

The Board concluded: "Because the former Creek Reservation is the Nation's reservation, and not [KTT's] reservation, [25 CFR] section 151.8 requires the written consent of the Nation before land within the reservation may be taken in trust for the benefit of [KTT]."[99]  Thus the provision in the 1985 IBIA opinion cited by KTT was overruled by the Board in 1991.[100]  Accordingly, neither the Board's 1985 opinion, nor the Secretary's taking land into trust for

---

failed to state a claim under IGRA, and on that basis vacated the district court's decision. *Hobia*, 775 F.3d 1204. Notably, however, nothing in the Circuit Court's reversal order questioned or disputed the district court's finding that KTT lacked jurisdiction over the parcel.

[94] 25 C.F.R. § 151.8.

[95] *See* NOA and SOR at 6 (May 6, 2017) (citing *Thlopthlocco Tribal Town v. Deputy Assistant Secretary – Indian Affairs (Operations)*, 13 IBIA 302 (1985)).

[96] *Thlopthlocco*, 13 IBIA at 306.

[97] *Kialegee Tribal Town of Okla. v. Muskogee Area Dir., Bureau of Indian Affairs*, 19 IBIA 296 (1991).

[98] *Id.* at 302-03 (listing authorities and affirming two BIA decisions finding that BIA could not take Creek reservation land into trust for KTT without the concurrence of MCN).

[99] *Kialegee Tribal Town*, 19 IBIA at 303.

[100] Because all the lands held for Thlopthlocco were taken into trust prior to enactment of 25 C.F.R. § 151.8, their status is firmly settled.

Thlopthlocco prior to 1980, support KTT's argument that it shares jurisdiction over the Creek reservation.

KTT next points to a decision issued by then-Acting AS-IA Mike Black on July 20, 2012, approving the acquisition of land into trust for the benefit of the United Keetoowah Band of Cherokee Indians in Oklahoma (UKB), for gaming purposes.[101] UKB is a federally recognized tribe comprised of a subset of the Cherokee Indians who reside on the Cherokee reservation. The UKB obtained recognition as a Tribe separate from the Cherokee Nation of Oklahoma (CNO). The relationship between UKB and the CNO is therefore nominally analogous to the relationship between the Creek Tribal Towns and MCN.

In his July 20, 2012, decision, Mr. Black determined that the historic Cherokee reservation was the "former reservation" for both CNO and UKB.[102] On that basis, Mr. Black concluded that this satisfied IGRA's requirements for taking the land into trust for gaming purposes.[103] KTT asserts that Mr. Black's decision "demonstrate(s) that the former Creek Reservation is also the former reservation of Kialegee within which it can exercise jurisdiction over lands that qualify as Indian country."[104]

Federal court decisions rendered subsequent to KTT's appeal vitiate KTT's arguments. CNO challenged the July 2012 decision cited by KTT. On March 24, 2020, the United States District Court for the Northern District of Oklahoma issued a decision carefully assessing Mr. Black's determination that the Cherokee reservation is the former reservation of both the CNO and the UKB.[105] The court concluded that the determination was "arbitrary, capricious, an abuse of discretion, and contrary to law."[106] And while the United States has appealed the district court's decision, the current state of the law is that, even assuming *arguendo* that Mr. Black's 2012 decision necessitates the conclusion that the CNO-UKB relationship is legally analogous to that of MCN-KTT, a proposition that KTT fails to demonstrate, that decision has been vacated.

Finally, and significantly, the Supreme Court's recent decision in *McGirt* establishes that the Creek reservation in Oklahoma had never been disestablished.[107] Arguments about whether the KTT exercises jurisdiction over parts of the "former Creek reservation" in reliance on Mr. Black's 2012 UKB decision fall away in light of *McGirt*. The Creek reservation is not a "former" reservation at all – it is the reservation of the MCN, and has been since 1866.[108]

I find that controlling case law compels the conclusion that KTT does not exercise jurisdiction over any Indian country.

---

[101] NOA and SOR at 7 (citing Decision Letter, Assistant Secretary – Indian Affairs Mike Black to Honorable George Wickliffe, July 30, 2012 [hereinafter "Black Decision"]).
[102] Black Decision at 4.
[103] *Ibid.*
[104] NOA and SOR at 7.
[105] *Cherokee Nation v Bernhardt*, No. 12-cv-493-GKF-JFJ, 2020 WL 1429946 (N.D. OK Mar. 24, 2020).
[106] *Id.* at *13.
[107] *McGirt*, 140 S. Ct. 2452 (2020).
[108] "[There was] no moment when any Act of Congress dissolved the Creek Tribe or disestablished its reservation." *Id.* at 2468.

### 3. KTT does not qualify under the statutory exemption to the criminalization of liquor in Indian country.

As noted above, Federal law provides that the statutes criminalizing liquor in Indian country do not apply—

> within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted *by the tribe having jurisdiction over such area of Indian country*, certified by the Secretary of the Interior, and published in the Federal register.[109]

The RD concluded that in light of this statutory language, "[b]ecause the Tribal Town does not have jurisdiction over any area of Indian country, it cannot enact a valid liquor ordinance, and the Secretary is not authorized to certify [KTT's liquor ordinance] or publish it in the Federal Register."[110]

I agree with the RD's conclusion. The plain and unambiguous requirement of the relevant statute is that a liquor ordinance must be adopted by the tribe having jurisdiction over the affected Indian country. The analysis set out above demonstrates that KTT does not have jurisdiction over any Indian country; rather, that MCN has jurisdiction over almost all Indian country within the Creek reservation (with the caveat that Thlopthlocco Tribal Town holds certain trust lands in that area). Consistent with that understanding, in 2008 the Secretary approved, and published in the Federal Register, a liquor ordinance adopted by MCN which states that it applies in "Muscogee (Creek) Nation Indian country as defined in Federal law." Case law cited above, particularly and dispositively the Supreme Court's recent decision in *McGirt v. Oklahoma*, establishes that Federal law defines the Muscogee (Creek) Nation's Indian country as the entire Creek reservation as established by treaty in 1866.

Because KTT is not "the tribe having jurisdiction" over Indian country within the Creek reservation, its LO was not "duly adopted by the tribe having jurisdiction over" those areas of Indian country. Therefore, the statute does not permit the Secretary to certify KTT's LO.

Nevertheless, KTT points out that it is organized under the OIWA, and thus is "entitled to all of the benefits and rights of other OIWA tribes, including the right to have land placed into trust for its benefit under Sections 1 and 3 of the OIWA."[111] KTT asserted that the RD erred by:

> [I]gnor[ing] the possibility that lands may be acquired in trust status within the former Creek Reservation that would qualify as Kialegee Indian Country. Even if Kialegee Indian Country in the form of the surviving allotments made to Kialegee Town members did not already exist, the possibility of the creation of Kialegee Indian country through the acquisition of trust land on the Town's behalf provides

---

[109] 18 U.S.C. § 1161 (emphasis added).
[110] RD's decision at 4 (AR 19).
[111] NOA and SOR at 6 (AR 23).

sufficient ground upon which the Regional Director should have approved the Ordinance.[112]

It is true – and appropriate – that the RD did not discuss whether KTT could acquire jurisdiction over some portion of Indian country in the future. The liquor ordinance statute, 18 U.S.C. § 1161, speaks in the present tense, permitting certification of a liquor ordinance adopted by the tribe "having" jurisdiction over the relevant area of Indian country.[113] Correctly applying the statute, the RD's decision makes clear that it is based on the fact that KTT does not *currently* exercise jurisdiction over any area of Indian country: "Because the Tribal Town *does not have* jurisdiction over any area of Indian Country it cannot enact a valid liquor ordinance. . . ."[114] The possibility that KTT may exercise jurisdiction over an area of Indian country at some time in the future is irrelevant for the purposes of considering KTT's LO today.[115]

### III.    Conclusion

I find that prior litigation conclusively establishes that KTT does not exercise jurisdiction over any area of Indian country. I agree with the RD's assessment that 18 U.S.C. § 1161 prohibits the Secretary from certifying an LO submitted by a Tribe that does not exercise jurisdiction over any Indian country. Upon these findings, I reject the LO submitted by KTT.


Dated:   NOV 05 2020                                Tara Sweeney
                                                    Assistant Secretary – Indian Affairs


---

[112] *Ibid.*
[113] 18 U.S.C. § 1161.
[114] RD's decision at 4 (AR 19) (emphasis added).
[115] Neither the RD in his decision, nor I in affirming that decision, take any position as to the potential legal bases through which KTT could obtain jurisdiction over some portion of Indian country in the future, or whether such an acquisition would qualify KTT to enact a liquor ordinance under applicable law.

**Distribution List:**
Via Certified mail and email:

Moises T. Grayson, Esq.
Blaxberg, Grayson, Kukoff & Forteza P.A.
Suite 730, Ingraham Building
25 Southeast Second Avenue
Miami, Florida
33131-1506
Moises.Grayson@blaxgray.com

Via Certified Mail:

Mekko Jeremiah Hobia
Town King, Kialegee Tribal Town
P.O. Box 332
Wetumka, OK  74883

Via regular mail:

Regional Director, Eastern Oklahoma Regional Office
Bureau of Indian Affairs
P.O. Box 8002
Muskogee, OK
74402-8002

Principal Chief
Muscogee (Creek) Nation
P.O. Box 580
Okmulgee, OK  74447

Conor P. Cleary, Esq.
Tulsa Field Office,
Office of the Solicitor
7906 East 33rd Street, Suite 100
Tulsa, OK  74145

Via hand delivery or email:

Assistant Solicitor for Indian Affairs
Branch of Tribal Government Services
Samuel.Ennis@sol.doi.gov